**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES HOUSE OF REPRESENTATIVES,
United States Capitol
Washington, D.C. 20515,

*Plaintiff*,

v.

STEVEN T. MNUCHIN,
in his official capacity as Secretary of the
United States Department of the Treasury,
1500 Pennsylvania Avenue N.W.
Washington, D.C. 20220,

UNITED STATES DEPARTMENT OF
THE TREASURY,
1500 Pennsylvania Avenue N.W.
Washington, D.C. 20220,

PATRICK M. SHANAHAN,
in his official capacity as Acting Secretary of the
United States Department of Defense,
1000 Defense Pentagon
Washington, D.C. 20301,

UNITED STATES DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, D.C. 20301,

KIRSTJEN M. NIELSEN,
in her official capacity as Secretary of the
United States Department of Homeland Security,
245 Murray Lane S.W.
Washington, D.C. 20528,

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
245 Murray Lane S.W.
Washington, D.C. 20528,

Case No. 19-cv-969

DAVID BERNHARDT,
in his official capacity as Acting Secretary of the
United States Department of the Interior,
1849 C Street N.W.
Washington, D.C. 20240,

UNITED STATES DEPARTMENT OF
THE INTERIOR,
1849 C Street N.W.
Washington, D.C. 20240,

*Defendants.*

## COMPLAINT

### INTRODUCTION

This case arises out of the unconstitutional actions taken by President Donald J. Trump's Administration to construct a wall along the southern border of the United States. The Administration sought – and Congress denied – $5 billion to construct a wall along the southern border. Congress instead appropriated only $1.375 billion for barrier construction. Having lost the political fight over funds to construct the wall, the Administration took the extraordinary step of announcing that it would nevertheless spend up to $8.1 billion on wall construction. In doing so, the Administration flouted fundamental separation-of-powers principles and usurped for itself legislative power specifically vested by the Constitution in Congress. Even the monarchs of England long ago lost the power to raise and spend money without the approval of Parliament.[1]

Notwithstanding the President's policy preferences and the Administration's recent actions regarding the border wall, the Constitution forbids the expenditure of any public funds by any

---

[1] *See The Civil War: The Long Parliament*, U.K. Parliament, https://tinyurl.com/UKLongParliament (last visited Apr. 3, 2019) (discussing Parliament's condemnation of King Charles I's "personal rule" from 1629-1640 and Parliament's declaration in the 1640s that nonparliamentary taxation would be illegal).

branch of the Federal Government, including the Executive Branch, without enactment of a law appropriating such funds.  The Appropriations Clause of the Constitution unequivocally states: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[2]  Congress thus has the defining role over any expenditure of any public funds, which cannot occur until identical appropriations bills are passed in the House of Representatives and the Senate, followed by delivery to the President for his signature or veto.[3]

With respect to the border wall, the constitutionally mandated legislative process was followed, resulting in $1.375 billion of appropriated funds for barrier construction.[4]  Dissatisfied with its failure to secure the amount of border wall funding it sought, the Administration unilaterally determined that it would spend federal funds as it chose – not as those funds had been appropriated – instead of continuing to press its case through the proper political channels.  The Administration's actions here demonstrate a shocking disregard for the Appropriations Clause, which protects Congress's "exclusive power over the federal purse," and is both "a bulwark of the Constitution's separation of powers among the three branches of the National Government," and "particularly important as a restraint on Executive Branch officers."[5]

Attempting to paper over its unconstitutional expenditure of funds not appropriated by Congress, the Administration incorrectly asserts the authority to spend billions of dollars on a border wall under three separate statutory provisions:  (1) "[a]bout $601 million from the Treasury Forfeiture Fund"; (2) "[u]p to $2.5 billion under the Department of Defense funds transferred for

---

[2] U.S. Const. art. I, § 9, cl. 7.

[3] *See* U.S. Const. art. I, § 7, cl. 2; *see also* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives.").

[4] *See* Pub. L. No. 116-6, § 230(a)(1) (2019) (to be printed at 133 Stat. 13, 28).

[5] *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346, 1347 (D.C. Cir. 2012) (quotation marks omitted); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424-25 (1990).

Support for Counterdrug Activities," 10 U.S.C. § 284; and (3) "[u]p to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency," 10 U.S.C. § 2808.[6]  As part of the Administration's attempt to justify its expenditures on the border wall, President Trump declared a national emergency along the southern border.  In declaring a national emergency, President Trump – at odds with the accepted meaning of "emergency" – explained: "I could do the wall over a longer period of time.  I didn't need to do this.  But I'd rather do it much faster."[7]  The House is unaware of any other instance in American history where a President has declared a national emergency to obtain funding after failing to win Congressional approval for an appropriation.[8]

As discussed below, the two main provisions on which the Administration purports to rely to spend up to $6.1 billion provide no authority for the planned transfers and expenditures.  In the absence of a Congressional appropriation for the border wall, the Administration is back where it started: abusing its power in direct violation of the Appropriations Clause.

First, the Administration's transfer of funds and proposed expenditures to construct a border wall under section 284 is not authorized by that provision.  Section 284(b)(7) authorizes the Secretary of Defense to provide support for counterdrug activities, including by constructing fences "to block drug smuggling corridors across international boundaries of the United States."[9] Congress appropriated $517.171 million for counter-narcotics support activities for fiscal year

---

[6] *Fact Sheet: President Donald J. Trump's Border Security Victory*, White House (Feb. 15, 2019) (Border Victory Fact Sheet), http://tinyurl.com/WHBorderVictory.

[7] *Remarks by President Trump on the National Security and Humanitarian Crisis on Our Southern Border*, White House (Feb. 15, 2019, 10:39 AM) (Feb. 15 Rose Garden Remarks), http://tinyurl.com/TrumpRoseGardenRemarks.

[8] *See* Charlie Savage, *Presidents Have Declared Dozens of Emergencies, But None Like Trump's*, N.Y. Times (Feb. 15, 2019), http://tinyurl.com/NYTDozensofEmergencies.

[9] 10 U.S.C. § 284(b)(7).

(FY) 2019.[10]   But defendants have announced their plan to transfer nearly $2.5 billion that Congress appropriated for other purposes into the counterdrug support account, and then to spend those funds on the construction of a border wall.[11]   On March 25, 2019, defendants transferred $1 billion from funds appropriated for military and reserve personnel costs to the Drug Interdiction and Counterdrug Activities appropriation for counter-narcotics support.[12]

Defendants claim that section 8005 of the 2019 Department of Defense Appropriations Act authorizes transfers into the drug interdiction fund for border wall construction.   But section 8005 specifies that funds may be transferred only for "higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."[13]   As the President's own statements indicate, this transfer is based not on unforeseen military requirements, but on his desire to build a wall more quickly than Congressional appropriations allow, after Congress denied the President's request for border wall funding above $1.375 billion.   Section 8005 also expressly prohibits the transfer of funds for "military construction,"[14] yet defendants have stated that the border wall is a military construction project.

Second, defendants fare no better in asserting that they have authority to expend $3.6 billion under section 2808(a).   Section 2808(a) provides that, when the President declares a national emergency "that requires the use of the armed forces," the Secretary of Defense "may

---

[10] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit. VI (2018) (to be printed at 132 Stat. 2981, 2997).

[11] *See* Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory.

[12] Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer.

[13] Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999.

[14] *Id.*

undertake military construction projects . . . not otherwise authorized by law that are necessary to support such use of the armed forces."[15]  When those statutory criteria are satisfied, the Secretary may undertake military construction projects "only within the total amount of funds that have been appropriated for military construction . . . that have not been obligated."[16]  There is, however, no national emergency *requiring* the use of the armed forces and, even if there were, a wall is not necessary to support the use of those forces.  The forces deployed to the border have performed support roles that could easily be done by civilians, such as stringing concertina wire.  No military experience or specialized training is required and there is no national defense element to their role.

In addition, the construction of a border wall is not a "military construction project."  On this point, however, the Administration's purported statutory authority to reprogram funds under section 2808 contradicts its claim that it is authorized to transfer funds to the drug interdiction fund under section 8005.  The Administration cannot have it both ways:  section 2808 prohibits reprogramming *except for* military construction projects, while section 8005 expressly prohibits the transfer of funds *for* military construction.

Absent any applicable Congressional appropriation, the expenditure of up to $8.1 billion to construct a border wall – and the transfer of appropriated funds from other sources to pay for the wall – violates the Appropriations Clause and the constitutional separation of powers.  The United States House of Representatives brings this civil action for declaratory and injunctive relief to halt the defendants' unconstitutional actions, which usurp the House's Article I legislative powers.

---

[15] 10 U.S.C. § 2808(a).

[16] *Id.*

## PARTIES

1.      Plaintiff the United States House of Representatives is the legislative body constituted by Article I, section 2 of the United States Constitution.

2.      Defendant Steven T. Mnuchin is, and has been since February 13, 2017, the Secretary of the United States Department of the Treasury.  As Secretary, defendant Mnuchin is responsible for all actions taken by the department he heads.  He is sued in his official capacity.

3.      Defendant the United States Department of the Treasury is an agency in the Executive Branch of the Federal Government responsible for managing federal finances and Government accounts.

4.      Defendant Patrick M. Shanahan is, and has been since January 1, 2019, the Acting Secretary of the United States Department of Defense (DOD).  As Acting Secretary, defendant Shanahan is responsible for all actions taken by the department he heads.  He is sued in his official capacity.  President Trump's emergency proclamation directs Acting Secretary Shanahan to "take all appropriate actions . . . to use or support the use of the authorities herein invoked."[17]

5.      Defendant the United States Department of Defense is an agency in the Executive Branch of the Federal Government responsible for the United States military.

6.      Defendant Kirstjen M. Nielsen is, and has been since December 6, 2017, the Secretary of the United States Department of Homeland Security (DHS).  As Secretary, defendant Nielsen is responsible for all actions taken by the department she heads.  She is sued in her official capacity.  President Trump's emergency proclamation directs Secretary Nielsen to "take all appropriate actions . . . to use or support the use of the authorities herein invoked."[18]

---

[17] Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 20, 2019) (National Emergency Proclamation).
[18] *Id.*

7.       Defendant the United States Department of Homeland Security is an agency in the Executive Branch of the Federal Government responsible for providing border security for the United States.

8.       Defendant David Bernhardt is, and has been since January 2, 2019, the Acting Secretary of the Interior.  As Acting Secretary, defendant Bernhardt is responsible for all actions taken by the department he heads.  He is sued in his official capacity.  President Trump's emergency proclamation directs Acting Secretary Bernhardt to "take all appropriate actions . . . to use or support the use of the authorities herein invoked."[19]

9.       Defendant the United States Department of the Interior is an agency in the Executive Branch of the Federal Government responsible for conserving and managing the nation's natural resources.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.  This case arises under the Constitution and is brought by the United States House of Representatives.

11.       This Court has authority to issue a declaratory judgment, and to order injunctive and other relief that is just and proper, pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e), and 5 U.S.C. § 703.

---

[19] *Id.*

## ALLEGATIONS

## I.   FACTUAL BACKGROUND

### A.  Candidate Trump Promises to Build a "Great Wall" Along the Southern Border

13.     From the first day of his campaign for President of the United States, then-candidate Trump made the construction of a "great wall" along the United States' border with Mexico a central campaign issue.[20]

14.     During his campaign announcement speech, candidate Trump complained that "[t]he U.S. has become a dumping ground for everybody else's problems."[21] "When Mexico sends its people," he explained, "they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [sic] us.  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."[22]  Mr. Trump promised that if he were elected, "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border."[23]  Mr. Trump also stated that "I will have Mexico pay for that wall.  Mark my words."[24]

15.     Chants of "Build the wall!" became a recurrent applause line at campaign rallies for candidate Trump,[25] and he continued to make unsubstantiated claims about conditions at the southern border throughout his campaign.  He warned that "the worst elements in Mexico are being

---

[20] *Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015) (Presidential Announcement Speech), http://tinyurl.com/TrumpAnnouncement.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Trump Explains Why He Feels the Primary Process Is "Unfair,"* Fox News (Apr. 13, 2016), https://tinyurl.com/HannityTranscript.  Candidate Trump said of his rallies, "if it gets a little boring, if I see people starting to sort of, maybe thinking about leaving, I can sort of tell the audience, I just say, 'We will build the wall!' and they go nuts."  Editorial Board, *A Chance to Reset the Republican Race*, N.Y. Times (Jan. 30, 2016), https://tinyurl.com/NYTChancetoReset.

pushed into the United States by the Mexican Government,"[26] including "tremendous infectious disease . . . pouring across the border."[27]  He claimed that "the Mexican drug cartels use the border unimpeded like it was a vacuum cleaner, sucking drugs and death right into the U.S."[28]  According to candidate Trump, the southern border was "totally out of control,"[29] and he "alone c[ould] fix it."[30]

16.    Recognizing that construction of a wall along the southern border would cost billions of dollars,[31] candidate Trump repeatedly assured voters that Mexico would pay the construction costs.[32]

---

[26] Philip Bump, *Donald Trump's Lengthy and Curious Defense of His Immigrant Comments, Annotated*, Wash. Post (July 6, 2015), https://tinyurl.com/WaPoCuriousDefense.

[27] *Id.*

[28] Donald Trump (@realDonaldTrump), Twitter (July 13, 2015, 3:47 AM), https://tinyurl.com/13July2015Tweet.

[29] @realDonaldTrump (July 3, 2015, 3:08 PM), https://tinyurl.com/3July2015Tweet.

[30] Philip Bump & Aaron Blake, *Donald Trump's Dark Speech to the Republican National Convention, Annotated*, Wash. Post (July 21, 2016), https://tinyurl.com/WaPoTrumpsDarkSpeech.

[31] Ron Nixon & Linda Qiu, *Trump's Evolving Words on the Wall*, N.Y. Times (Jan. 18, 2018), https://tinyurl.com/NYTEvolvingWords.  Candidate Trump's cost estimates grew from "$4 or $5 billion" in September 2015 to "probably $8 billion" in February 2016, *id.*, and "$5–10 billion" in March 2016, *Compelling Mexico to Pay for the Wall*, DonaldJTrump.com (Apr. 2016) (Compelling Mexico to Pay), https://tinyurl.com/CompellingMexicoToPay.  A wall along the southern border could cost considerably more than that: "[e]stimates range from $8 billion to $67 billion or more[.]"  Mark Niquette, *About That Wall Trump Said Mexico Would Be Paying For . . .*, Wash. Post (Dec. 12, 2018), https://tinyurl.com/WaPoAboutThatWall.

[32] Presidential Announcement Speech, http://tinyurl.com/TrumpAnnouncement; *see also* Video: Presidential Candidate Donald Trump on National Security, C-SPAN (Sept. 15, 2015), https://tinyurl.com/CSPANSpeech ("Mexico is going to pay for the wall, believe me." (starting around 27:50)); *Transcript: Read the Full Text of the CNBC Republican Debate in Boulder*, Time (Oct. 28, 2015), https://tinyurl.com/TimeDebateTranscript ("Mexico's going to pay for the wall[.]"); Compelling Mexico to Pay, https://tinyurl.com/CompellingMexicoToPay ("There are several ways to compel Mexico to pay for the wall[.]"); *Donald Trump's Contract with the American Voter*, DonaldJTrump.com, https://tinyurl.com/TrumpContract ("Mexico will be reimbursing the United States for the full cost of [the] wall[.]").

17.     Mr. Trump won the election and was sworn in as the 45th President of the United States on January 20, 2017.

### B. President Trump Attempts to Build a Border Wall During His First Two Years in Office

18.     Shortly before his inauguration on January 20, 2017, President-elect Trump promised, "We're going to build a wall.  I could wait about a year-and-a-half until we finish our negotiations with Mexico, which will start immediately after we get to office, but . . . I don't feel like waiting a year or a year-and-a-half."[33]

19.     At the time of President Trump's inauguration, the Federal Government had already constructed significant sections of barriers along the southern border.  In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), authorizing the Attorney General to install barriers "in areas of high illegal entry into the United States" and directed the construction of 14 miles of barriers in San Diego.[34]  Congress amended the IIRIRA with the passage of the Secure Fence Act of 2006, directing construction of barriers in specific areas and designating five "priority areas" with strict construction deadlines.[35]  In the Consolidated

---

[33] Aaron Blake, *Donald Trump's Big Press Conference Transcript*, Wash. Post (Jan. 11, 2017), https://tinyurl.com/11Jan2017PressConference.    "The U.S.-Mexico land border is approximately 1,933 miles." Michael John Garcia, Cong. Research Serv., R42975, *Barriers Along the U.S. Borders: Key Authorities and Requirements* 1 n.2 (2017), https://tinyurl.com/CRSBarrierAuthorities. As President Trump has explained, much of the border consists of rugged terrain that even proponents of a wall concede do not need a wall.  *See, e.g.*, *Transcript of Donald Trump Interview with the Wall Street Journal*, Wall Street Journal (Jan. 14, 2018), http://tinyurl.com/WSJInterviewTranscript ("The wall's never meant to be 2,100 miles long.  We have mountains that are far better than a wall, we have violent rivers that nobody goes near[.]");   @realDonaldTrump   (Jan.   18,   2018,   3:15   AM), https://tinyurl.com/18Jan2018Tweet315AM ("The Wall . . . was never intended to be built in areas where there is natural protection such as mountains, wastelands or tough rivers or water.").

[34] Pub. L. No. 104-208, div. C., tit. I, § 102(a), (b)(1), (b)(4), 110 Stat. 3009, 3009-546, 554-55 (1996).

[35] Pub. L. No. 109-367, § 3, 120 Stat. 2368, 2638-39 (codified as amended as a note to 8 U.S.C. § 1103) (2006).

Appropriations Act, 2008, Congress repealed those deadlines and granted DHS discretion to determine new priority areas along the southern border where fencing would be "most practical and effective."[36]  Consistent with these laws and Congressional appropriations from FY 2005 to 2016, there was a total of 354 miles of primary pedestrian fencing, 37 miles of secondary pedestrian fencing, 14 miles of tertiary pedestrian fencing, and 300 miles of vehicle fencing along the southern border at the time of President Trump's inauguration.[37]

20.     Five days after his inauguration, on January 25, 2017, President Trump issued an executive order directing the Secretary of Homeland Security to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border."[38]  The order further directed the Secretary to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds for the planning, designing, and constructing of a physical wall along the southern border."[39]  The order defines "wall" as "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier."[40]

---

[36] Pub. L. No. 110-161, div. E, tit. V, § 564, 121 Stat. 1844, 2090 (2008).

[37] *Mileage of Pedestrian and Vehicle Fencing by State*, U.S. Border Patrol (Aug. 2, 2017), https://tinyurl.com/Mileage2Aug2017.  The primary fence is "[t]he first layer of fencing," which may "include both pedestrian and vehicle fencing and is the first fence encountered when moving north from the border; the secondary fence, located behind the primary fence, consists solely of pedestrian fencing; and the third layer, or tertiary fence, is primarily used to delineate property lines rather than deter illegal entries."  Gov't Accountability Office, GAO-17-331, *Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps* 9 n.24 (2017), http://tinyurl.com/GAOSwBorderSecurity.  The Administration sources cited herein frequently refer to border fencing as a "wall."  For consistency, this Complaint generally refers to the President's planned barrier construction in the same manner.  However, when a cited source uses a more specific term, such as "fencing," this Complaint uses that term.

[38] Exec. Order No. 13,767, 82 Fed. Reg. 8793, 8794 (Jan. 25, 2017).

[39] *Id.*

[40] *Id.*

21.     During President Trump's first two years in office, DHS responded to the President's executive order by using the funds that had been appropriated by Congress on the construction of a border wall, but no more.

22.     In March 2017, the President issued a supplemental appropriations request for FY 2017 and sought $3 billion for border security improvements,[41] including "$999 million for planning, design, and construction of the first installment of the border wall" along the southern border.[42] Congress instead provided DHS with $341.2 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border."[43] DHS received this funding in May 2017, awarded its first contract against that funding in November 2017, and began construction in February 2018.[44] The U.S. Customs & Border Protection (CBP) has provided information to Congress indicating that, as of early 2019, it had constructed 37 of the 40 miles of fencing with this funding.

23.     In his FY 2018 budget request, the President sought "$2.6 billion in high-priority tactical infrastructure and border security technology,"[45] $1.6 billion of which would be spent to

---

[41] Letter from President Trump to Paul Ryan, Speaker, U.S. House of Representatives 1 (Mar. 16, 2017), https://tinyurl.com/BudgetRequestFY17.

[42] Memorandum from Mick Mulvaney, Dir., Office of Mgmt. & Budget, to President Trump, FY 2017 Appropriations Request 3 (Mar. 16, 2017), https://tinyurl.com/BudgetRequestFY17.

[43] Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. F, tit. VI, 131 Stat 135, 434. DHS has stated that Congress appropriated "$292 million to build 40 miles of a steel bollard wall in the San Diego, El Centro and El Paso Sectors – Border Patrol's highest priority locations." Press Release, U.S. Dep't of Homeland Security, Walls Work (Dec. 12, 2018) (DHS 'Walls Work' Press Release), http://tinyurl.com/DHSWallsWork. It is unclear why the amount stated in the DHS press release is lower than the amount appropriated in the bill.

[44] DHS "Walls Work" Press Release, http://tinyurl.com/DHSWallsWork.

[45] Office of Mgmt. & Budget, *Budget of the U.S. Government: A New Foundation for American Greatness: Fiscal Year 2018*, at 18 (2017), https://tinyurl.com/BudgetRequestFY18.

construct 74 miles of new or replacement border wall.[46]   The requested amount was intended to allow the Trump Administration to "aggressively implement the President's commitment to construct a physical wall along the southern border."[47]   Congress instead appropriated $1.571 billion for new border security technology and new and replacement fencing in specified areas on the southern border.[48]   The appropriated amount included $38 million for "border barrier planning and design"[49] and provided for "more than 95 miles of 'border wall system,' including approximately 47 miles of new barriers and 48 miles of upgraded barriers."[50]   The President announced that the FY 2018 Congressional appropriation was a "Big WIN . . . for building the wall."[51]   Based on information provided to Congress by the Administration, it appears that less than 1 mile of fencing has been constructed with FY 2018 funding.

24.     In total, during President Trump's first two years in office, Congress appropriated funds sufficient to construct approximately 135 miles of new and upgraded barriers along the

---

[46] U.S. Dep't of Homeland Security, *FY 2018 Budget in Brief* 3, 28, http://tinyurl.com/DHSFY18BudgetBrief.

[47] Office of Mgmt. & Budget, *America First: A Budget Blueprint to Make America Great Again* 14 (2017), http://tinyurl.com/FY18BudgetRequest.

[48] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) (to be printed at 132 Stat. 348, 616).

[49] *Id.*

[50] *Homeland Security Appropriations Bill, 2018: Omnibus Agreement Summary* 1, S. Comm. on Appropriations, http://tinyurl.com/FY18OmnibusAgreementSummary.   DHS separately claimed that the FY 2018 appropriation would fund "approximately 84 miles of border wall in multiple locations across the Southwest border."   DHS "Walls Work" Press Release, http://tinyurl.com/DHSWallsWork.

[51] @realDonaldTrump (July 12, 2017, 4:24 PM), https://tinyurl.com/12July2017Tweet; *see also* @realDonaldTrump (Mar. 21, 2018, 8:00 PM), https://tinyurl.com/21Mar2018Tweet ("Got $1.6 Billion to start Wall on Southern Border, rest will be forthcoming.").

southern border.  President Trump has declared, "we have a lot of appropriation,"[52] and "we're building a lot of wall."[53]

### C. President Trump Shuts Down the Federal Government for His Border Wall

25.    President Trump's FY 2019 budget request, presented in February 2018, sought only "$1.6 billion to construct approximately 65 miles of border wall."[54]  Around July 2018, President Trump informally increased his request to $5 billion for wall funding in public and private comments to lawmakers.[55]  At no point did the Administration submit to Congress a formal, updated budget request seeking additional funds for such construction, nor did it explain the difference between its initial $1.6 billion request and subsequent communications asking for $5 billion.[56]

26.    Near the end of the 115th Congress, Congress began working on a FY 2019 appropriations bill before the December 22, 2018 deadline when federal funding would expire for

---

[52] Video: President Trump on Human Trafficking, C-SPAN (Feb. 1, 2019), https://tinyurl.com/CSPANFeb2019PressConference (starting around 51:25).

[53] *Id.* (starting around 9:30, 40:10, 41:25, 43:03, and 49:15).

[54] Office of Mgmt. & Budget, *Fiscal Year 2019: Efficient, Effective, Accountable: An American Budget* 57 (2018), https://tinyurl.com/BudgetRequestFY19; *see also Stronger Border Security: 2019 Budget Fact Sheet*, White House (Feb. 2018), http://tinyurl.com/WHFY18BudgetFactSheet (noting request for "$1.6 billion for new border wall in locations identified by the Border Patrol as necessary to obtain operational control of the border and impede illegal crossings").

[55] *See* Cong. Research Serv., R45268, *Department of Homeland Security Appropriations: FY2019*, at 10 n.17 (Oct. 5, 2018), https://tinyurl.com/CRS-DHSFY19; Rachael Bade, *Immigration Storm Bears Down on Republicans*, Politico (July 2, 2018, 5:05 AM), https://tinyurl.com/PoliticoImmigrationStorm ("[D]uring a meeting with appropriators last week, Trump pressed Republicans to give him $5 billion as a down payment on his wall[.]").

[56] The process for submitting and amending budget and appropriations requests to Congress is subject to rigorous and well-established guidelines and procedures that were not followed here.  *See generally* Office of Mgmt. & Budget, OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (2018), https://tinyurl.com/OMBCircularA11; U.S. Gov't Accountability Office, GAO-16-464SP, *Principles of Federal Appropriations Law* 2-15 (4th ed. 2016) (noting "long and exhaustive administrative process of budget preparation and review"), https://tinyurl.com/GAORedBook.

nine federal departments, including DHS.  The initial Senate appropriations bill funding DHS included the exact amount that the President had formally requested: $1.6 billion for approximately 65 miles of border fencing.[57]  House Democratic leadership indicated that they would agree to pass the measure "so long as the language d[id] not *require* [the $1.6 billion] to be spent on the wall."[58]

27.     On December 11, 2018, President Trump held a televised meeting with the Democratic leaders of Congress, then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck Schumer, to discuss the impending funding deadline.[59]  At that meeting, President Trump said he wanted $5 billion to build a portion of the border wall and warned: "If we don't get what we want one way or the other, whether it's through you, through a military, through anything you want to call, I will shut down the government, absolutely."[60]  The President declared that he would be "proud to shut down the government for border security."[61]

28.     On December 19, 2018 – two days before funding for nine federal departments was set to expire – the Senate passed a continuing resolution funding the Government through February 8, 2019.[62]  This Senate resolution did not include funding for a border wall.[63]  Senate Majority Leader Mitch McConnell indicated his understanding that the President would support the

---

[57] S. 3109, 115th Cong., tit. 2 (as reported by S. Comm. on Appropriations, June 21, 2018); *see* Lindsey McPherson, *$1.6 Billion for Border Security, Not Just Wall, Could Be Agreed To, Hoyer Says*, Roll Call (Dec. 4, 2018, 12:46 PM) (McPherson, *$1.6 Billion for Border Security*), http://tinyurl.com/RollCallDec18.

[58] McPherson, *$1.6 Billion for Border Security* (emphasis added), http://tinyurl.com/RollCallDec18.

[59] *See* Aaron Blake, *Trump's Extraordinary Oval Office Squabble with Chuck Schumer and Nancy Pelosi*, Wash. Post (Dec. 11, 2018), https://tinyurl.com/WaPoOvalOfficeSquabble.

[60] *Id.*

[61] *Id.*

[62] Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).

[63] *Id.*

continuing resolution.[64]  However, President Trump announced, "I've made my position very clear: Any measure that funds the government must include border security."[65]

29.     On December 19, 2018, the House of Representatives approved a short-term funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection – Procurement, Construction, and Improvements."[66]  The Senate never passed the House-approved version of the legislation because "Democrats would not be willing to support $5 billion in wall funding."[67]

30.     Appropriations for a substantial portion of the Federal Government expired on December 21, 2018, precipitating the longest Federal Government shutdown in history.

31.     On January 4, 2019, the President for the first time publicly raised the possibility of declaring a national emergency to move forward with construction of a border wall in the event that Congress refused his requested appropriation.[68]  The President asserted that, if the "negotiated process" with Congressional leaders did not result in the funding that he wanted, he could "call a national emergency and build [the wall] very quickly."[69]  A few days later, the President declared in a televised Oval Office address that "there is a growing humanitarian and security crisis at our

---

[64] Erica Werner et al., *Senate Passes Bill to Keep Government Open Until February, Undercutting Trump's Drive for Border Wall Funding*, Wash. Post (Dec. 19, 2018), https://tinyurl.com/WaPoSenateBill ("Congressional leaders said they expected Trump to sign [the continuing resolution] before the shutdown deadline.").

[65] *Remarks by President Trump at Signing of H.R. 2, the Agriculture Improvement Act of 2018*, White House (Dec. 20, 2018), https://tinyurl.com/TrumpHR2Remarks.

[66] Further Additional Continuing Appropriations Act, 2019, H.R. 695, 115th Cong., § 141 (2018).

[67] *See* Bo Erickson et al., *House Passes Spending Bill with $5 Billion Border Wall Funding, Increasing Likelihood of Shutdown*, CBS News (Dec. 20, 2018, 9:00 PM), http://tinyurl.com/CBSHousePassesBill.

[68] *See Remarks by President Trump After Meeting with Congressional Leadership on Border Security*, White House (Jan. 4, 2019), https://tinyurl.com/TrumpJan4Remarks.

[69] *Id.*

southern border."[70]  He stated that his "administration ha[d] presented Congress with a detailed proposal to secure the border," including "$5.7 billion for a physical barrier."[71]  He implored Congress to "do[] its job" and "pass a bill that ends this crisis."[72]

32.     On January 9, 2019, President Trump stated that "I have an absolute right to do [a] national emergency if I want," and that the "threshold" for invoking the emergency would be if "I can't make a deal with people that are unreasonable."[73]

33.     On January 12, 2019, the President referred to a national emergency declaration as "the easy way out": "Now, the easy solution is for me to call a national emergency.  I could do that very quickly . . . but I'm not going to do it so fast, because this is something Congress should do and we're waiting for the Democrats to vote."[74]  "Congress should do this," the President said, but "[i]f they can't do it, I will declare a national emergency."[75]

34.     After it became apparent that the Government's continued closure was causing serious nationwide disruptions, the President finally agreed to end the shutdown on January 25, 2019.[76]  He signed a continuing resolution that funded the Government through February 15, 2019,

---

[70] *Full Transcript: Trump's Speech on Immigration and the Democratic Response*, N.Y. Times (Jan. 8, 2019), http://tinyurl.com/TrumpNationalAddress.

[71] *Id.*; *see also* Letter from Russell T. Vought, Acting Dir., Office of Mgmt. & Budget, to Senator Richard Shelby, Chairman, Senate Comm. on Appropriations (Jan. 6, 2019), http://tinyurl.com/ShelbyLettertoApprops.

[72] *Id.*

[73] Greg Sargent, *Trump: I Have the "Absolute Right" to Declare a National Emergency If Democrats Defy Me*, Wash. Post (Jan. 9, 2019), https://tinyurl.com/WaPoRightToDeclare.

[74] *Remarks by President Trump During Roundtable Discussion with State, Local, and Community Leaders on Border Security and Safe Communities*, White House (Jan. 12, 2019), https://tinyurl.com/TrumpJan12Remarks.

[75] *Id.*

[76] *See* Nicholas Fandos et al., *Trump Signs Bill Reopening Government for 3 Weeks in Surprise Retreat from Wall*, N.Y. Times (Jan. 25, 2019), https://tinyurl.com/NYTTrumpSurpriseRetreat.

and provided no additional border wall funding.[77]  The five-week shutdown cost the U.S. economy $8 billion dollars, $3 billion of which is unrecoverable.[78]

35.     On January 25, 2019, a bipartisan Congressional conference committee was established to negotiate a deal to fund the Government for FY 2019.[79]  The committee ultimately reached a compromise that included $1.375 billion for 55 miles of new fencing along the border.[80]  The agreement further provided for "$14.959 billion for [CBP's budget], $942 million more than fiscal year 2018," to fund a total of 600 additional CBP officers and nearly half a billion dollars "to address humanitarian concerns at the border, including medical care, more efficient transportation, and holding facility requirements with better conditions and services for migrants."[81]

36.     On February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019.[82]  This Act provides $1.375 billion for construction of fencing in the Rio Grande Valley area of the border, but provides that in that area "[n]one of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing – (1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical Park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge."[83]  Congress limited the funding

---

[77] *See* Further Additional Continuing Appropriations Act, 2019, Pub. L. No. 116-5 (2019) (to be printed at 133 Stat. 10).

[78] Cong. Budget Office, *The Effects of the Partial Shutdown Ending in January 2019* (2019), https://tinyurl.com/CBOShutdownEffects.

[79] *See* Phil Mattingly, *These Members of Congress Are Seeking a Deal on Border Security and Trump's Wall*, CNN (Jan. 28, 2019, 5:05 PM), http://tinyurl.com/CNNConferenceCommittee.

[80] Senate Appropriations Comm., *Summary of DHS Fiscal Year 2019 Appropriations Agreement*, 2, http://tinyurl.com/SenateFY19AppropsSummary.

[81] *Id.* at 1.

[82] Pub L. No. 116-6 (2019) (to be printed at 133 Stat. 13).

[83] *Id.* § 231, 133 Stat. 28.

for new fencing to "operationally effective designs" that had been deployed as of 2017, "such as currently deployed steel bollard designs, that prioritize agent safety."[84]  No other funding was designated for the construction of a border wall.

37.    On February 15, 2019, President Trump signed the 2019 Consolidated Appropriations Act into law.

### D. President Trump Announces That, Even with a Lack of Appropriated Funds, His Administration Will Spend up to $8.1 Billion on a Border Wall, and Declares a National Emergency

38.    On the same day that he signed the 2019 Consolidated Appropriations Act, President Trump expressed his dissatisfaction with the $1.375 billion that Congress had appropriated for construction of border fencing and announced that his Administration would instead spend up to $8.1 billion on construction of a border wall.[85]

39.    Acting White House Chief of Staff Mick Mulvaney stated that "with the $8 billion, we should have sufficient money this year to [build the amount of wall that] we wanted to do with the $5.7 [billion] worth of money that the President asked for originally."[86]  A senior Administration official indicated that the Administration "expect[s] they will be able to go farther than 234 miles."[87]

40.    In addition to the amount that Congress appropriated, the White House designated three sources from which it would draw funding to "be used sequentially and as needed":

(a) approximately $601 million from the Treasury Forfeiture Fund (31 U.S.C. § 9705);

---

[84] *Id.* § 230(b), 133 Stat. 28.

[85] Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory; Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

[86] Press Release, White House, Background Press Call by Senior Administration Officials on President Trump's Remarks on the National Security and Humanitarian Crisis on Our Southern Border (Feb. 15, 2019) (Background Press Call), https://tinyurl.com/WHPressCall.

[87] *Id.*

(b) up to $2.5 billion under the DOD funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and

(c) up to $3.6 billion reallocated from DOD military construction projects (10 U.S.C. § 2808).[88]

41.     The $3.6 billion that the Administration intends to access under section 2808 is designated for military construction projects that both the Administration and Congress have treated as priorities in FY 2018 and FY 2019.[89]  Administration officials have explained that they will seek to "backfill" the reallocated $3.6 billion by asking Congress to appropriate additional funding for military construction projects in the FY 2020 Department of Defense appropriations act.[90]  The FY 2020 budget request includes "$3.6 billion for support of the emergency declaration providing emergency military construction, such as building of barriers, necessary to support the

---

[88] *See* Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory.

[89] For FY 2018, DOD requested $10.4 billion for military construction projects. *See* Christopher T. Mann, Cong. Research Serv., R45217, *FY2018 Military Construction Authorizations and Appropriations*, Summary (2018) (CRS FY2018 Military Construction), https://tinyurl.com/CRSFY18MilCon.   Reflecting the critical need for military construction, Congress instead appropriated $10.8 billion for military construction projects, Pub. L. No. 115-141, div. J, tit. I (2018) (to be printed at 132 Stat. 348, 797-98) – 4% more than DOD had requested and 33% more than in FY 2017, *see* CRS FY2018 Military Construction, https://tinyurl.com/CRSFY18MilCon.  For FY 2019, the Administration requested $11.4 billion for military construction, and Congress appropriated $11.2 billion.  Cong. Research Serv., IF 10965, *FY2019 Military Construction Appropriations: An Overview of H.R. 5895 and Issues in Conference* tbl.1 (2018), https://tinyurl.com/CRS-FY2019MilCon; *see* Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2019, Pub. L. No. 115-244, div. C (2018) (to be printed at 132 Stat. 2897, 2946-48).  The Administration complained that the bill did not match its request and would "delay[] critical resources to complete high-priority projects." Letter from Mick Mulvaney, Dir., Office of Mgmt. & Budget, to Senator Richard Shelby, Chairman, Senate Comm. on Appropriations (June 18, 2018), https://tinyurl.com/June2018Letter.

[90] Background Press Call, https://tinyurl.com/WHPressCall.  When asked whether there were "plans to reimburse the Defense Department for the [military construction] money . . . [or] [s]ort of backfill it with the FY20 request," the "senior Administration official" responded, "[Y]es, we have a budget that is due to be transmitted in March to the Congress, and that will make plans to backfill for these accounts[.]"  *Id.*; *see also Fact Sheet on Section 2808 Funding Pool*, U.S. Dep't of Def. (2019) http://tinyurl.com/2808FundingPool (identifying potential pool of sources of military construction funds that could be reallocated to construct the border wall).

use of the Armed Forces at the southern United States border" and an additional "$3.6 billion for funding any [military construction] projects delayed as a result of the emergency declaration."[91]

42.   To support the use of emergency construction funding under section 2808, President Trump also issued a proclamation declaring that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."[92]

43.   In this proclamation, the President noted that "[t]he problem of large-scale unlawful migration through the southern border is long-standing."[93]  The emergency proclamation asserted:

(a)  "The southern border is a major entry point for criminals, gang members, and illicit narcotics."

(b)  "[R]ecent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."

(c)  Aliens who are not detained "fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate."[94]

44.   Based on these assertions, the President declared a "national emergency" pursuant to the National Emergencies Act[95] and directed defendant Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands."[96]

---

[91] U.S. Dep't of the Army, *Military Construction (Part IA OCO/Emergency)*, at 21, *in Department of the Army Fiscal Year (FY) 2020: President's Budget Submission* (2019), https://tinyurl.com/ArmyFY2020Budget.

[92] Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 20, 2019) (National Emergency Proclamation).

[93] *Id*.

[94] *Id*.

[95] 50 U.S.C. § 1601 *et seq.*

[96] *See* National Emergency Proclamation.

45.     In announcing his proclamation, President Trump declared that he had been "successful" in receiving funding from Congress for part of his desired wall.[97]  He exclaimed that Congress had appropriated a "crazy" amount of money:  "We have so much money, we don't know what to do with it.  I don't know what to do with all the money [Congress is] giving us.  It's crazy."[98]  President Trump stated that Democrats "didn't even fight us on most of the stuff," such as "[p]orts of entry."[99]  The President complained that funding for the border wall was the "only" exception: "[\$1.375 billion] [s]ounds like a lot, but it's not so much, although we're putting it to much better use than it used to be."[100]  The President declared that "[i]f we had a wall, we don't need the military because we'd have a wall."[101]  He further stated that "I went through Congress.  I made a deal.  I got almost \$1.4 billion when I wasn't supposed to get one dollar – not one dollar.  'He's not going to get one dollar.'  Well, I got \$1.4 billion.  But I'm not happy with it."[102]

46.     Because he was declaring a national emergency, the President said, the Administration "ha[s] a chance of getting close to \$8 billion.  Whether it's \$8 billion or \$2 billion or \$1.5 billion, it's going to build a lot of wall."[103]  Indeed, President Trump declared that "[w]e're getting it done," and that "[w]e're right now in construction with wall in some of the most important areas."[104]  He similarly declared, "I've built a lot of wall.  I have a lot of money, and I've built a lot of wall."[105]

---

[97] Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*

47.     Reiterating that he was "successful" in getting Democrats to appropriate funding

for the wall, President Trump explained why he nevertheless declared a national emergency:

> So I did – I was successful, in that sense, but I want to do it faster.  I
> could do the wall over a longer period of time.  *I didn't need to do
> this.*  But I'd rather do it much faster.  And I don't have to do it for
> the election.  *I've already done a lot of wall, for the election – 2020*.
> And the only reason we're up here talking about this is because of
> the election, because they want to try and win an election, which it
> looks like they're not going to be able to do.  And this is one of the
> ways they think they can possibly win, is by obstruction and a lot of
> other nonsense. And I think that I just want to get it done faster,
> that's all.[106]

### E.  Defendants Begin Transferring Funds to Implement the President's Direction to Spend up to $8.1 Billion on a Border Wall

48.     President Trump has reported that wall construction is "[m]oving quickly,"[107] and

senior Administration officials have stated that people will be "shock[ed]" to "see how quickly the

administration will build a wall."[108]  Indeed, defendants have begun transferring money pursuant

to the President's direction to spend up to $8.1 billion on a border wall.

49.     On February 15, 2019, the Department of Treasury formally notified Congress that

it had adopted a plan to provide up to $601 million requested by DHS in two tranches, and that the

first tranche of $242 million would be made available for obligation fifteen days later.

50.     On March 25, 2019, the Department of Defense transferred $1 billion from funds

appropriated for military and reserve personnel costs to the Drug Interdiction and Counterdrug

Activities appropriations fund.[109]  DOD announced that "[t]hese funds will be used to support

---

[106] *Id.* (emphasis added).

[107] @realDonaldTrump (Jan. 20, 2019, 6:20 AM), https://tinyurl.com/20Jan2019Tweet.

[108] Rachael Bade et al., *'A Recipe for Disaster'? Trump's Border Emergency Drags the GOP into a Risky Fight Ahead of 2020*, Wash. Post (Feb. 15, 2019), http://tinyurl.com/WaPoRecipeDisaster.

[109] Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer ("This

DHS's request to build 57 miles of 18-foot-high pedestrian fencing, constructing and improving roads, and installing lighting within the Yuma and El Paso Sectors of the border."[110]

51.     To implement the President's order to reallocate up to $3.6 billion in additional funds under section 2808, DOD has identified military construction projects that could be cut to finance the construction of the border wall.[111]

### F. Congress Disapproves the President's Emergency Declaration

52.     Condemnation of the President's actions was swift, even from the President's early campaign supporters.[112]

---

reprogramming action transfers $1,000.000 million from the Military Personnel, Army . . . and Reserve Personnel, Army . . . appropriations to the Drug Interdiction and Counter-Drug Activities, Defense . . . appropriation.").

[110] Press Release, U.S. Dep't of Def., DOD Authorizes Support to Counter Drug Border Security (Mar. 25, 2019) (DOD March 25 Press Release), http://tinyurl.com/DoDMarch25PressRelease.

[111] *See* U.S. Dep't of Def., *Fact Sheet on Section 2808 Funding Pool* (Feb. 19, 2019), https://tinyurl.com/DODFactSheetMilConCuts.

[112] *See, e.g.*, Damian Paletta et al., *Trump's Declaration of National Emergency Hit with First Lawsuits*, Wash. Post (Feb. 16, 2019), https://tinyurl.com/WaPoTrumpsDeclaration ("Rep. Mac Thornberry (Tex.), the top Republican on the House Armed Services Committee, warned against tapping Defense Department and military construction accounts to build the wall. 'Doing so would have detrimental consequences for our troops,' he said[.]"); Christal Hayes, *Ann Coulter After Trump's Order: 'The Only National Emergency Is That Our President Is an Idiot,'* USA Today (Feb. 16, 2019, 5:19 PM), https://tinyurl.com/USATodayCoulter (describing early supporter of President Trump Ann Coulter's dissatisfaction with the President's action); Lisa Mascaro, *Trump's National Emergency Sparks New GOP Divide in Congress*, Associated Press (Feb. 15, 2019), https://tinyurl.com/APNewGOPDivide (recounting disapproval from several Republican lawmakers, including Senator Lamar Alexander (R-Tenn.) ("Declaring a national emergency is unnecessary, unwise and inconsistent with the U.S. Constitution.") and Senator Thom Tillis (R-N.C.) ("I don't believe a national emergency declaration is the solution.")). Representative Will Hurd (R-Tex.), who represents a district covering about 820 miles of the U.S.-Mexico border, also expressed disagreement with the decision: "[A] national emergency declaration . . . is not a tool that the president needs in order to solve this problem. This is a problem that has existed for – before Ronald Reagan. And . . . remember we just passed a piece of legislation that adds more technology, that has physical barriers in order to . . . solve this problem." *Transcript: Rep. Will Hurd on "Face the Nation," February 17, 2019*, CBS News (Feb. 17, 2019, 11:22 AM), https://tinyurl.com/CBSTranscript.

53.     On February 26, 2019, the United States House of Representatives adopted House Joint Resolution 46 by a vote of 245 to 182,[113] providing for the termination of the February 15, 2019 national emergency declaration of the President, pursuant to section 202 of the National Emergencies Act, 50 U.S.C. § 1622.

54.     On March 14, 2019, the Senate passed House Joint Resolution 46 by a vote of 59 to 41,[114] providing for the termination of the February 15, 2019, national emergency declaration of the President, pursuant to section 202 of the National Emergencies Act, 50 U.S.C. § 1622.  The joint resolution was supported by numerous Republican Senators, including Senator Mitt Romney, who stated that his vote of disapproval was "a vote for the Constitution and for the balance of powers that is at its core."[115]

55.     On March 15, 2019, President Trump issued the first veto of his Presidency, striking down the joint resolution of the House and Senate that terminated his national emergency.[116]

56.     On April 4, 2019, the Bipartisan Legal Advisory Group of the United States House of Representatives authorized the filing of this lawsuit.[117]

---

[113] 165 Cong. Rec. H2217-18 (daily ed. Feb. 26, 2019).

[114] 165 Cong. Rec. S1882 (daily ed. Mar. 14, 2019).

[115] Marianne Levine, *Senate Deals Blow to Trump in Vote to Terminate Border Emergency*, Politico (Mar. 14, 2019, 4:16 PM), http://tinyurl.com/PoliticoSenateVote.

[116] *Veto Message to the House of Representatives for H.J. Res. 46*, White House (March 15, 2019), https://tinyurl.com/TrumpVetoMessage.

[117] The Bipartisan Legal Advisory Group consists of the Speaker, Majority Leader and Whip, and Minority Leader and Whip and "speaks for, and articulates the institutional position of, the House in all litigation matters."  Rule II.8(b), Rules of the U.S. House of Representatives (116th Cong.).  The Republican Leader and the Republican Whip decline to support this filing for institutional reasons, as the appropriate recourse provided under Article I of the U.S. Constitution is to pass legislation.

## II.  LEGAL ALLEGATIONS

57.     The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[118]  This clause vests Congress with the "exclusive power over the federal purse," and it forms the "bulwark of the Constitution's separation of powers."[119]  The Supreme Court has made clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."[120]  Indeed, "not a dollar" of any public funds can be used to pay for anything not previously sanctioned by Congress.[121]

58.     Notwithstanding this unequivocal constitutional command, on the same day that President Trump signed appropriations legislation providing only $1.375 billion in FY 2019 funds for the construction of a wall along the southern border, he announced that his Administration would in fact spend up to $8.1 billion.[122]  This expenditure of unappropriated funds disregards the separation of powers and usurps Congress's exclusive authority under the Appropriations Clause to control federal funds.

59.     In the absence of any law appropriating the $8.1 billion defendants want to construct a wall on the southern border, defendants attempt to justify the expenditures under sections 284 and 2808.  But defendants cannot satisfy the statutory requirements for transferring and expending funds under those provisions.  The defendants' transfer and expenditure of funds without authority violates the Appropriations Clause.

---

[118] U.S. Const. art. I, § 9, cl. 7.

[119] *FLRA*, 665 F.3d at 1346-47 (quotation marks omitted); *see also* 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342 (1833) (noting that, if not for the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure").

[120] *Richmond*, 496 U.S. at 425.

[121] *Reeside v. Walker*, 52 U.S. 272, 291 (1850).

[122] Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory.

**A. Defendants Are Not Authorized to Spend up to $2.5 Billion on a Border Wall Under 10 U.S.C. § 284(b)**

60.     In pertinent part, 10 U.S.C. § 284 provides that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the federal government" if "such support is requested[] by the official who has responsibility for the counterdrug activities . . . of the department or agency of the Federal Government."[123]   Section 284(b) further provides that "[t]he purposes for which the Secretary may provide support" include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."[124]

61.     Authority under this section does not depend on the President's declaration of a national emergency.

62.     For FY 2019, Congress appropriated $517.171 million for counter-narcotics support, which funds activities under section 284.[125]   The House understands that most of these appropriated funds have already been used for authorized purposes.

63.     On March 25, 2019, defendants transferred $1 billion from funds appropriated for military and reserve personnel costs to the Drug Interdiction and Counterdrug Activities appropriation fund.[126]   DOD has announced that those funds will be used, among other things, to build 57 miles of 18-foot-high pedestrian fencing within the Yuma and El Paso sectors of the border.[127]

---

[123] 10 U.S.C. § 284(a), (a)(1)(A).

[124] *Id.* § 284(b), (b)(7).

[125] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit. VI (2018) (to be printed at 132 Stat. 2981, 2997).

[126] Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer.

[127] DOD March 25 Press Release, http://tinyurl.com/DODMarch25PressRelease.

64.     Defendants claim that section 8005 of the 2019 Department of Defense Appropriations Act authorizes such transfers.  In pertinent part, section 8005 provides that

> [u]pon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.[128]

65.     When Congress enacted section 8005, it established specific limitations on the Secretary's authority to transfer funds, including that (1) the transferred funds cannot be used for "military construction"; (2) the transferred funds must be used "for higher priority items, based on unforeseen military requirements"; and (3) the transferred funds may not be used "where the item for which funds are requested has been denied by the Congress."[129]

66.     The already-completed $1 billion transfer from funds appropriated for military and reserve personnel costs to the Drug Interdiction and Counterdrug Activities appropriation fund, and the additional transfers that have been announced to construct the border wall, are not authorized under section 8005 because they do not satisfy the restrictions in that section.

67.     Section 8005 prohibits the transfer of funds for "military construction."  As discussed below, the construction of a border wall does not satisfy the definition of "military construction."  Congress has defined the term "military construction" to include "any construction,

---

[128] Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999.
[129] *Id.*

development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road."[130]  Section 2801(c)(4) defines "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."[131]

68.     Although construction of a border wall is not "military construction," on this point, the defendants' statements and actions regarding the transfer and expenditure of funds to build a wall are contradictory on their face.  Section 8005 forbids the transfer of funds for "military construction," while section 2808 only permits expenditures for "military construction" – yet, defendants have asserted that both provisions apply to the construction of a border wall.  The construction of a border wall is not "military construction" as defined by section 2801(a), and thus this restriction would not bar the transfer of funds under section 8005.  The defendants have stated, however, that the border wall *is* "military construction" for purposes of reprogramming funds under section 2808, which only authorizes transfers for such construction.  Thus, under defendants' own logic, section 8005 prohibits the transfer of funds to construct the wall.  If the expenditure were authorized under section 2808 for "military construction," as the President and the White House have stated, then it could not be authorized under section 8005, which prohibits transfers for "military construction."  One or the other of the defendants' actions is barred by the applicable statutes.

69.     In any event, the transfer and expenditure of funds to construct a border wall fails to comply with the requirement in section 8005 that the transfer authority "may not be used unless

---

[130] 10 U.S.C. § 2801(a) (defining "'military construction' as used in this chapter or any of provision of law").
[131] *Id.* § 2801(c)(4).

for higher priority items, based on unforeseen military requirements, than those for which originally appropriated."[132]   The transfer under section 8005 is not based on any "unforeseen military requirements."   Congress simply disagreed with President Trump's assessment that $5 billion for a border wall was necessary.   The President has long asserted the need to build a wall, but he would like to do so faster than Congress has allowed through appropriations: "I could do the wall over a longer period of time.   I didn't need to do this.   But I'd rather do it much faster."[133] In addition, the wall is addressing what has overwhelmingly been a civilian matter in the United States.   Over the last year, President Trump has ordered a few thousand troops to provide assistance to DHS and CBP at the southern border.[134]   These troops are strictly limited to a supporting role. They do not actively participate in law enforcement efforts, but instead merely provide assistance to CBP, such as "aerial reconnaissance, ground surveillance, search and rescue support and medical support."[135]   While there are troops on the southern border now, border protection has been, and continues to be, a civilian agency responsibility and task.[136]   This is true – as Congress has made clear – even when "the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response."[137]   In those circumstances, "the Attorney

---

[132] Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999.

[133] Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

[134] *See* Jim Garamone, *Additional Personnel to Deploy to Southwest Border*, U.S. Dep't of Def. (Oct. 26, 2018), https://tinyurl.com/BorderTroops.

[135] Jim Garamone, *DOD Officials Testify on Military Support to Southwest Border*, U.S. Dep't of Def. (Jan. 29, 2019), http://tinyurl.com/DODJan29Article.

[136] *See* 6 U.S.C. § 202 (assigning DHS responsibility for "[s]ecuring the borders" and "[c]arrying out the immigration enforcement functions"); *id.* at § 251 (assigning DHS "all functions" pertaining to, *inter alia*, "[t]he Border Patrol program" and "[t]he detention and removal program"); 8 U.S.C. § 1103(a)(5) (providing the Secretary of Homeland Security "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens").

[137] 8 U.S.C. § 1103(a)(10).

General may authorize any State or local law enforcement officer" to perform the immigration functions of DHS.[138]

70.    Finally, the President's request for funds above $1.375 billion to construct a border wall was "denied by Congress"[139] and, therefore, is not authorized under section 8005.  Congress plainly rejected President Trump's request for $5 billion for a border wall.  In fact, President Trump's disagreement with Congress on this point precipitated the longest Federal Government shutdown in history.

71.    Section 8005 of the Department of Defense Appropriations Act does not authorize the transfer of funds into the Drug Interdiction and Counterdrug Activities appropriation fund to construct a border wall under section 284.  The defendants' transfer and expenditure of these funds without a valid Congressional appropriation directly injures the House by usurping its Article I authority over appropriations.

## B.  Defendants Are Not Authorized to Spend up to $3.6 Billion on a Border Wall Under the President's National Emergency Statutory Authority

72.    The National Emergencies Act (NEA) was enacted in 1976 and provides that "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power, the President is authorized to declare such national emergency."[140]   The NEA does not "enlarge or add to Executive power."[141]   Rather, Congress enacted the NEA to accomplish twin goals.  First, the NEA "would end the states of emergency under which the United States has been operating for more than 40 years."[142]   Second,

---

[138] *Id.*
[139] Pub. L. No. 115-245, § 8005, 132 Stat. 2981, 2999.
[140] 50 U.S.C. § 1621(a).
[141] S. Rep. No. 94-1168, at 3 (1976).
[142] *Id.*

"[i]t would also insure that the extraordinary powers which now reside in the hands of the Chief Executive . . . could be utilized only when emergencies actually exist, and then, only under safeguards of congressional review."[143]

73.     Under the NEA,

> [w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.  Such specification may be made either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders published in the Federal Register and transmitted to the Congress.[144]

74.     Thus, a proclamation issued under the NEA merely triggers the President's authority to invoke *other* existing acts of Congress that authorize "the exercise, during the period of a national emergency, of any special or extraordinary power."[145]

75.     One such statute is 10 U.S.C. § 2808.  Section 2808(a) provides that

> [i]n the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.[146]

---

[143] *Id.*
[144] 50 U.S.C. § 1631.
[145] *Id.* § 1621(a).
[146] 10 U.S.C. § 2808(a).

76.     The term "military construction project" within section 2808(a) is defined to include "all military construction work . . . necessary to produce a complete and usable facility or a complete and usable improvement to an existing facility."[147]   Section 2801(a) specifies that "military construction" includes "any construction, development, conversion, or extension of any kind carried out with respect to a military installation."[148]   And section 2801(c)(4) defines "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."[149]

77.     Section 2808(a) therefore establishes three specific limitations on the expenditure of funds: (1) there must be a national emergency "that requires the use of the armed forces"; (2) the funding must be spent on a "military construction project"; and (3) the project must be "necessary to support the use of the armed forces."[150]

78.     Section 2808(a) does not authorize defendants' diversion of military construction funds to build a border wall because defendants' construction of a border wall complies with none of these limitations.

79.     *First*, there is no national emergency that "requires the use of the armed forces" with respect to the southern border.  Enforcing the laws with respect to our borders is a matter for DHS and CBP, not the military.  Indeed, the Posse Comitatus Act and related provisions prohibit the military from enforcing the nation's immigration laws or from directly participating "in a

---

[147] *Id.* § 2801(b).
[148] *Id.* § 2801(a).
[149] *Id.* § 2801(c)(4).
[150] *Id.* § 2808(a).

search, seizure, arrest, or other similar activity unless participation in such activity . . . is otherwise authorized by law."[151]

80.     The Immigration and Naturalization Service has historically relied on illegal crossing apprehensions "as its proxy measure of illegal immigration between ports of entry."[152] Combining several metrics, DHS recently estimated "a 91 percent decline" in illegal crossings between 2000 and 2016.[153]  The number of southern border apprehensions by CBP officers has declined, from their peak at 1,643,697 in 2000 to 396,579 in 2018.[154]

81.     Nor do the available data indicate that any threat potentially associated with illegal crossings has recently increased.  On the contrary, the amount of drugs seized by CBP between ports of entry steadily decreased from 2014 to 2018: CBP seized approximately 1,931,635 pounds of cocaine, heroin, marijuana, methamphetamine, and fentanyl combined in 2014; by FY 2018 (the latest year for which CBP has published complete data), total reported narcotics seizures between ports of entry were 415,354 pounds – the lowest level in five years.[155]  CBP data further indicate that the vast majority of narcotics are smuggled *at* ports of entry, not between: in FY 2018, of the total amount seized, approximately 88% of cocaine, 90% of heroin, 40% of marijuana, 83% of

---

[151] 10 U.S.C. § 275; *see* Posse Comitatus Act, 18 U.S.C. § 1385 (imposing criminal penalties for the willful use of any part of the Army or the Air Force "as a posse comitatus or otherwise to execute the laws" unless "expressly authorized by the Constitution or Act of Congress").

[152] *Efforts by DHS to Estimate Southwest Border Security Between Ports of Entry*, U.S. Dep't of Homeland Security Off. of Immigr. Stat., 1 (Sept. 2017), http://tinyurl.com/DHSOISReport.

[153] *Id.* at 17.

[154] *Southwest Border Sectors: Total Illegal Alien Apprehensions by Fiscal Year*, U.S. Customs & Border Protection (Mar. 2019), https://tinyurl.com/CBPSWBorderApprehensions.

[155] *See CBP Enforcement Statistics FY 2019*, U.S. Customs & Border Protection, https://tinyurl.com/CBPFY19Stats (last visited Apr. 3, 2019) (showing the amount of each drug seized annually at and between ports of entry from 2014 to 2018).

methamphetamine, and 82% of fentanyl were seized at ports of entry.[156]   In addition, the evidence

suggests that undocumented immigrants commit crimes at roughly half the rate of native-born

Americans.[157]

82.   The primary change in recent years relates not to the number of individuals who

enter the United States illegally or any potential threat they might pose, but instead to the profile

of those who come.   DHS data show that a person who enters today is more likely to come in a

family unit and claim asylum under law: "Before 2011, over 90% of arriving aliens were single

adult males," whereas "[t]oday 40% are families and children."[158]   Additionally, "[b]efore 2009,

90% of arriving aliens were Mexican nationals," whereas "[t]oday nearly 50% are Central

Americans."[159]   And "[b]efore 2013, approximately 1% of arriving aliens claimed credible fear

(asylum)," whereas "[n]ow 1 out of 10 claim credible fear."[160]   This development has been

apparent for years.[161]   In response, Congress has, among other things, increased CBP's budget to

address the needs of these families, including by providing for family case management,

supporting alternatives to detention, and increasing the number of immigration judges.[162]

---

[156] *See id.* (percentages calculated from CBP data).

[157] *See* Alex Nowrasteh, Cato Inst., Research & Policy Brief No. 4, *Criminal Immigrants in Texas* (2018), http://tinyurl.com/CatoBrief.

[158] Press Release, U.S. Dep't of Homeland Security, To Secure the Border and Make America Safe Again, We Need to Deploy the National Guard (April 4, 2018), http://tinyurl.com/DHSSecureBorderPressRelease.

[159] *Id.*

[160] *Id.*

[161] *See, e.g.*, *Southwest Border Migration FY2017*, U.S. Customs & Border Protection, (Dec. 15, 2017), https://tinyurl.com/CBPFY17SWStats.

[162] *Compare* Pub. L. No. 116-6 (FY 2019 CBP appropriations), *with* Pub. L. No. 115-141 (FY 2018 CBP appropriations); *see generally* H. Rep. No. 116-9, at 478-84 (2019) (explaining the 2019 increase in funds for family case management and directing ICE "to prioritize the use of ATD [alternatives to detention] programs for families, including family case management, for which the bill provides significant additional resources").

83.    **Second**, the construction of a border wall is not a military construction project under section 2801(b) because it does not satisfy the definition of "military construction" in section 2801(a).    The proposed construction is not being "carried out with respect to a military installation,"[163] *i.e.*, "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."[164] The southern border is not a "base, camp, post, station, yard, [or] center," nor is it some "other activity under the jurisdiction of the Secretary of a military department."[165]

84.    **Third**, a border wall is not "necessary to support [the] use of the armed forces" at the southern border.[166]   As discussed, over the last year, President Trump has ordered a few thousand troops to provide assistance to DHS and CBP at the southern border.[167]  These troops are limited to a supporting role.   They do not actively participate in law enforcement efforts, but instead merely provide assistance to CBP, such as "aerial reconnaissance, ground surveillance, search and rescue support and medical support."[168]   A border wall is not "necessary" to support the use of the armed forces in the provision of the assistance activities they are authorized to conduct.

85.    The construction of a southern border wall stands in marked contrast to other military projects that have been considered under section 2808.  The declaration of an emergency has been used to invoke section 2808 spending authority on only two occasions.   In only one

---

[163] 10 U.S.C. § 2801(a).
[164] *Id.* § 2801(c)(4).
[165] *See id.*
[166] *Id.* § 2808(a).
[167] *See* Jim Garamone, *Additional Personnel to Deploy to Southwest Border*, U.S. Dep't of Def. (Oct. 26, 2018), https://tinyurl.com/BorderTroops.
[168] Jim Garamone, *DOD Officials Testify on Military Support to Southwest Border*, U.S. Dep't of Def. (Jan. 29, 2019), http://tinyurl.com/DODJan29Article.

instance – involving the national emergency declared after the September 11 attacks – were section 2808 funds actually expended.

86.     In August 1990, President George H.W. Bush, declared a national emergency in response to "the threat to the national security . . . of the United States caused by the invasion of Kuwait by Iraq."[169]   A few months later, President Bush invoked "emergency construction authority" under section 2808.[170]   Army officials determined that $20.5 million was needed to construct new systems and facilities at the U.S. Army base at Doha to support the Army's efforts in Kuwait.[171]   Ultimately, however, the Kuwaiti government paid for the cost of the construction, and the Army never made use of the emergency construction authority.[172]

87.     Shortly after the terrorist attacks of September 11, 2001, President George W. Bush declared a national emergency in response to the "continuing and immediate threat of further [terrorist] attacks on the United States."[173]   A few months later, President Bush invoked emergency construction authority under section 2808.[174]   In the end, 18 projects totaling $1.44 billion were funded using emergency construction authority under section 2808.[175]   These projects ranged from $6.3 million in January 2012 for aircraft parking, taxiway, and shelter at Camp Lemonnier,

---

[169] Exec. Order No. 12,734, 55 Fed. Reg. 48,099 (Nov. 14, 1990); *see* Exec. Order No. 12,722, 55 Fed. Reg. 31,803 (Aug. 2, 1990).

[170] Exec. Order No. 12,734.

[171] *See* Janet A. McDonnell, *After Desert Storm* 221-22 (Dep't of the Army 1999), https://tinyurl.com/McDonnellAfterDesertStorm.

[172] *See id.* at 225 (citing Memorandum from Col. Ian T. Patterson to James DeWire, Kuwait Reconstruction: Doha (Sept. 5, 1991)).

[173] Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept. 14, 2001); *see also* Exec. Notice, Continuation of the National Emergency with Respect to Certain Terrorist Attacks, 83 Fed. Reg. 46,067 (Sept. 12, 2002).

[174] *See* Exec. Order No. 13,235, 66 Fed. Reg. 58,343 (Nov. 16, 2001).

[175] Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* 3 (2019), https://tinyurl.com/CRS-MilConFunding.

Djibouti, to $228 million in June 2013 for a task force compound at Camp Lemonnier.[176] All but one of the projects were overseas; the exception was a project relating to security measures for weapons of mass destruction in five U.S. states.[177]

88.     Defendants' expenditure of funds in contravention of the specific limitations of section 2808 directly injures the House by usurping its Article I authority over appropriations.

## CLAIMS FOR RELIEF

### COUNT I

### (Use of Unappropriated Funds to Construct Border Wall Under 10 U.S.C. § 284 Violates Article I, § 9, Clause 7 of the Constitution)

89.     The House incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

90.     Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

91.     Congress has not appropriated $2.5 billion in funds for the purposes authorized by 10 U.S.C. § 284 to construct a wall along the southern border.

92.     Section 8005 of the 2019 Department of Defense Appropriations Act does not authorize defendants to transfer funds that Congress has appropriated for other purposes to the section 284 counter-narcotics account for purposes of constructing a border wall.

93.     Section 8005 establishes several specific limitations on the authority to transfer funds, including (1) that the transferred funds cannot be used for "military construction"; (2) the transferred funds must be used "for higher priority items, based on unforeseen military

---

[176] *See id.*
[177] *See id.* at 2.

requirements"; and (3) the transferred funds may be used "in no case where the item for which funds are requested has been denied by the Congress."

94.      Section 8005 does not authorize defendants to transfer funds to be expended under section 284 for purposes of constructing a border wall because the transfer violates multiple limitations on the authority set forth in section 8005.

95.      Defendants claim that the border wall is a "military construction project" for purposes of section 2808.  Construction of a border wall is not "military construction."  If, however, defendants are correct that the construction of the border wall satisfies the section 2808 requirement that it be a "military construction project," then the transfer is prohibited for that reason under section 8005.

96.      Defendants' purported need to construct a border wall is not based on an "unforeseen military requirement[]."

97.      The President's request for funds above $1.375 billion to construct a border wall was "denied by Congress."

98.      Section 8005 therefore does not authorize defendants to transfer up to $2.5 billion to be expended under section 284 authority to construct a border wall.  Defendants have already transferred $1 billion to the Drug Interdiction and Counterdrug Activities fund in violation of Congressional appropriations.

99.      The House has been injured, and will continue to be injured, by defendants' unconstitutional actions, which usurp the House's authority over appropriations.

100.      For the reasons stated herein, the House is entitled to a declaration that defendants' transfer of funds and expenditure of up to $2.5 billion to construct a border wall under section 284 violate Article I, section 9, clause 7 of the Constitution, and the Court should enjoin defendants

from transferring any funds under section 8005, or expending funds in excess of Congressional appropriations, to build a border wall under section 284.

## COUNT II

**(Use of Unappropriated Funds to Construct Border Wall Under 10 U.S.C. § 2808 Violates Article I, § 9, Clause 7 of the Constitution)**

101.    The House incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

102.    Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

103.    10 U.S.C. § 2808 does not authorize defendants to spend up to $3.6 billion to construct a wall along the southern border.

104.    Even where the President has declared a national emergency, section 2808 sets forth specific limitations on the expenditure of funds, including that (1) there must be a national emergency "that requires the use of the armed forces," (2) the funding must be spent on a "military construction project," and (3) the project must be "necessary to support the use of the armed forces."

105.    Defendants' expenditure of section 2808(a) funds on a border wall satisfies none of these limitations.

106.    The asserted national emergency at the southern border does not "require[] the use of the armed forces."

107.    The construction of a border wall along the southern border is not a "military construction project."

108.    The construction of a border wall along the southern border is not "necessary to support the use of the armed forces."

109.    Defendants' expenditure of up to $3.6 billion on the construction of a border wall under section 2808 violates Article I, section 9, clause 7 of the Constitution.

110.    The House has been injured, and will continue to be injured, by defendants' unconstitutional actions, which usurp the House's appropriations authority and mean that the relevant funds are no longer available to be spent on the purposes for which they were appropriated.

111.    For the reasons stated herein, the House is entitled to a declaration that defendants' expenditure of funds on a border wall pursuant to 10 U.S.C. § 2808 violates Article I, section 9, clause 7 of the Constitution, and the Court should enjoin defendants from expending any funds pursuant to section 2808 to build a border wall.

### COUNT III

### (Use of Unappropriated Funds to Construct Border Wall Under 10 U.S.C. § 284 Violates the Administrative Procedure Act)

112.    The House incorporates by reference and re-alleges the preceding paragraphs, as if set forth fully herein.

113.    Defendants' transfer of $1 billion on March 25, 2019 under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 constitutes "agency action" and/or "final agency action" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq.*

114.    Defendants' transfer of $1 billion on March 25, 2019 under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 is "not in accordance with law" within the meaning of APA § 706(2)(A).

115.    Defendants' transfer of $1 billion on March 25, 2019 under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under

10 U.S.C. § 284 is "contrary to constitutional right, power, privilege, or immunity" within the meaning of APA § 706(2)(B).

116.    Defendants' transfer of $1 billion on March 25, 2019 under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of APA § 706(2)(C).

117.    Accordingly, defendants' transfer of $1 billion on March 25, 2019 under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 violates the APA, in particular APA § 706(2)(A), (B), and (C).

118.    The House has been injured, and will continue to be injured, by defendants' unlawful actions, which, among other things, usurp the House's legislative authority.

119.    The House has no adequate or available administrative remedy, and/or any effort to obtain an administrative remedy would be futile.

120.    For the reasons stated herein, the House is entitled to a declaration that defendants' transfer of $1 billion on March 25, 2019 and any subsequent transfers up to $2.5 billion under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 violate the APA, and the Court should enjoin defendants from expending the transferred funds under section 284 in excess of Congressional appropriations or transferring any additional money under section 8005 for purposes of constructing a border wall under 10 U.S.C. § 284.

## PRAYER FOR RELIEF

WHEREFORE, the House respectfully prays that this Court:

A.    Enter declaratory relief as follows:

(i)    With respect to Count I, declare that defendants' transfer of $1 billion on

March 25, 2019 and any subsequent transfers under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 or the expenditure of funds under section 284 in excess of Congressional appropriations violates Article I, section 9, clause 7 of the Constitution;

(ii)  With respect to Count II, declare that defendants' expenditure of funds on a border wall pursuant to 10 U.S.C. § 2808 violates Article I, section 9, clause 7 of the Constitution; and

(iii)  With respect to Count III, declare that defendants' transfer of $1 billion on March 25, 2019 and any subsequent transfers under section 8005 of the 2019 Department of Defense Appropriations Act and any expenditure of those funds for purposes of constructing a border wall under 10 U.S.C. § 284 violates the APA.

B.  Enter injunctive relief as follows:

(i)  With respect to Count I, enjoin defendants from transferring any funds under section 8005 of the 2019 Department of Defense Appropriations Act for purposes of constructing a border wall under 10 U.S.C. § 284 and expending funds under section 284 in excess of Congressional appropriations, including the $1 billion transferred on March 25, 2019;

(ii)  With respect to Count II, enjoin defendants from expending any funds pursuant to 10 U.S.C. § 2808 to build a border wall; and

(iii)  With respect to Count III, enjoin defendants from expending the transferred funds under 10 U.S.C. § 284 in excess of Congressional appropriations or

transferring any additional money under section 8005 for purposes of constructing a border wall under section 284.

C.      Grant the House such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (D.C. Bar No. 253492),
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008),
    *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854),
    *Associate General Counsel*
Kristin A. Shapiro (D.C. Bar No. 1007010),
    *Assistant General Counsel*
Brooks M. Hanner (D.C. Bar No. 1005346),
    *Assistant General Counsel*
Sarah E. Clouse (MA Bar No. 688187),
    *Attorney*

OFFICE OF GENERAL COUNSEL[*]
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

***Counsel for Plaintiff the United States House of
    Representatives***

April 5, 2019

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571.