**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES, | |
| *Plaintiff*, | |
| v. | Case No. 1:19-cv-00969 |
| STEVEN T. MNUCHIN, in his official capacity as Secretary of the United States Department of the Treasury, *et al.*, | |
| *Defendants*. | |

## <u>UNITED STATES HOUSE OF REPRESENTATIVES'
APPLICATION FOR A PRELIMINARY INJUNCTION</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65.1(c), the United States House of Representatives respectfully applies for a preliminary injunction prohibiting defendants from spending funds in excess of Congressional appropriations for counter-narcotics support under 10 U.S.C. § 284 and from spending funds under 10 U.S.C. § 2808(a) on the construction of a wall along the southern border. The House requests that an oral hearing on this application be held on an expedited basis pursuant to Local Rules 7(f) and 65.1(d). A proposed order granting preliminary injunctive relief is submitted with this application. The grounds for this application are set forth in the accompanying memorandum.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 2533492)
    *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
    *Deputy General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
    *Associate General Counsel*
KRISTIN A. SHAPIRO (D.C. Bar No. 1007010)
    *Assistant General Counsel*
BROOKS M. HANNER (D.C. Bar No. 1005346)
    *Assistant General Counsel*
SARAH E. CLOUSE (MA Bar No. 688187)
    *Attorney*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES[*]
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff the United States House of*
    *Representatives*

April 23, 2019

---

[*] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>       *Plaintiff*,<br><br>  v.<br><br>STEVEN T. MNUCHIN, in his official capacity as Secretary of the United States Department of the Treasury, *et al.*,<br><br>       *Defendants*. | Case No. 1:19-cv-00969 |

<u>**UNITED STATES HOUSE OF REPRESENTATIVES' MEMORANDUM IN
SUPPORT OF ITS APPLICATION FOR A PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A. FACTUAL BACKGROUND .................................................................... 4

        1. "I will build a great great wall on our southern border." ................... 4

        2. "I am proud to shut down the government for border security." ........ 7

        3. "I didn't need to do this.  But I'd rather do it much faster." ............. 11

        4. "A vote for today's resolution by Republican Senators is a vote for Nancy Pelosi, Crime, and the Open Border Democrats!" ............................. 18

    B. PROCEDURAL HISTORY .................................................................... 18

ARGUMENT ................................................................................................... 19

I. THE HOUSE HAS STANDING ................................................................ 20

    A. THE HOUSE HAS AN INJURY IN FACT ............................................ 20

        1. Defendants' expenditure of funds without an appropriation inflicts an institutional injury upon the House .................................................. 21

        2. The institutional injury to the House constitutes a cognizable injury in fact ..... 24

    B. THE HOUSE'S INJURY IS FAIRLY TRACEABLE TO DEFENDANTS' CONDUCT AND LIKELY TO BE REDRESSED BY A FAVORABLE JUDICIAL DECISION ............................................................................. 27

II. THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION PROHIBITING DEFENDANTS FROM SPENDING FUNDS ON A BORDER WALL WITHOUT A VALID APPROPRIATION ...................................................... 28

    A. THE HOUSE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .... 29

        1. Defendants' transfer, obligation, and expenditure of $2.5 billion under section 284 on a border wall violate the Appropriations Clause ...................... 29

        2. Defendants' expenditure of $3.6 billion under section 2808 on a border wall violates the Appropriations Clause .................................................. 34

    B. THE HOUSE IS LIKELY TO SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION ............................................................. 40

    C. THE BALANCE OF THE EQUITIES FAVORS A PRELIMINARY INJUNCTION ............................................................................................ 42

    D. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION ............... 44

CONCLUSION ................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

\* *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ...............................................................19, 20, 21, 24, 25, 26, 27

*Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*,
   388 F.3d 405 (3d Cir. 2004) ...........................................................................................24

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
   897 F.3d 314 (D.C. Cir. 2018) .......................................................................................40

*Bank of Am. Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017) .............................................................................................20, 27

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................33

*Blumenthal v. Trump*,
   335 F. Supp. 3d 45 (D.D.C. 2018) ..................................................................................23

*Brady Campaign to Prevent Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................................43, 44

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ...............................................................19, 20, 40, 41

*Cincinnati Soap Co. v. United States*,
   301 U.S. 308 (1937) ........................................................................................................22

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001) ........................................................................................................37

*Comm. on the Judiciary v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) .............................................................................24, 26

*Comm. on Oversight & Gov't Reform v. Holder*,
   979 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................................24, 26

*Delta Data Sys. Corp. v. Webster*,
   744 F.2d 197 (D.C. Cir. 1984) ........................................................................................29

*Fund for Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003) ................................................................................43

\*     *Gordon v. Holder*,
       721 F.3d 638 (D.C. Cir. 2013)............................................3, 40, 41, 42, 44, 45

       *Harrington v. Bush*,
       553 F.2d 190 (D.C. Cir. 1977) .............................................................30, 31

       *INS. v. Chadha*,
       462 U.S. 919 (1983) .........................................................................24

       *INS v. Phinpathya*,
       464 U.S. 183 (1984) .........................................................................39

\*     *League of Women Voters of the U.S. v. Newby*,
       838 F.3d 1 (D.C. Cir. 2016) ...........................................3, 28, 29, 40, 42, 43, 44

       *Nat'l Treasury Emps. Union v. Nixon*,
       492 F.2d 587 (D.C. Cir. 1974) ...........................................................23, 24

       *Nat. Res. Def. Council v. Pena*,
       147 F.3d 1012 (D.C. Cir. 1998) ..............................................................28

       *Ohio Oil Co. v. Conway*,
       279 U.S. 813 (1929) .........................................................................42

\*     *OPM v. Richmond*,
       496 U.S. 414 (1990) .......................................................................22, 23

       *Pursuing Am.'s Greatness v. FEC*,
       831 F.3d 500 (D.C. Cir. 2016) ...........................................................29, 44

       *Reeside v. Walker*,
       52 U.S. 272 (1850) ..........................................................................22

       *R.I.L-R v. Johnson*,
       80 F. Supp. 3d 164 (D.D.C. 2015) ...........................................................28

       *Schneider v. Smith*,
       390 U.S. 17 (1968) ..........................................................................39

       *Sixty-Seventh Minnesota State Senate v. Beens*,
       406 U.S. 187 (1972) .........................................................................24

\*     *U.S. Dep't of the Navy v. FLRA*,
       665 F.3d 1339 (D.C. Cir. 2012) .......................................................21, 22, 29

\* *U.S. House of Representatives v. Burwell,*
   130 F. Supp. 3d 53 (D.D.C. 2015)..............................19, 21, 23, 24, 25, 26, 27, 28, 40, 42

*U.S. House of Representatives v. U.S. Dep't of Commerce,*
   11 F. Supp. 2d 76 (D.D.C. 1998) ...................................................24

*United States v. Am. Tel. & Tel. Co.,*
   551 F.2d 384 (D.C. Cir. 1976) .................................................24, 26

*United States v. Dreyer,*
   804 F.3d 1266 (9th Cir. 2015) ...................................................35

*United States v. MacCollom,*
   426 U.S. 317 (1976) ...............................................................22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...........................................................29, 40, 42

**Constitution, Statutes, Public Laws, and Rules**

U.S. Const. art. I, § 2, cl. 5....................................................23

U.S. Const. art. I, § 3, cl. 6....................................................23

U.S. Const. art. I, § 9, cl. 7....................................................21

U.S. Const. art. II, § 2, cl. 2...................................................23

5 U.S.C. § 704.................................................................33

5 U.S.C. § 706(2)(A)-(C)......................................................33

7 U.S.C. § 702.............................................................33, 34

8 U.S.C. § 1101 note.........................................................43

8 U.S.C. §§ 1521.............................................................36

8 U.S.C. § 1522(d)...........................................................36

10 U.S.C. § 284..............................................................12

10 U.S.C. § 284(a)..............................................12, 13, 29, 30, 38

10 U.S.C. § 284(b).........................................................13, 30

10 U.S.C. § 2801(a) ...............................................................................33, 36

10 U.S.C. § 2801(b) ...................................................................................36

10 U.S.C. § 2801(c)(4) ...............................................................................37

10 U.S.C. § 2808(a) ...............................................................2, 3, 15, 34

18 U.S.C. § 1385 ........................................................................................35

22 U.S.C. § 2601(c) ...................................................................................43

31 U.S.C. § 9705(g)(4)(B) .........................................................................35

31 U.S.C. § 1301(a) ...................................................................................30

31 U.S.C. § 1341(a) ...................................................................................31

31 U.S.C. 1532 ...........................................................................................30

Consolidated Appropriations Act, 2019,
    Pub L. No. 116-6 (2019) (to be printed at 133 Stat. 13) ...............................10, 11

Department of Defense and Labor, Health and Human Services, and Education
    Appropriations Act, 2019 and Continuing Appropriations Act, 2019,
    Pub. L. No. 115-245 (2018) (to be printed at 132 Stat. 2981) ..............................13, 14, 31

Fed. R. Evid. 201(b) ..................................................................................28

Pub. L. No. 93-238, § 735, 87 Stat. 1026, 1044 (1974) ............................32

Pub. L. No. 99-169, § 502(b), 99 Stat. 1005 (codified at 50 U.S.C. § 3094(b)) ...........................32

**Other Authorities**

2 Joseph Story, *Commentaries on the Constitution of the United States* § 1348 (1833) .........22, 23

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342 (1833) .........21, 22

*A Guide to Emergency Powers and Their Use*, Brennan Ctr. (Jan. 23, 2019) ...............................39

H. Rep. No. 93-662 (1973) .........................................................................32

H. Rep. 94-238 (1975) ................................................................................39

H. Rep. No. 99-106 (1985) .........................................................................32

Jennifer K. Elsea, Cong. Research Serv., R42669,
    *The Posse Comitatus Act and Related Matters* (2018) ....................................................35

Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017,
    *Military Construction Funding in the Event of a National Emergency* (2019) ................37

*National Emergencies Act: Hearing on H.R. 3884 Before the S. Comm. on*
    *Gov't Operations*, 94th Cong. (1976) ..............................................................................40

Office of the Under Secretary of Defense (Comptroller),
    DOD Serial No. FY 04-37 PA, Reprogramming Action (Sept. 3, 2004) .........................31

Press Release, White House, Statement by the President on Signing H.R. 3884, the
    "National Emergencies Act" (Sept. 14, 1976) ..................................................................39

S. Rep. 94-1168 (1976) .................................................................................................................39

*The Federalist No. 51* (James Madison) .....................................................................................21

*The Federalist No. 58* (James Madison) .....................................................................................21

**INTRODUCTION**

The U.S. House of Representatives seeks a preliminary injunction to halt the Executive Branch defendants' unauthorized expenditure of federal funds to construct a wall along the southern border without a valid Congressional appropriation. On the same day that President Trump signed legislation under which Congress provided only $1.375 billion for the construction of the border wall, he announced that his Administration would in fact spend up to $8.1 billion. As Acting White House Chief of Staff and Director of the Office of Management and Budget Mick Mulvaney tellingly explained, President Trump decided to build the wall "with or without Congress."[1]

The decision to spend funds "without Congress" violates the Appropriations Clause of the U.S. Constitution, which mandates that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This clause embodies a bedrock principle of our constitutional separation of powers doctrine, which protects against overreaching by the Federal Government. Its presence in the Constitution is no surprise given that even the monarchs of England long ago lost the power to raise and spend money without the approval of Parliament.[2]

Absent this Court's timely intervention, defendants are poised to begin construction on the border wall next month, using funds that Congress declined to appropriate for that purpose. This Court should therefore issue a preliminary injunction to prevent that irreparable injury to the House. The various requirements for a preliminary injunction are readily met here.

The House is likely to succeed on the merits of its claims. Absent a valid appropriation, defendants' expenditures violate the Appropriations Clause. Defendants attempt to paper over

---

[1] Andrew O'Reilly, *Mulvaney Says Border Wall Will Get Built, "With or Without" Funding from Congress*, Fox News (Feb. 10, 2019), https://tinyurl.com/MulvaneyFoxNewsSunday.

[2] *See The Civil War: The Long Parliament*, U.K. Parliament, https://tinyurl.com/UKLongParliament (last visited Apr. 10, 2019).

their constitutional violation, but to no avail; the provisions that defendants invoke as authorizing the expenditures on a border wall – 10 U.S.C. §§ 284 and 2808 – provide no such authority.

Section 284 authorizes the Secretary of Defense to construct fences to block drug smuggling corridors along the border. Most of the fiscal year (FY) 2019 funding that Congress appropriated for the military's Drug Interdiction and Counterdrug Activities has already been used. The defendants therefore plan to transfer into that fund $2.5 billion that Congress appropriated for *other* purposes. Not only have defendants already transferred $1 billion into that fund, but they also recently awarded contracts against that funding for construction set to begin next month.

Defendants incorrectly claim that section 8005 of the 2019 Department of Defense Appropriations Act authorizes the transfer of this funding. That section only authorizes transfers for "higher priority items, based on unforeseen military requirements" and "in no case where the item for which funds are requested has been denied by the Congress." Congress was thus clear that section 8005 could not be used to circumvent the appropriations process to pay for an item that Congress had declined to fund. But that is precisely what defendants have done here – they are transferring money into the drug interdiction fund to pay for construction that is not based on "unforeseen military requirements" and for a request that was "denied by the Congress." Moreover, section 8005 expressly excludes transfers for purposes of "military construction." Yet, as discussed below, defendants have asserted that building the border wall *is* military construction.

Defendants' asserted authority to spend $3.6 billion on border wall construction under section 2808 fares no better. Section 2808(a) provides that, when the President declares a national emergency, the Secretary of Defense may redirect unobligated military construction funds to other projects if (1) there is a national emergency "that requires use of the armed forces," (2) the funding is spent on a "military construction project," and (3) the project is "necessary to support [the] use

of the armed forces." But, here, there is no emergency that requires the use of the *armed forces*, and a border wall is not necessary to support the use of such forces. In addition, the border wall is not a "military construction project" as that term is statutorily defined. And, as noted above, section 8005 *prohibits* transfers of funds for "military construction," while section 2808 *requires* that the funds be spent on military construction projects. Defendants cannot have it both ways: if the border wall is a military construction project, as they assert by invoking section 2808, then their construction of the wall using funds under section 284 is unauthorized.

The House likewise satisfies the remaining requirements for a preliminary injunction. As already noted, defendants are moving quickly to construct the border wall, and they have awarded contracts against funds that Congress did not appropriate for that purpose. And more contracts are coming soon. Once made, these unconstitutional expenditures cannot be undone, and the grave institutional injury inflicted on the House cannot be remedied. The House is prepared to litigate this case on an expedited basis, and defendants cannot plausibly contend that the funds at issue must be spent immediately, as opposed to after speedy resolution of the merits of the House's claim. This point was confirmed by President Trump himself, as he candidly acknowledged, "I could do the wall over a longer period of time. I didn't need to do this."[3]

Finally, the public interest favors an injunction because there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, "it may be assumed that the Constitution is the ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quotation marks omitted). The Court should grant the House's application for a preliminary injunction.

---

[3] *Remarks by President Trump on the National Security and Humanitarian Crisis on Our Southern Border*, White House (Feb. 15, 2019, 10:39 AM) (Feb. 15 Rose Garden Remarks), http://tinyurl.com/TrumpRoseGardenRemarks.

# BACKGROUND

## A. Factual Background

### 1. *"I will build a great great wall on our southern border."*

On June 16, 2015, Donald J. Trump announced that he was running for President of the United States.[4]  During his speech, Mr. Trump complained that "[t]he U.S. has become a dumping ground for everybody else's problems."[5]  "When Mexico sends its people," he explained, "they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us [sic].  They're bringing drugs.  They're bringing crime.  They're rapists.  And some, I assume, are good people."[6]  Mr. Trump promised that if he were elected, "I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border."[7]  As a candidate, Mr. Trump also stated that "I will have Mexico pay for that wall.  Mark my words."[8]

Mr. Trump won the election and was sworn in as the 45th President of the United States on January 20, 2017.  Five days later, President Trump issued an executive order directing the Secretary of Homeland Security to "take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border," which the order defined to "mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier."[9]

---

[4] *See Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015) (Presidential Announcement Speech), http://tinyurl.com/TrumpAnnouncement.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] Exec. Order No. 13,767, 82 Fed. Reg. 8793, 8794 (Jan. 25, 2017).  The Administration sources cited herein frequently refer to border fencing as a "wall."  For consistency, the House will generally refer to the President's planned barrier construction in the same manner.  However, when a cited source uses a more specific term, such as "fencing," the House will use that term.

The order further directed the Secretary to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds for the planning, designing, and constructing of a physical wall along the southern border."[10]

During President Trump's first two years in office, the Department of Homeland Security (DHS) responded to Executive Order 13,767 by spending as much money as had been appropriated by Congress on the construction of a border wall, but no more. For FY 2017, President Trump requested "$999 million for planning, design, and construction of the first installment of the border wall."[11] In response, Congress provided DHS with $341.2 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border."[12]

For FY 2018, President Trump requested from Congress "$2.6 billion in high-priority tactical infrastructure and border security technology, including funding to plan, design, and construct a physical wall along the southern border as directed by the President's January 25, 2017 [Executive Order]."[13] The White House's budget request explained that this amount would "aggressively implement the President's commitment to construct a physical wall along the southern border."[14] DHS separately explained that $1.6 billion of the $2.7 billion would be spent to construct 74 miles of new or replacement border wall.[15]

_____

[10] *Id.*

[11] Memorandum from Mick Mulvaney, Dir., Office of Mgmt. & Budget, to President Trump, FY 2017 Appropriations Request 3 (Mar. 16, 2017), https://tinyurl.com/BudgetRequestFY17.

[12] Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, div. F, tit. VI, 131 Stat 135, 434.

[13] Office of Mgmt. & Budget, *Budget of the U.S. Government: A New Foundation for American Greatness: Fiscal Year 2018*, at 18 (2017), http://tinyurl.com/BudgetRequestFY18.

[14] Office of Mgmt. & Budget, *America First: A Budget Blueprint to Make America Great Again* 14 (2017), http://tinyurl.com/FY18BudgetRequest.

[15] U.S. Dep't of Homeland Security, *FY 2018 Budget in Brief* at 3, 26, 28, http://tinyurl.com/DHSFY18BudgetBrief. The remaining funds from the White House's $2.7

In response to the President's FY 2018 request, Congress appropriated "$1.571 billion for physical barriers and associated technology along the Southwest border."[16] Congress intended this funding to "provide[] for more than 95 miles of 'border wall system,' including approximately 47 miles of new barriers and 48 miles of upgraded barriers."[17] At one point, President Trump described this appropriation as a "Big WIN . . . for building the wall."[18] Based on information provided to Congress by the Administration, it appears that CBP has constructed less than 1 mile of fencing with this funding.[19]

Accordingly, during President Trump's first two years in office, Congress appropriated funds sufficient to construct approximately 135 miles of new and upgraded barriers along the southern border. Notably, these barriers are in addition to the 354 miles of primary pedestrian fencing, 37 miles of secondary pedestrian fencing, 14 miles of tertiary pedestrian fencing, and 300 miles of vehicle fencing along the southern border that existed at the time of President Trump's

---

billion-dollar request would be spent on tactical infrastructure, surveillance technology, staffing, and other assets. *See id.* at 26-28.

[16] *Homeland Security Appropriations Bill, 2018: Omnibus Agreement Summary* 1, Senate Comm. on Appropriations (FY 2018 Omnibus Agreement Summary), http://tinyurl.com/FY18OmnibusAgreementSummary; *see also* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a) (to be printed at 132 Stat. 348, 616).

[17] FY 2018 Omnibus Agreement Summary at 1, http://tinyurl.com/FY18OmnibusAgreementSummary. DHS separately explained that this funding "equates to approximately 84 [sic] miles of border wall in multiple locations across the Southwest border." *See* Press Release, U.S. Dep't of Homeland Security, Walls Work (Dec. 12, 2018), http://tinyurl.com/DHSWallsWork.

[18] Donald Trump (@realDonaldTrump), Twitter (July 12, 2017, 4:24 PM), https://tinyurl.com/12July2017Tweet.

[19] *See* Compl. ¶ 23.

inauguration.[20]  In other words, as President Trump has declared, "we have a lot of appropriation," and "we're building a lot of wall."[21]

        2.   *"I am proud to shut down the government for border security."*

President Trump sought Congressional appropriations to continue the construction of a border wall during his third year in office.  For FY 2019, President Trump officially requested from Congress "$1.6 billion to construct approximately 65 miles of border wall."[22]  Around July 2018, however, President Trump informally "pressed Republicans to give him $5 billion as a down

---

[20] *Mileage of Pedestrian and Vehicle Fencing by State*, U.S. Border Patrol (Aug. 2, 2017), https://tinyurl.com/Mileage2Aug2017.  The primary fence is "[t]he first layer of fencing," which may "include both pedestrian and vehicle fencing . . . ; the secondary fence, located behind the primary fence, consists solely of pedestrian fencing; and the . . . tertiary fence[] is primarily used to delineate property lines."  U.S. Gov't Accountability Office, GAO-17-331, *Southwest Border Security: Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps* 9 n.24 (2017), http://tinyurl.com/GAOSwBorderSecurity.  "The U.S.-Mexico land border is approximately 1,933 miles."  Michael John Garcia, Cong. Research Serv., R42975, *Barriers Along the U.S. Borders: Key Authorities and Requirements* 1 n.2, https://tinyurl.com/CRSBarrierAuthorities.  Much of the border consists of rugged terrain that even President Trump concedes does not need a wall.  *See, e.g.*, *Transcript of Donald Trump Interview with the Wall Street Journal*, Wall Street J. (Jan. 14, 2018), http://tinyurl.com/WSJInterviewTranscript ("The wall's never meant to be 2,100 miles long.  We have mountains that are far better than a wall, we have violent rivers that nobody goes near[.]").
[21] Video: President Trump on Human Trafficking, C-SPAN (Feb. 1, 2019), https://tinyurl.com/CSPANFeb2019PressConference (starting around 9:30, 40:10, 41:25, 43:03, 49:15, and 51:25).
[22] Office of Mgmt. & Budget, *Fiscal Year 2019: Efficient, Effective, Accountable: An American Budget* 58 (2018), http://tinyurl.com/WHFY19BudgetRequest; *see also Stronger Border Security: 2019 Budget Fact Sheet*, White House, at 2 (Feb. 2018), http://tinyurl.com/WHFY19BudgetFactSheet (noting request for "1.6 billion for new border wall in locations identified by the Border Patrol as necessary to obtain operational control of the border and impede illegal crossings").

payment on his wall."[23]  President Trump never amended his formal budget request, nor did he provide any additional details concerning his informal request for $5 billion.[24]

The initial FY 2019 Senate appropriations bill for DHS included $1.6 billion for approximately 65 miles of border fencing – the figure officially requested by the White House.[25] Democrats in the House indicated that they would agree to pass the measure "so long as the language d[id] not *require* [the $1.6 billion] to be spent on the wall."[26]  Near the end of the 115th Congress, however, Congress and the President reached an impasse on appropriations for a border wall.

On December 11, 2018, President Trump held a televised meeting with Speaker of the House (then-Minority Leader) Nancy Pelosi and Senate Minority Leader Chuck Schumer to negotiate FY 2019 appropriations for a border wall.[27]  At that meeting, President Trump reiterated his demand for $5 billion for a border wall.[28]  He further warned that "[i]f we don't get what we

---

[23] Rachael Bade, *Immigration Storm Bears Down on Republicans*, Politico (July 2, 2018, 5:05 AM), http://tinyurl.com/PoliticoImmigrationStorm.

[24] The process for submitting and amending budget and appropriations requests to Congress is subject to rigorous and well-established guidelines and procedures that were not followed here. *See generally* Office of Mgmt. & Budget, OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* (2018), https://tinyurl.com/OMBCircularA11; U.S. Gov't Accountability Office, GAO-16-464SP, *Principles of Federal Appropriations Law* 2-15 (4th ed. 2016), https://tinyurl.com/GAORedBook (noting "long and exhaustive administrative process of budget preparation and review").

[25] S. 3109, 115th Cong., tit. II (as reported by Senate Comm. on Appropriations, June 21, 2018); *see* Lindsey McPherson, *$1.6 Billion for Border Security, Not Just Wall, Could Be Agreed To, Hoyer Says*, Roll Call (Dec. 4, 2018, 12:46 PM) (McPherson, *$1.6 Billion for Border Security*), http://tinyurl.com/RollCallDec18.

[26] McPherson, *$1.6 Billion for Border Security*, http://tinyurl.com/RollCallDec18 (emphasis added).

[27] Aaron Blake, *Trump's Extraordinary Oval Office Squabble with Chuck Schumer and Nancy Pelosi, Annotated*, Wash. Post (Dec. 11, 2018), https://tinyurl.com/WaPoOvalOfficeSquabble.

[28] *Id.*

want one way or the other, whether it's through you, through a military, through anything you want to call, I will shut down the government, absolutely."[29]  He declared, "I am proud to shut down the government for border security."[30]

On December 19, 2018 – two days before funding for nine federal departments, including DHS, was set to expire – the Senate passed a continuing resolution to fund the Federal Government through February 8, 2019.[31]  The Senate resolution did not include additional funding for a border wall.[32]  The next day, the House approved a short-term funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection – Procurement, Construction, and Improvements."[33]  However, because "Democrats w[ere] not . . . willing to support $5 billion in wall funding," the Senate never considered the House's version of the legislation."[34]

Consistent with President Trump's threats, appropriations for a substantial portion of the Federal Government expired on December 21, 2018, beginning the longest Federal Government shutdown in history.[35]  On January 2, 2019, Speaker Pelosi stated that the incoming House would provide "nothing for the wall."[36]  On January 8, 2019, President Trump addressed the nation from the Oval Office, stating that "there is a growing humanitarian and security crisis at our southern

---

[29] *Id.*

[30] *Id.*

[31] *See* Further Additional Continuing Appropriations Act, 2019, H.R. 695, 115th Cong. § 101(1) (Dec. 19, 2018).

[32] *Id.*

[33] *See* H.R. 695, 115th Cong. § 141 (Dec. 20, 2018).

[34] Bo Erickson et al., *House Passes Spending Bill with $5 Billion Border Wall Funding, Increasing Likelihood of Shutdown*, CBS News (Dec. 20, 2018, 9:00 PM), http://tinyurl.com/CBSHousePassesBill.

[35] *See* Pub. L. No. 115-298 (2018) (to be printed at 132 Stat. 4382).

[36] Tal Axelrod, *Pelosi on Negotiations with Trump: "Nothing for the Wall"*, The Hill (Jan. 2, 2019), http://tinyurl.com/HillNothingForWall.

border."[37]  He stated that his "administration ha[d] presented Congress with a detailed proposal to secure the border," including "$5.7 billion for a physical barrier."[38]  He implored Congress to "do[] its job" and "pass a bill that ends this crisis."[39]

On January 25, 2019, after it became apparent that the Federal Government's closure was causing serious disruption throughout the nation, President Trump agreed to end the shutdown by signing a continuing resolution to fund the Government through February 14, 2019.[40]  Between January 25 and February 14, a bipartisan conference committee was established to negotiate a deal to fund the Government for FY 2019.[41]  The committee ultimately reached a compromise that included $1.375 billion for 55 miles of new fencing along the border.[42]

On February 14, 2019, Congress passed the Consolidated Appropriations Act, 2019.[43]  The Act appropriated $1.375 billion for construction of fencing in the Rio Grande Valley area of the border but provided that in that area "[n]one of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing – (1) within the Santa Ana Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical [P]ark;

---

[37] *Full Transcripts: Trump's Speech on Immigration and the Democratic Response*, N.Y. Times (Jan. 8, 2019) (National Address Transcript), http://tinyurl.com/TrumpNationalAddress.

[38] *Id.*; *see also* Letter from Russell T. Vought, Acting Dir., Office of Mgmt. & Budget, to Senator Richard Shelby, Chairman, Senate Comm. on Appropriations (Jan. 6, 2019), http://tinyurl.com/ShelbyLettertoApprops (requesting "$5.7 billion for construction of a steel barrier for the Southwest border" to "fully fund the top 10 priorities in CBP s Border Security Improvement Plan").

[39] National Address Transcript, http://tinyurl.com/TrumpNationalAddress.

[40] *See* Further Additional Continuing Appropriations Act, 2019, Pub. L. No. 116-5 (2019) (to be printed at 133 Stat. 10); Kevin Liptak, *Flight Delays Pile Pressure on Trump Amid Shutdown*, CNN (Jan. 25, 2019, 12:17 PM) http://tinyurl.com/CNNFlightDelays.

[41] *See* Phil Mattingly, *These Members of Congress are Seeking a Deal on Border Security and Trump's Wall*, CNN (Jan. 28, 2019, 5:05 PM), http://tinyurl.com/CNNConferenceCommittee.

[42] *Summary of DHS Fiscal Year 2019 Appropriations Agreement*, Senate Appropriations Comm., 2 (2019), http://tinyurl.com/SenateFY19AppropsSummary.

[43] Pub L. No. 116-6 (2019) (to be printed at 133 Stat. 13).

(4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge."[44]  Congress limited the funding for new fencing to "operationally effective designs" that had been deployed as of 2017, "such as currently deployed steel bollard designs, that prioritize agent safety."[45]  No other funding was designated by Congress for the construction of a border wall.

The Act further provided for "$14.959 billion for [CBP's budget], $942 million more than fiscal year 2018," in order to fund a total of 600 additional CBP officers and to provide for nearly half a billion dollars "to address humanitarian concerns at the border, including medical care, more efficient transportation, and holding facility requirements with better conditions and services for migrants."[46]  It also appropriated additional funds for family case management, supporting alternatives to detention, and increasing the number of immigration judges.[47]

On February 15, 2019, President Trump signed the 2019 Consolidated Appropriations Act into law.[48]

### 3.  *"I didn't need to do this.  But I'd rather do it much faster."*

The same day he signed the 2019 Appropriations Act, President Trump expressed his dissatisfaction with the $1.375 billion that Congress has appropriated and announced that his

---

[44] *Id.* § 231, 133 Stat. 28.

[45] *Id.* § 230(b), 133 Stat. 28.

[46] Senate Summary of FY 2019 Appropriations Agreement at 2, http://tinyurl.com/SenateFY19AppropsSummary.

[47] *Compare* Pub. L. No. 116-6 (FY 2019 Immigration & Customs Enforcement (ICE) appropriations), *with* Pub. L. No. 115-141 (FY 2018 ICE appropriations).  *See generally* H. Rep. No. 116-9, at 478-84 (2019) (Conf. Rep.) (explaining the 2019 increase in funds for family case management and directing ICE "to prioritize the use of ATD [alternatives to detention] programs for families, including family case management, for which the bill provides significant additional resources").

[48] *See* Pub. L. No. 116-6 (to be printed at 133 Stat. 13).

Administration would instead spend up to $8.1 billion on the construction of a border wall.[49]  To use the words of Mr. Mulvaney, the Administration decided to build the wall "without Congress."[50]

The White House stated that it would draw funding from three sources to supplement the amount appropriated by Congress:

- About $601 million from the Treasury Forfeiture Fund

- Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284)

- Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808).[51]

The White House stated that these sources "will be used sequentially and as needed."[52]

The House's lawsuit and this preliminary injunction application concern only the latter two of these purported funding sources – section 284 and section 2808.

      *a.  Section 284*

Defendants announced that they plan to spend "[u]p to $2.5 billion under the Department of Defense [(DOD)] funds transferred for Support for Counterdrug Activities" under 10 U.S.C. § 284.[53]  In pertinent part, section 284 provides that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if "such support is requested[] by the official who has responsibility for the

---

[49] *Fact Sheet: President Donald J. Trump's Border Security Victory*, White House (Feb. 15, 2019) (Border Victory Fact Sheet), http://tinyurl.com/WHBorderVictory; Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

[50] Andrew O'Reilly, *Mulvaney Says Border Wall Will Get Built, 'With or Without' Funding from Congress*, Fox News (Feb. 10, 2019), https://tinyurl.com/MulvaneyFoxNewsSunday.

[51] Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory.

[52] *Id.*

[53] *See id.*

counterdrug activities . . . of the department or agency of the Federal Government." 10 U.S.C. § 284, (a)(1)(A). Section 284(b) further provides that "[t]he purposes for which the Secretary may provide support" include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b), (b)(7). Authority under this section does not depend on the President's declaration of a national emergency.

For FY 2019, Congress appropriated only about $517.2 million for the military's Drug Interdiction and Counterdrug Activities fund (drug interdiction fund), including counter-narcotics support under section 284.[54] The House understands that most of this funding has already been used.[55] Defendants therefore plan to transfer approximately $2.5 billion that Congress appropriated for *other* purposes into the fund.[56] And on March 25, 2019, defendants transferred an initial tranche of $1 billion from funds that Congress appropriated for military personnel costs to the drug interdiction fund.[57] DOD announced that "[t]hese funds will be used to support DHS's request to build 57 miles of 18-foot-high pedestrian fencing, constructing and improving roads, and installing lighting within the Yuma and El Paso Sectors of the border."[58] Defendants have announced that they will begin construction with these funds next month.[59]

---

[54] Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, div. A, tit. VI (2018) (to be printed at 132 Stat. 2981, 2997).

[55] *See* Compl. ¶ 62.

[56] *See id.* ¶¶ 63-64.

[57] Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer.

[58] Press Release, U.S. Dep't of Def., DOD Authorizes Support to Counter Drug Border Security (Mar. 25, 2019), http://tinyurl.com/DODMarch25PressRelease.

[59] *See* Ryan Browne, *Pentagon Awards Nearly $1 Billion to Build Trump's Border Wall*, CNN (Apr. 9, 2019, 6:30 PM), https://tinyurl.com/CNNPentagonAwards1B.

Defendants claim that section 8005 of the 2019 Department of Defense Appropriations Act authorizes such transfers. In pertinent part, section 8005 provides:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.

Pub. L. No. 115-245, § 8005 (2018) (to be printed at 132 Stat. 2981, 2999). Section 8005 thus authorizes transfers only for "higher priority items, based on unforeseen military requirements," and it prohibits transfers if "the item[s] for which funds are requested [have] been denied by the Congress."

      *b. Section 2808*

Defendants also announced that they plan to spend "[u]p to $3.6 billion reallocated from Department of Defense military construction projects" under 10 U.S.C. § 2808.[60] Defendants have already identified military construction projects that might be cut to finance the construction of a border wall under section 2808.[61] And DOD's FY 2020 budget request includes an additional

---

[60] *See* Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory.

[61] U.S. Dep't of the Army, Military Construction (Part IA OCO/Emergency), at 21, *in Department of the Army Fiscal Year (FY) 2020: President's Budget Submission* (2019), https://tinyurl.com/ArmyFY2020Budget.

"$3.6 billion for funding any [military construction] projects delayed as a result of the emergency declaration."[62]

In pertinent part, section 2808 provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

10 U.S.C. § 2808(a). Section 2808(a) thus authorizes the Secretary of Defense to redirect unobligated military construction funds to other projects subject to three specific limitations: (1) there must be a national emergency "that requires use of the armed forces," (2) the funding must be spent on a "military construction project[]," and (3) the project must be "necessary to support [the] use of the armed forces."

As a predicate to asserting authority under section 2808(a) to spend funds on border wall construction, on February 15, 2019, President Trump declared a "national emergency" at the southern border:

> NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 201 and 301 of the National Emergencies Act (50 U.S.C. 1601 *et seq.*), hereby declare that a national emergency exists at the southern border of the United States[.] . . . To provide additional authority to the Department of Defense to support the Federal Government's response to the emergency at the southern border, I hereby declare that this emergency requires use of the Armed Forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. 1631),

---

[62] *Id.*

15

that the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.[63]

The House is unaware of any other instance in American history where a President has declared a national emergency to obtain funding after having failed to win Congressional approval for an appropriation.[64]

The proclamation outlines the asserted basis for the national emergency declaration. It explained that "[t]he southern border is a major entry point for criminals, gang members, and illicit narcotics."[65] The proclamation concedes that this "problem of large-scale unlawful migration . . . is longstanding," but explained that "the situation has worsened in certain respects in recent years" because there are "sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."[66]

Prior to signing the proclamation, President Trump explained his decision in remarks from the Rose Garden.[67] A complete transcript is attached as Exhibit A. Among other things, President Trump explained that Democrats appropriated for border security a "crazy" amount of money – "so much money, we don't know what to do with it."[68] Democrats "didn't even fight us on most

---

[63] Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (National Emergency Proclamation), https://tinyurl.com/NationalEmergencyProclamation.

[64] *See* Charlie Savage, *Presidents Have Declared Dozens of Emergencies, But None Like Trump's*, N.Y. Times (Feb. 15, 2019), http://tinyurl.com/NYTDozensofEmergencies.

[65] *See* National Emergency Proclamation, https://tinyurl.com/NationalEmergencyProclamation.

[66] *Id.*

[67] Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

[68] *Id.*

of the stuff," such as "[p]orts of entry."[69]  "The only place [Democrats] don't want to give as much money [is the wall] – [$1.375 billion]," which "[s]ounds like a lot, but it's not so much."[70]  Later he remarked: "I went through Congress.  I made a deal.  I got almost $1.4 billion when I wasn't supposed to get one dollar – not one dollar.  'He's not going to get one dollar.'  Well, I got $1.4 billion.  But I'm not happy with it."[71]

President Trump also stated that, regardless of how much FY 2019 funding is spent, his Administration will build a substantial amount of border wall.  "So we have a chance of getting close to $8 billion," he explained.[72]  But "[w]hether it's $8 billion or $2 billion or $1.5 billion, it's going to build a lot of wall."[73]  Indeed, President Trump declared that "[w]e're getting it done," and that "[w]e're right now in construction with wall in some of the most important areas."[74]

Reiterating that he was "successful" in getting Democrats to appropriate funding for the wall, President Trump explained why he nevertheless declared a national emergency:

> So I did – I was successful, in that sense, but I want to do it faster.  ***I could do the wall over a longer period of time.  I didn't need to do this.***  But I'd rather do it much faster.  And I don't have to do it for the election.  ***I've already done a lot of wall, for the election – 2020.***  And the only reason we're up here talking about this is because of the election, because they want to try and win an election, which it looks like they're not going to be able to do.  And this is one of the ways they think they can possibly win, is by obstruction and a lot of other nonsense.  ***And I think that I just want to get it done faster, that's all.***[75]

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*; *see also id.* ("I've built a lot of wall.  I have a lot of money, and I've built a lot of wall.").

[75] *Id.* (emphases added).

4. *"A vote for today's resolution by Republican Senators is a vote for Nancy Pelosi, Crime, and the Open Border Democrats!"*[76]

Congress swiftly rebuked President Trump's decision to declare a national emergency at the southern border and spend in excess of what Congress had appropriated on the construction of a border wall. On February 26, 2019, the House adopted House Joint Resolution 46 by a vote of 245 to 182, providing for the termination of President Trump's national emergency declaration pursuant to section 202 of the National Emergencies Act, 50 U.S.C. § 1622.[77] And on March 14, 2019, the Senate passed the joint resolution by a vote of 59 to 41.[78] The joint resolution was supported by numerous Republicans, such as Senator Mitt Romney, who stated that his vote of disapproval was "a vote for the Constitution and for the balance of powers that is at its core."[79] President Trump vetoed the joint resolution on March 15, 2019.[80]

## B. Procedural History

The House filed this suit on April 5, 2019. As the complaint sets forth in detail, defendants' transfer, obligation, and expenditure of funds to construct a border wall without a valid Congressional appropriation violates the Appropriations Clause. Count I claims that section 8005 does not authorize defendants' transfer of funds for purposes of constructing a border wall under section 284, and that defendants' expenditure of funds under this section therefore violates the Appropriations Clause. Count II claims that section 2808(a) does not authorize defendants' expenditure of funds on the construction of a border wall, and that defendants' expenditure of funds under this section therefore violates the Appropriations Clause. Count III claims that

---

[76] @realDonaldTrump (Mar. 14, 2019, 7:46 AM), http://tinyurl.com/14Mar2019Tweet.

[77] 165 Cong. Rec. H2217-18 (daily ed. Feb. 26, 2019).

[78] 165 Cong. Rec. S1882 (daily ed. Mar. 14, 2019).

[79] Marianne Levine, *Senate Deals Blow to Trump in Vote to Terminate Border Emergency*, Politico (Mar. 14, 2019, 4:16 PM), http://tinyurl.com/PoliticoSenateVote.

[80] *Veto Message to the House of Representatives for H.J. Res. 46*, White House (March 15, 2019), https://tinyurl.com/TrumpVetoMessage.

defendants' transfer of $1 billion under section 8005 is reviewable agency action that violates the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*   The complaint seeks, *inter alia*, declaratory and injunctive relief prohibiting defendants from spending funds in excess of what Congress appropriated for counter-narcotics support under section 284 and from spending funds under section 2808(a) on the construction of a border wall.

## ARGUMENT

This Court should issue a preliminary injunction to enjoin the defendants' unconstitutional and unlawful actions, which have usurped the House's legislative authority.  At the threshold, the House has Article III standing to bring this suit.  The "standing . . . element of the Constitution's case-or-controversy" requirement is "[t]rained on whether the plaintiff is a proper party to bring a particular lawsuit." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quotation marks and punctuation omitted).  The House has filed this suit to defend its own constitutional authority against a significant encroachment by the Executive Branch.  As this court has recognized, "the House . . . as an institution would suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation." *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53, 74 (D.D.C. 2015).  Indeed, the House's injury is "particularly insidious" because our "constitutional structure would collapse, and the role of the House would be meaningless, if the Executive could circumvent the appropriations process and spend funds however it pleases." *Id.* at 71, 72.

The House also readily satisfies the requirements for a preliminary injunction.  The House is likely to succeed on the merits of its claims against defendants' unconstitutional expenditure of funds on the construction of a border wall in the absence of a valid appropriation.  And the issuance of a preliminary injunction is necessary in this case to "preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 297 (D.C. Cir. 2006) (quotation marks omitted). Defendants are moving quickly to construct the border wall, and they have already awarded contracts against funds that Congress did not appropriate for that purpose. Absent this Court's intervention, within a few weeks defendants will begin construction on a border wall using funds that were not appropriated by Congress for that purpose. The injury to the House when funds are spent in violation of the Appropriations Clause is irreparable, and the balance of the equities and the public interest favor a preliminary injunction.

## I.   THE HOUSE HAS STANDING

The House has standing to bring this suit for relief against defendants' unconstitutional expenditure of funds on a border wall. To "demonstrate constitutional standing," a "plaintiff must show an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) (citations omitted). In considering whether the House has standing, the Court must assume the merits of the House's claim. *See Ariz. State Legislature*, 135 S. Ct. at 2663.

The "standing . . . element of the Constitution's case-or-controversy" requirement is "[t]rained on whether the plaintiff is a proper party to bring a particular lawsuit." *Ariz. State Legislature*, 135 S. Ct. at 2663 (quotation marks and punctuation omitted). The House is the proper party to bring this lawsuit. The Appropriations Clause vests Congress with the exclusive authority and concomitant responsibility to control the purse strings of the Federal Government. The House suffers direct injury when this authority has been infringed, and it has a significant institutional interest in safeguarding its own constitutional power.

### A.  The House Has an Injury in Fact

"'To qualify as a party with standing to litigate,' [a plaintiff] 'must show, first and foremost,' injury in the form of 'invasion of a legally protected interest' that is 'concrete and

particularized' and 'actual or imminent.'" *Ariz. State Legislature*, 135 S. Ct. at 2663 (citations omitted). As this Court has recognized, "[t]he House . . . as an institution would suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation." *Burwell*, 130 F. Supp. 3d at 74. As explained below, defendants' violation of the Appropriations Clause inflicts a substantial institutional injury upon the House, and this institutional injury is a cognizable injury in fact for purposes of Article III standing.

> 1. *Defendants' expenditure of funds without an appropriation inflicts an institutional injury upon the House*

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Defendants' "constitutional trespass" upon Congress's authority under this clause plainly "inflict[s] a concrete, particular harm upon the House" as an institution. *Burwell*, 130 F. Supp. 3d at 70.

The Appropriations Clause was designed to protect "Congress's 'exclusive power over the federal purse,'" *U.S. Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted). "Th[is] power of the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *Id.* (quoting *The Federalist No. 51* (James Madison); *see also The Federalist No. 58* (James Madison) ("The House of Representatives cannot only refuse, but they alone can propose the supplies requisite for the support of government."). The Framers vested appropriations authority in Congress to provide it with "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." *The Federalist No. 58*; *FLRA*, 665 F.3d at 1347 ("The Appropriations Clause is thus a bulwark of the Constitution's separation of powers" because it operates "as a restraint on Executive Branch officers" who may seek "'unbounded power

over the public purse.'" (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342 (1833) (*Commentaries*), at 213-14).

Consistent with the purpose of the Appropriations Clause, courts have repeatedly held that "Congress's control over federal expenditures is absolute." *FLRA*, 665 F.3d at 1348 (quotation marks omitted); *see also OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("'[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). Thus, "[t]he established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976). Further, "[n]o officer, however high, not even the President, . . . is empowered to . . . take[] or draw[] money from the Treasury except under an appropriation by Congress." *Reeside v. Walker*, 52 U.S. 272, 291 (1850). "However much money may be in the Treasury at any one time, *not a dollar* of it can be used in the payment of any thing not thus previously sanctioned." *Id.* (emphasis added). The Executive Branch cannot buy so much as a single bottle of water without a valid appropriation. *See FLRA*, 665 F.3d at 479 ("[W]hen safe and drinkable tap water is available in the workplace, bottled water constitutes a personal expense for which appropriated funds may not be expended.").

Congress's authority under the clause is absolute for good reason. As Justice Story explained, "it is highly proper, that congress should possess the power to decide how and when any money should be applied for these purposes." *Richmond*, 496 U.S. at 427 (quoting 2 *Commentaries* § 1348). "If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure." *Id.* (quoting 2 *Commentaries* § 1348); *accord FLRA*, 665 F.3d at 1347.

Due to its plenary nature, the Appropriations Clause provides the House with a powerful tool to check the Executive Branch. *See Richmond*, 496 U.S. at 427 ("The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation." (quoting 2 *Commentaries* § 1348)). In multiple briefs filed in this court, the Executive Branch itself has acknowledged the importance of this authority: "Congress, of course, has a variety of means by which it can exert pressure on the Executive Branch, such as . . . reducing Executive Branch appropriations." Mem. in Supp. of Mot. to Dismiss and in Opp'n to Mot. for Partial Summ. J. . . . at 9, *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), No. 1:08-cv-00409 (ECF No. 16-1); *see also* Mem. in Supp. of Mot. to Dismiss at 29, *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013), No. 1:12-cv-01332 (ECF No. 13-1) (similar).

Indeed, the House's appropriations authority is its "*ultimate* check on the otherwise unbounded power of the Executive," *Burwell*, 130 F. Supp. 3d at 76 (emphasis added), and the Executive's usurpation of this authority therefore inflicts a significant harm to the House as an institution. Other tools possessed by Congress to check the Executive Branch will frequently not be as useful or as fitting as withholding an appropriation. For example, Congress's constitutional authority to advise and consent on Presidential appointments, U.S. Const. art. II, § 2, cl. 2, lies solely with the Senate, and thus does not provide the House with any means to check the Executive Branch. Similarly, while the House possesses "the sole Power of Impeachment," *id.* art. I, § 2, cl. 5, it depends on the Senate to "try all Impeachments," *id.* art. I, § 3, cl. 6. Moreover, because impeachment is an "extreme" measure, in some respects it is a limited tool to check most Executive Branch abuses. *Blumenthal v. Trump*, 335 F. Supp. 3d 45, 68 (D.D.C. 2018); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("[T]he Constitution should

not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President.").

In short, permitting defendants to "offend[] the Appropriations Clause" would "affect[] the constitutional balance of powers" in a manner that puts the House at a severe disadvantage within our system of government, which the Framers never intended. *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. FLRA*, 388 F.3d 405, 414 (3d Cir. 2004). Defendants' unconstitutional expenditures thus inflict a palpable institutional injury on the House.

> 2. *The institutional injury to the House constitutes a cognizable injury in fact*

The House's institutional injury constitutes a cognizable injury in fact for purposes of Article III standing. Indeed, the Supreme Court and courts in this Circuit have consistently held that legislative entities, like the House or Senate, have standing to seek redress for institutional injuries.[81]

This court in *U.S. House of Representatives v. Burwell* held that the House had standing "to sue and stop expenditures for which no annual appropriation was enacted." 130 F. Supp. 3d at 70. *Burwell* was a challenge brought by the House to enjoin various Executive Branch officials from making cost-sharing reduction payments to insurers under the Patient Protection and Affordable Care Act, Pub. L. No. 11-148, 124 Stat. 119 (2010). *See Burwell*, 130 F. Supp. at 63.

---

[81] *See, e.g., Ariz. State Legislature*, 135 S. Ct. at 2663-66 (state legislature standing to assert redistricting authority); *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 194 (1972) (state senate standing to prosecute lawsuit challenging apportionment); *United States v. Am. Tel. & Tel. Co. (AT&T)*, 551 F.2d 384, 390-91 (D.C. Cir. 1976) ("[T]he House as a whole has standing to assert its investigatory power."); *Burwell*, 130 F. Supp. 3d at 70 (House standing to assert appropriations authority); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 69 (D.D.C. 2008) (House standing to assert investigatory and oversight authority); *Holder*, 979 F. Supp. 2d at 3 (D.D.C. 2013) (same); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 83-86 (D.D.C. 1998) (House standing to assert informational interest in the census and interest in its lawful composition); *see also INS. v. Chadha*, 462 U.S. 919, 939 (1983) (holding Congress is the "proper party" to defend the constitutionality of the one-House veto).

The House contended that the payments were unconstitutional because they lacked a valid appropriation, whereas the defendants claimed that 31 U.S.C. § 1324 provided a permanent appropriation for the payments. *See id.* at 74. The court explained that, "[p]roperly understood," the House's claim was "not about the implementation, interpretation, or execution of any federal statute," but rather it was "a complaint that the Executive ha[d] drawn funds from the Treasury without a congressional appropriation . . . in violation of [the Appropriations Clause]." *Id.* at 70.

The court further explained that it was "clear that the House ha[d] suffered a concrete, particularized injury that gives it standing to sue." *Burwell*, 130 F. Supp. 3d at 71. This was so because "Congress . . . is the only body empowered by the Constitution to adopt laws directing monies to be spent from the U.S. Treasury," and "this constitutional structure would collapse, and the role of the House would be meaningless, if the Executive could circumvent the appropriations process and spend funds however it pleases." *Id.* In fact, the court continued, "the harm alleged in this case is particularly insidious *because*, if proved, it would eliminate Congress's role vis-à-vis the Executive," as "[t]he political tug of war anticipated by the Constitution depends on [the Appropriations Clause] having some force." *Id.* at 73. Thus, the court concluded that where the Executive Branch has taken action "in contravention of the specific proscription" of the Appropriations Clause, "the House as an institution has standing to sue." *Id.* at 71; *id.* at 74 ("The House of Representatives as an institution would suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation.").

Similarly, in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court recently held that the Arizona Legislature had standing to challenge Arizona Proposition 106, which gave the Arizona Independent Redistricting Commission binding authority over redistricting. 135 S. Ct. at 2663-67. The legislature claimed that Proposition 106 violated its

authority under the Elections Clause of the U.S. Constitution, which provides that "[t]he Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof," art. 1, § 4, cl. 1. *See Ariz. State Legislature*, 135 S. Ct. at 2663. In holding that the legislature had standing, the Supreme Court explained that Proposition 106 "strip[ped] the Legislature of its alleged prerogative to initiate redistricting," and thus that the legislature as "an institutional plaintiff" was properly asserting an "institutional injury" in a lawsuit it commenced "after authorizing votes in both of its chambers." *Id.* at 2663-64.[82]

Finally, courts have repeatedly held that the House suffers a cognizable injury when its investigational and oversight authority has been impaired. The D.C. Circuit has stated in no uncertain terms that "[i]t is clear that the House as a whole ha[s] standing to assert its investigatory power, and can designate a member to act on its behalf." *United States v. Am. Tel. & Tel. Co.* (*AT&T*), 551 F.2d 384, 391 (D.C. Cir. 1976). Thus, the D.C. Circuit held in *AT&T* that the Chairman of the House Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce had standing to intervene in a lawsuit brought by the Executive Branch seeking to enjoin AT&T from complying with a subcommittee subpoena. *Id.* at 391. Similarly, this court has consistently held that House committees have standing "to vindicate . . . [their] institutional prerogative to compel compliance with [their] subpoenas." *Miers*, 558 F. Supp. 2d at 79 (House Committee on the Judiciary); *see also Holder*, 979 F. Supp. 2d at 20 (House Committee on Oversight & Government Reform).

---

[82] The Supreme Court additionally noted that "[t]he case before us does not touch or concern the question whether Congress has standing to bring a suit against the President," because "[t]here is no federal analogue to Arizona's initiative power, and a suit between Congress and the President would raise separation-of-powers concerns absent here." *Ariz. State Legislature*, 135 S. Ct. at 2665 n.12. As the court in *Burwell* explained, this "*obiter dictum* raises cautions only as to justiciability, not jurisdiction." 130 F. Supp. 3d at 69.

As in the cases detailed above, the House is "an institutional plaintiff asserting an institutional injury," *Ariz. State Legislature*, 135 S. Ct. at 2665, whose lawsuit is authorized by the House, *see* Compl. ¶ 56. And just as in *Burwell*, defendants have inflicted a "particularly insidious" harm upon the House by disabling one of the most effective weapons the House has in any "political tug-of-war" with the Executive Branch. *Burwell*, 130 F. Supp. 3d at 73.

This point is evidenced by the facts at hand. Exercising its appropriations authority, the House rejected the President's request for $5 billion for a border wall. *See supra* pp. 7-11. President Trump chose to shut down the Federal Government in an attempt to gain leverage over the House. *See id.* This strategy failed, and instead of accepting that he could not obtain the appropriations he desired through the route required by the Constitution, the President decided to circumvent the appropriations process.

The defendants' drawing of funds from the Treasury absent a valid appropriation therefore inflicts a cognizable injury to the House. This injury is "actual or imminent,'" *Ariz. State Legislature*, 135 S. Ct. at 2663 (quotation marks omitted), as defendants are moving quickly to construct a border wall, *see supra* pp. 13-15. Indeed, they have already withdrawn money from military personnel accounts and transferred it to the drug interdiction fund for purposes of building a border wall, and they have already awarded contracts for such construction against this funding. *See supra* p. 13. The House is a proper party to seek judicial relief for the defendants' usurpation of the House's own constitutional authority.

## B. The House's Injury Is Fairly Traceable to Defendants' Conduct and Likely to Be Redressed by a Favorable Judicial Decision

Finally with respect to standing, the House's injury is one that is both "'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am.*, 137 S. Ct. at 1302 (citations omitted); *see also Burwell*, 130 F. Supp. 3d at 71 n.18 (noting

that defendants conceded that the House had established traceability and redressability).  The

House's injury is traceable to defendants' conduct because defendants are the Executive Branch

officials charged with implementing the President's directive to spend funds on the construction

of a border wall in the absence of a valid appropriation.  And if the House is successful on its

claims that defendants' transfer, obligation, and expenditure of funds to construct a border wall

violates the Appropriations Clause, the injury to the House is likely to be redressed by a favorable

order of this Court enjoining the unconstitutional expenditures.  *Id.* at 76 ("If successful on the

merits," the House's constitutional claim "might result in an injunction against [the

unconstitutional expenditures]" which "would cure the constitutional injury.").  In sum, "the

constitutional trespass alleged in this case would inflict a concrete, particular harm upon the House

for which it has standing to seek redress in this Court."  *Id.* at 70.

## II.  THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION PROHIBITING DEFENDANTS FROM SPENDING FUNDS ON A BORDER WALL WITHOUT A VALID APPROPRIATION

This Court should issue a preliminary injunction prohibiting defendants from spending

funds in excess of Congressional appropriations for counter-narcotics support under section 284

and from spending funds under section 2808(a) on the construction of a wall along the southern

border.[83]  "A party seeking a preliminary injunction must make a 'clear showing that four factors,

---

[83] A plaintiff seeking a preliminary injunction may "rely on 'evidence that is less complete than in a trial on the merits'"; the evidence need only be "credible." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015) (quoting *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998)).  In support of its application, the House relies on widely known facts and facts apparent from government records that are subject to judicial notice. *See generally* Fed. R. Evid. 201(b).  Most of the documents that the House relies upon are available online and links are provided in this memorandum.  A few of the documents are nonpublic records of the agencies that were provided to the House by defendants; in such cases, this memorandum cites the allegation in the complaint that describes those documents.  The House can provide copies of these documents to the Court upon request.

taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters*, 838 F.3d at 6 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[84]  In this case, all four factors weigh in favor of issuing a preliminary injunction.

## A. The House Is Likely to Succeed on the Merits of Its Claims

As an initial matter, the House is likely to succeed on the merits of its claims that defendants are expending transferred funds under sections 284 and 2808(a) on the construction of a border wall without a valid appropriation in violation of the Appropriations Clause and the APA.  *See* Compl. (Counts I-III).  "Decisions of the Supreme Court and this Court have strictly enforced the constitutional requirement, implemented by federal statutes, that uses of appropriated funds be authorized by Congress." *FLRA*, 665 F.3d at 1342.  In considering whether defendants' proposed expenditures comply with Congress's specific statutory limitations, "it is the court that has the last word and it should not shrink from exercising its power." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 202 (D.C. Cir. 1984) (quotation marks and punctuation omitted); *accord FLRA*, 665 F.3d at 1349.

> ### 1. Defendants' transfer, obligation, and expenditure of $2.5 billion under section 284 on a border wall violate the Appropriations Clause

To begin, defendants are not authorized to spend up to $2.5 billion of transferred funds under section 284 on the construction of a border wall.  Section 284(a) provides that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other

---

[84] The D.C. Circuit has had "no occasion . . . to decide whether the [D.C. Circuit's] 'sliding scale' approach [with respect to the four factors] remains valid after *Winter*." *League of Women Voters*, 838 F.3d at 7.  Because the House "satisf[ies] each of the four preliminary injunction factors," this case also does not present such an occasion. *Id.*

department or agency of the federal government" if "such support is requested[] by the official who has responsibility for the counterdrug activities . . . of the department or agency of the Federal Government." 10 U.S.C. § 284(a), (a)(1)(A). Section 284(b) further provides that "[t]he purposes for which the Secretary may provide support" include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b), (b)(7). Authority under this section does not depend on the President declaring a national emergency.

For FY 2019, Congress appropriated $517.171 million to the Drug Interdiction and Counterdrug Activities appropriation fund (drug interdiction fund), which is the source of funding for counter-narcotics support under section 284. *See supra* p. 13. The House does not challenge the expenditure of any remaining appropriated funds under section 284 on the construction of a border wall. But defendants were not content to spend the appropriated funds under section 284. Instead, they have transferred into this account $1 billion that Congress appropriated for other purposes and awarded contracts against this funding to construct a border wall,[85] and they plan to transfer another $1.5 billion into this account.

It is a fundamental principle of appropriations law that "[a]n amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." 31 U.S.C. § 1532; *see also id.* § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").[86] Defendants incorrectly claim that section 8005 of the 2019 Department of Defense

---

[85] Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer.

[86] These provisions are among the "various statutory provisions" that reflect "[t]he Congressionally chosen method of implementing" the Appropriations Clause. *Harrington v. Bush*,

Appropriations Act authorizes the transfers here, and they have already transferred $1 billion of funding under this section to the drug interdiction fund for the purpose of constructing a border wall. *See supra* p. 13. In pertinent part, section 8005 provides that the Secretary of Defense may:

> [T]ransfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof . . . : *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.

Pub. L. No. 115-245, § 8005 (2018) (to be printed at 132 Stat. 2981, 2999). Three limitations on defendants' transfer authority in this section are relevant here.

*First*, section 8005 only authorizes transfers of funds "for higher priority items, based on unforeseen military requirements." Congress included this limitation to confine DOD's transfer authority to situations where unanticipated circumstances justify a departure from Congress's previously authorized spending. For example, in the past, DOD has used this authority to transfer funds to pay for unexpected hurricane damage to bases.[87] Here, by contrast, defendants' supposed need to transfer money does not arise from unforeseen circumstances. President Trump has been demanding $5 billion for a border wall since summer 2018, and he has been complaining about a supposed crisis at the border since the start of his campaign. *See supra* pp. 4, 7-8. The purported

---

553 F.2d 190, 194–95 (D.C. Cir. 1977) (footnote omitted); *see also, e.g.*, 31 U.S.C. § 1341(a) (prohibiting government officers from making or authorizing expenditures "exceeding an amount available in an appropriation").

[87] *See, e.g.*, Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 04-37 PA, Reprogramming Action (Sept. 3, 2004), http://tinyurl.com/DOD2004ReprogrammingAction.

need to build a border wall was entirely foreseen – Congress simply disagreed with President Trump's opinion that $5 billion for a border wall was necessary and proper.

*Second*, section 8005 does not authorize the transfer of funds in cases "where the item for which funds are requested has been denied by the Congress." The "denied by the Congress" restriction was added to DOD's transfer authority starting in FY 1974, to "tighten congressional control of the reprogramming process." H. Rep. No. 93-662, at 16 (1973); *see* Pub. L. No. 93-238, § 735, 87 Stat. 1026, 1044 (1974). The House committee report on the 1974 appropriations bill explained that "[n]ot frequently, but on some occasions, the Department ha[d] requested that funds which have been specifically deleted in the legislative process be restored through the reprogramming process," and that "[t]he Committee believe[d] that to concur in such actions would place committees in the position of undoing the work of the Congress." H. Rep. No. 93-662, at 16. Of considerable significance here, the committee stated that such a position would be "untenable." *Id.* Consistent with its purpose, this sort of appropriations restriction is intended to be "construed strictly" to "prevent the funding for programs which have been considered by Congress and for which funding has been denied." *See* H. Rep. No. 99-106, at 9 (1985) (discussing analogous appropriations restriction in Pub. L. No. 99-169, § 502(b), 99 Stat. 1005 (codified at 50 U.S.C. § 3094(b))).

In the striking factual circumstances surrounding the Administration's repeated demands for border wall funding – which culminated in the longest Federal Government shutdown in history – Congress's rejection of President Trump's request for $5 billion for a border wall was clear. *See supra* pp. 7-11. DOD's use of its transfer authority to restore the funds "which have been considered by Congress and . . . denied," H. Rep. No. 99-106, at 9, is therefore "untenable," H. Rep. No. 93-662, at 16.

*Finally*, section 8005 does not authorize transferring funds for "military construction." Section 2801(a) provides that "[t]he term 'military construction' as used in this chapter or any other provision of law includes any construction development, conversion, or extension of any kind carried out with respect to a military installation." 10 U.S.C. § 2801(a). For the reasons set forth in the next section, construction of a border wall does not constitute "military construction" because the border is not a "military installation." If, however, the Court were to hold that the construction of a border wall *does* constitute "military construction" – as defendants must be urging by invoking section 2808(a) – then defendants' transfer of funds is not authorized under section 8005.

In the absence of a statutory authorization for their expenditures of federal funds, defendants are in clear violation of the Appropriations Clause. In addition to their constitutional violations – and for essentially the same reasons – the defendants' transfer, obligation, and expenditure of $1 billion under section 8005 violate the APA, 5 U.S.C. § 500 *et seq.* The transfer of $1 billion to the drug interdiction fund, and the award of contracts against that funding to construct a border wall, are "final agency action[s]" for which the House has "no other adequate remedy in a court." 5 U.S.C. § 704. The transfer and obligation of these funds "mark the 'consummation' of the agency's decisionmaking process . . . by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). And there is no other means – through an administrative proceeding or otherwise – for the House to obtain judicial review. For the reasons discussed below, defendants' transfer, obligation, and expenditure of these funds are "not in accordance with law," are "contrary to constitutional right, power, privilege, or immunity," and are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A)-(C). And there can be no meaningful

dispute that the House has been "adversely affected or aggrieved by" defendants' actions, 7 U.S.C. § 702, which usurp the House's constitutional authority under the Appropriations Clause – a constitutional provision that reserves for Congress the exclusive power over the federal purse.

2. *Defendants' expenditure of $3.6 billion under section 2808 on a border wall violates the Appropriations Clause*

Defendants are likewise not authorized to spend up to $3.6 billion on the construction of a border wall under section 2808(a). Section 2808(a) provides that:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense … may undertake military construction projects … not otherwise authorized by law that are necessary to support such use of the armed forces.

10 U.S.C. § 2808(a). The House does not dispute that the President has declared a national emergency pursuant to the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, a threshold requirement under section 2808(a). However, even where the President has declared a national emergency, section 2808(a) imposes three independent limitations on the expenditure of funds: (1) there must be a national emergency "that requires use of the armed forces," (2) the funding must be spent on a "military construction project," and (3) the project must be "necessary to support [the] use of the armed forces." 10 U.S.C. § 2808(a). Defendants may not rely on section 2808(a) here because they comply with none of its limitations.

*First*, there is no national emergency "that requires use of the armed forces." President Trump's emergency proclamation recognizes that the "problem of large-scale unlawful migration . . . is longstanding."[88] Although the proclamation also states that "[t]he southern border

---

[88] *See* National Emergency Proclamation, https://tinyurl.com/NationalEmergencyProclamation.

is a major entry point for criminals, gang members, and illicit narcotics,"[89] border security is a matter for *domestic* law enforcement.[90]  Indeed, that is precisely the job that Congress has tasked and equipped CBP – not the armed forces – to do.[91]  CBP is the "largest federal law enforcement agency in the United States," and its mission is to "safeguard America's borders."[92]  Not only is it CBP's job to ensure the security of the nation's borders, but the military is expressly prohibited by the Posse Comitatus Act, 18 U.S.C. § 1385,[93] from making "direct active use of Federal troops" to execute domestic law.  *United States v. Dreyer*, 804 F.3d 1266, 1272 (9th Cir. 2015) (quotation marks omitted).  Defendants cannot credibly maintain that the armed forces are "required" to address the current supposed emergency.  In fact, the Acting Secretary of Defense recently admitted that the situation at the southern border is "not a military threat."[94]

President Trump's proclamation claims that the situation at the border has "worsened" due to "sharp increases in the number of family units entering and seeking entry to the United States

---

[89] *See id.*

[90] Defendants' use of $601 million from the Treasury Forfeiture Fund to construct a border wall, *see* Border Victory Fact Sheet, http://tinyurl.com/WHBorderVictory, also confirms that construction of a border wall is a matter for law enforcement, because money from this fund may only be applied to "law enforcement activities," *see* 31 U.S.C. § 9705(g)(4)(B).

[91] *See, e.g.*, *Snapshot: A Summary of CBP Facts and Figures*, U.S. Customs & Border Protection (Dec. 2018), http://tinyurl.com/CBPSnapshotDec18.

[92] *Id.*

[93] The Posse Comitatus Act applies only to "the Army or the Air Force."  18 U.S.C. § 1385. Similar restrictions, however, apply to other branches of the armed forces by statute and regulation. *See* Jennifer K. Elsea, Cong. Research Serv., R42669, *The Posse Comitatus Act and Related Matters* 3-5 (2018), https://tinyurl.com/CRSPosseComitatus.

[94] *Department of Defense Budget Posture: Hearing Before the S. Comm. on Armed Servs.*, 116th Cong. (2019) (statement of Patrick Shanahan, Acting Sec'y, Dep't of Def.) (pre-published stenographic transcript available at https://tinyurl.com/DefenseBudgetHearing).

and an inability to provide detention space."[95]  However, this trend has been apparent for years,[96] and the humanitarian issues it raises are a matter for the domestic law enforcement agencies,[97] not the armed forces.  As explained, *see supra* p. 11, Congress's FY 2019 appropriation for CBP dramatically increased its budget "to address humanitarian concerns at the border, including medical care, more efficient transportation, and holding facility requirements with better conditions and services for migrants."[98]  As President Trump expressed, Democrats appropriated for border security "so much money, we don't know what to do with it."[99]

*Second*, a border wall is not a "military construction project" as that term is defined by statute.  *See* 10 U.S.C. § 2801(b) (defining "military construction project" as "all *military construction* work . . . necessary to produce a complete and usable facility or a complete and usable improvement to an existing facility" (emphasis added)).  The statute defines "military construction project" with reference to the specifically defined term "military construction," which includes "any construction, development, conversion, or extension of any kind carried out with respect to a military installation."  *Id.* § 2801(a).[100]  And a "military installation" is defined to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a

---

[95] National          Emergency          Proclamation, https://tinyurl.com/NationalEmergencyProclamation.

[96] *See, e.g.*, *Southwest Border Migration FY2017*, U.S. Customs & Border Protection (Dec. 15, 2017), https://tinyurl.com/CBPFY17SWStats.

[97] The Department of Health and Human Services also assists with caring for immigrant children, *see* 8 U.S.C. §§ 1521, 1522(d) ("establish[ing], within the Department of Health and Human Services, an office to be known as the Office of Refugee Resettlement," which provides "[a]ssistance for refugee children"), and it is not even a law enforcement agency, much less a military one.

[98] *Summary of DHS Fiscal Year 2019 Appropriations Agreement*, Senate Appropriations Comm., 1 (2019), http://tinyurl.com/SenateFY19AppropsSummary.

[99] *See* Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

[100] Section 2801(a) further states that military construction includes "any acquisition of land or construction of a defense access road (as described in section 210 of title 23)."

military department." [101]  *Id.* § 2801(c)(4).  Thus, a "military construction project" is "military construction work" "carried out with respect to a military installation" – *i.e.*, "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."

In this case, the border wall is not a "military construction project" because it is not "carried out with respect to a military installation."[102]  The southern border is clearly not a "base, camp, post, station, yard, [or] center."  Nor is it some "other activity under the jurisdiction of the Secretary of a military department."  "[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quotation marks omitted).  Thus, for the southern border to qualify as some "other activity under the jurisdiction of the Secretary of a military department" for purposes of section 2808(a), it must be "similar in nature" to a military "base, camp, post, station, yard, [or] center."  The southern border of the United States obviously is like none of these places.

Defendants' use of section 284 to build a border wall confirms that such construction does not constitute "military construction."  As explained earlier, section 8005 does not authorize transferring funds for purposes of "military construction," *see supra* p. 33, and defendants

_____

[101] This is the definition applicable to domestic military installations.  "[I]n the case of an activity in a foreign country," the activity must be "under the operational control of the Secretary of a military department or the Secretary of Defense."  10 U.S.C. § 2801(c)(4).

[102] Previous projects under section 2808 have included the construction of barracks hangars and improvements to airfield runways.  *See* Michael J. Vassalotti & Brendan W. McGarry, Cong. Research Serv., IN11017, *Military Construction Funding in the Event of a National Emergency* 2 (2019), https://tinyurl.com/CRS-MilConFunding (listing all military construction projects under section 2808(a) between 2001 and 2014).  Notably – with the exception of one project related to "security measures for weapons of mass destruction" – every project carried out under section 2808(a) has occurred abroad.  *See id.* at 2-3.

therefore appear to concede that a border wall does not constitute military construction by invoking this transfer authority to justify their transfer, obligation, and expenditure of $2.5 billion. The Administration cannot have it both ways: section 2808 prohibits reprogramming *except for* military construction projects, while section 8005 prohibits the transfer of funds *for* military construction. Moreover, section 284 authorizes the Secretary of Defense to construct fencing along the border *only* to "provide support for the counterdrug activities . . . of *any other* department or agency of the Federal Government" and *only* if "such support is requested[] by the official who has responsibility for" such activities. 10 U.S.C. § 284(a) (emphasis added). But if the border were "similar in nature" to a "base, camp, post, station, yard, [or] center," it would make little sense for Congress to have limited the Secretary of Defense to constructing fencing only at the request of another agency.

*Finally*, a border wall is not "necessary to support [the] use of the armed forces." Over the last year, President Trump has ordered a few thousand troops to assist DHS and CBP at the border.[103] Consistent with the Posse Comitatus Act, *see supra* p. 35, these troops are strictly limited to a supporting role. They do not actively participate in law enforcement efforts but instead provide assistance such as "aerial reconnaissance, ground surveillance, search and rescue support and medical support."[104] There is no reason a border wall is "necessary" to support the troops in their provision of such assistance, and President Trump himself admitted that he "didn't need to do this."[105]

*     *     *

---

[103] *See* Jim Garamone, *Additional Personnel to Deploy to Southwest Border*, U.S. Dep't of Def. (Oct. 26, 2018), https://tinyurl.com/BorderTroops.

[104] Jim Garamone, *DOD Officials Testify on Military Support to Southwest Border*, U.S. Dep't of Def. (Jan. 29, 2019), http://tinyurl.com/DODJan29Article.

[105] Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

Defendants cannot satisfy the "strict threshold criteria" set forth in section 2808(a). *INS v. Phinpathya*, 464 U.S. 183, 195 (1984). Defendants' expenditure of section 2808(a) funds therefore circumvents the will of Congress and undermines our "tripartite scheme of government" in which it is "up to Congress" to control the federal purse. *Id.* at 196.

Nor should the Court "stretch th[e] words [of section 2808(a)'s three limitations] beyond their normal meaning" to excuse defendants' transgression. *Schneider v. Smith*, 390 U.S. 17, 27 (1968). Section 2808 is one of scores of statutes that the President may invoke by declaring a national emergency under the National Emergencies Act.[106] That statute was enacted in 1976, "to reform the existing maze of statutes which has resulted from the states of emergency under which the country has been operating for over 40 years."[107] The National Emergencies Act was "not intended to grant additional authority to the President," but instead to make clear that "[t]he President can only exercise those powers delegated to him in other statutes." S. Rep. 94-1168, at 4 (1976); *accord* H. Rep. 94-238, at 5-6 (1975). That is why the Act itself "ma[de] no attempt to define when a declaration of national emergency is proper." S. Rep. 94-1168, at 3. Rather, "[t]he circumstances authorizing a declaration of national emergency are defined by the statutes giving the President the extraordinary powers to use in the case of a national emergency." *Id.* at 4.

In other words, Congress declined to define what constitutes a "national emergency" in the National Emergencies Act because it intended for the underlying statutes that provide emergency authority – statutes like section 2808(a) – to limit the circumstances and manner in which such authority could be exercised. If courts fail to enforce the limitations set forth in such statutes, then

---

[106] *See A Guide to Emergency Powers and Their Use*, Brennan Ctr. (Jan. 23, 2019), http://tinyurl.com/BrennanCenterEmergencyPowers.

[107] Press Release, White House, Statement by the President on Signing H.R. 3884, the "National Emergencies Act" (Sept. 14, 1976), https://tinyurl.com/PressReleaseNEA.

the President's emergency authority will once again be practically unbounded. Only by strictly

enforcing the limits of the President's emergency statutory authority can we ensure that it is not

deployed with respect to "frivolous or partisan matters," *National Emergencies Act: Hearing on*

*H.R. 3884 Before the S. Comm. on Gov't Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank

Church), or – to use the words of President Trump's proclamation – "longstanding" problems that

should be addressed through the proper political channels.

Accordingly, as with defendants' proposed expenditure under section 284, defendants'

proposed expenditure of up to $3.6 billion under section 2808(a) on the construction of a border

wall is unauthorized and violates the Appropriations Clause.

## B. The House Is Likely to Suffer Irreparable Injury Absent a Preliminary Injunction

"[I]rreparable injury" to the House is also "likely in the absence of an injunction. *Winter*,

555 U.S. at 7. "The party seeking a preliminary injunction must make two showings to

demonstrate irreparable harm": (1) "the harm must be 'certain and great,' 'actual and not

theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent

irreparable harm,'" and (2) "the harm 'must be beyond remediation.'" *League of Women Voters*,

838 F.3d at 7-8 (citing *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The House easily

clears both hurdles.

To start, the harm to the House is certain and great absent an injunction. *See League of*

*Women Voters*, 838 F.3d at 7-8. As explained above, *see supra* pp. 24-26, the institutional injury

suffered by the House in this case is "particularly insidious." *Burwell*, 130 F. Supp. 3d at 73. Like

other constitutional harms, this constitutional injury to the House "unquestionably" constitutes an

irreparable injury. *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314,

334 (D.C. Cir. 2018) ("[T]he loss of constitutional freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." (quotation marks omitted)); *see also Gordon*, 721 F.3d at 653 ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (quotation marks omitted)); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 303 ("Where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination.").

The House has been and will continue to be injured absent injunction. President Trump has stated that wall construction is "[m]oving quickly,"[108] and senior Administration officials have boasted that "it will 'shock' people to see how quickly the administration will build a wall."[109] Defendants have already transferred money under section 284 and awarded contracts against that funding, and they have identified military construction projects that might be cut to fund the construction of a border wall under section 2808, and requested an extra $3.6 billion in FY 2020 appropriations to offset the cuts they will make to these projects given their diversion of funds for the construction of a border wall.[110] *See supra* pp. 14-15. And, of course, President Trump explained that he "didn't need to" declare a national emergency because he "could do the wall over a longer period of time," except that he "just want[s] to get it done *faster*."[111]

---

[108] @realDonaldTrump (Jan. 20, 2019, 6:20 AM), http://tinyurl.com/20Jan2019Tweet.

[109] Rachael Bade et al., *"A Recipe for Disaster"? Trump's Border Emergency Drags the GOP into a Risky Fight Ahead of 2020*, Wash. Post (Feb. 15, 2019), http://tinyurl.com/WaPoRecipeDisaster.

[110] On February 15, 2019, defendants also notified Congress that the first tranche of funding from the Treasury Forfeiture Fund – amounting to $242 million – requested by DHS would be available for obligation within fifteen days. *See* Compl. ¶ 49. Although this lawsuit does not challenge defendants' use of this funding, it is illustrative of the speed with which they are proceeding.

[111] Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks (emphasis added).

Finally, the House's injury cannot be remedied if defendants are permitted to make unconstitutional expenditures while this case is pending. *Cf. Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929) ("If the tax be paid during the pendency of the suit, and the statute be adjudged invalid by the final decree, the plaintiff will be remediless."). If defendants are permitted to spend funds on border wall construction while this case is being litigated, those funds cannot be clawed back. There is no question that the House will be irreparably injured absent an injunction.

### C. The Balance of the Equities Favors a Preliminary Injunction

The balance of the equities likewise favors a preliminary injunction. *See League of Women Voters*, 838 F.3d at 12. In analyzing this factor, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 7 (quotation marks omitted). The equities in this case favor an injunction because, as explained above, *see supra* pp. 24-26, the House will suffer a "particularly insidious" irreparable injury absent an injunction, *Burwell*, 130 F. Supp. 3d at 73, whereas issuance of a "preliminary injunction will not substantially injure other interested parties," *League of Women Voters*, 838 F.3d at 12 (quotation marks omitted). Any countervailing assertion of harm by defendants is unavailing.

*First*, the Federal Government does not suffer any cognizable harm when it is prevented from acting unconstitutionally. *Cf. Gordon*, 721 F.3d at 655 ("Although the preliminary injunction might temporarily frustrate the federal government's interest in enforcing state and local tax laws, the district court permissibly gave greater weight to the possibility that Gordon could suffer an ongoing constitutional violation while this litigation proceeds."). Because the House has demonstrated that it is likely to succeed on the merits, *see supra* pp. 29-40, the balance of the equities automatically favors the issuance of a preliminary injunction, *see infra* p. 44 (explaining

that Federal Government's interest is synonymous with the public interest and that the Constitution is the ultimate expression of the public interest).

*Second*, even if defendants could contend that being prevented from illegally expending funds on a border wall causes them harm, any competing claims of harm would still be insufficient to tip the equities in their favor. The expenditure of the funds at issue is not necessary to meaningfully advance any government interest. As explained above, *see supra* pp. 34-38, there is neither a military crisis at the border nor is a border wall necessary to address any purported crisis.

Moreover, the Executive Branch has numerous "other tools at [its] disposal" – tools that Congress *has* authorized and funded – to secure the border. *See League of Women Voters*, 838 F.3d at 13 ("Additionally . . . the states have other tools at their disposal to ensure the integrity of elections, including protections against voter fraud."). For example, the Executive Branch could actually spend the funds that Congress appropriated and deemed sufficient for the construction of a border wall, *see supra* pp. 10-11, and it could invoke any or all of the multiple statutes Congress has crafted specifically to address immigration emergencies.[112]

Defendants also cannot "set forth any reason as to why" the funds "must be [spent] *at this time*, as opposed to after a resolution on the merits of [the House's] claims." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 27 (D.D.C. 2009) (emphasis added); *see also Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 237 (D.D.C. 2003) ("[Defendants] have not met their burden of demonstrating why reduction of the mute swan population in Maryland *must* begin at this time[.]"). President Trump waited over two years into his presidency before declaring a

---

[112] *See, e.g.*, Immigration and Nationality Act, § 404(b), 8 U.S.C. § 1101 note (establishing the Immigration Emergency Fund to provide for an increase in border enforcement activities during immigration emergencies); 22 U.S.C. § 2601(c) (establishing the Emergency Refugee and Migration Assistance Fund to provide assistance with respect to unexpected urgent refugee and migration needs).

national emergency. *See supra* pp. 11-12. And he declared an emergency even though the Executive Branch has not yet spent all of funds that Congress has appropriated for the construction of a border wall. *See supra* p. 6. The House is prepared to litigate this case on an expedited basis. In such a context, defendants cannot plausibly contend that they "*must*" spend the funds at issue here immediately. *Brady Campaign*, 612 F. Supp. 2d at 27 (emphasis added). Indeed, President Trump himself stated that he "could do the wall over a longer period of time" and that he "didn't need to do this."[113]

In sharp contrast to any purported harm that defendants claim, the harm to the House cannot be undone. *See supra* pp. 40-42. The balance of the equities therefore heavily favors an injunction.

### D. The Public Interest Favors a Preliminary Injunction

Finally, issuing a preliminary injunction "accord[s] with the public interest." *League of Women Voters*, 838 F.3d at 6 (quotation marks omitted). Because the parties in this case are officials charged with representing the public, any harm to the parties "and the public interest [is] one and the same, because the government's interest *is* the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 511.

Consequently, the public interest here favors issuance of a preliminary injunction for reasons similar to those discussed with respect to the other preliminary injunction factors: "[E]nforcement of an unconstitutional law is always contrary to the public interest." *Id.* (quoting *Gordon*, 721 F.3d at 653); *see also League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). There is in fact a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (quotation marks omitted).

---

[113] *See* Feb. 15 Rose Garden Remarks, http://tinyurl.com/TrumpRoseGardenRemarks.

Because "it may be assumed that the Constitution is the ultimate expression of the public interest," *Gordon*, 721 F.3d at 653 (quotation marks omitted), the public interest is served by ensuring that defendants do not irrevocably offend that document while this case is being litigated.

## CONCLUSION

The Court should issue a preliminary injunction prohibiting defendants from spending funds in excess of Congressional appropriations for counter-narcotics support under section 284 and from spending funds under section 2808(a) on the construction of a wall along the southern border.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 2533492)
   *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
   *Deputy General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
   *Associate General Counsel*
KRISTIN A. SHAPIRO (D.C. Bar No. 1007010)
   *Assistant General Counsel*
BROOKS M. HANNER (D.C. Bar No. 1005346)
   *Assistant General Counsel*
SARAH E. CLOUSE (MA Bar No. 688187)
   *Attorney*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES[*]
219 Cannon House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

*Counsel for Plaintiff the United States House of
    Representatives*

April 23, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, Sarah Friedman, and Lily Hsu, students at The George Washington University Law School, in preparing this brief.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2019, I caused the foregoing document to be filed via the

U.S. District Court for the District of Columbia's CM/ECF system, which I understand caused a

copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter