# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES HOUSE OF REPRESENTATIVES, | ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:19-cv-00969-TNM |
| v. | ) ) | |
| STEVEN T. MNUCHIN, in his official capacity as Secretary of the United States Department of the Treasury, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) ) | |

## BRIEF OF FORMER GENERAL COUNSELS OF THE U.S. HOUSE OF REPRESENTATIVES AS *AMICI CURIAE*

ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP

Lawrence S. Robbins (D.C. Bar No. 420260)
Alan E. Untereiner (D.C. Bar No. 428053)
D. Hunter Smith (D.C. Bar No. 1035055)
Megan Browder* (CO Bar No. 49660)
Carolyn Forstein (D.C. Bar No. 230152)
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: lrobbins@robbinsrussell.com

*Counsel for* Amici Curiae

*Supervised by principals of the firm pending admission to the D.C. Bar.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

INTEREST OF *AMICI CURIAE* .......................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    A.    The Vital Role Of The Appropriations Clause In The Separation Of Powers............................................................................................................... 2

    B.    The Appropriations Dispute Giving Rise To This Lawsuit And This Court's Role In Resolving It ................................................................................... 5

ARGUMENT ........................................................................................................................... 7

I.    The President's Proposed Expenditures Harm The House's Institutional Interest In Exercising The Appropriations Power................................................................................. 8

    A.    Legislatures Have Standing To Assert Institutional Injuries ................................. 8

    B.    The Cases Involving Suits By Individual Legislators Are Readily Distinguishable ...................................................................................................... 10

    C.    Congressional Institutional-Standing Comports With The Separation of Powers................................................................................................................... 12

II.    The Injury To Congress's Institutional Interests Is Especially Clear Here Because Congress Rejected The Very Expenditures The President Plans To Make ...................... 13

III.    There Are No Alternative Legislative Remedies Available To Congress That Could Avoid or Mitigate The Clear Harm To Its Institutional Interests .................................... 15

CONCLUSION......................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................................................................12

*\*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015) ......................................................................................................7, 8

*Blumenthal v. Trump*,
  335 F. Supp. 3d 45 (D.D.C. 2018) .......................................................................................17

*Campbell v. Clinton*,
  203 F.3d 19 (D.C. Cir. 2000) ...............................................................................................15

*Chenoweth v. Clinton*,
  181 F.3d 112 (D.C. Cir. 1999) .........................................................................11, 12, 14, 16

*Cincinnati Soap Co. v. United States*,
  301 U.S. 308 (1937) ..............................................................................................................4

*City of Waukesha v. E.P.A.*,
  320 F.3d 228 (D.C. Cir. 2003) ...............................................................................................7

*\*Coleman v. Miller*,
  307 U.S. 433 (1939) ......................................................................................................13, 15

*Comm. on Oversight & Gov't Reform v. Holder*,
  979 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................................9, 17

*Comm. On the Judiciary, U.S. House of Representatives v. Miers*,
  558 F. Supp. 2d 53 (D.D.C. 2008) .....................................................................................9, 11

*Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*,
  788 F.3d 312 (D.C. Cir. 2015) ................................................................................................8

*Cummings v. Murphy*,
  321 F. Supp. 3d 92 (D.D.C. 2018) .................................................................................11, 12, 14

*Honig v. Doe*,
  484 U.S. 305 (1988) .............................................................................................................17

*INS v. Chadha*,
  462 U.S. 919 (1983) ..........................................................................................................8, 10

## TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

*Kennedy v. Sampson*,
    511 F.2d 430 (D.C. Cir. 1974) ................................................................. 14

*Kucinich v. Bush*,
    236 F. Supp. 2d 1 (D.D.C. 2002) ....................................................... 11, 12

*Kucinich v. Obama*,
    821 F. Supp. 2d 110 (D.D.C. 2011) ......................................................... 12

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 7

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..................................................................................... 6

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ............................................................... 17

*Powell v. McCormack*,
    395 U.S. 486 (1969) ................................................................................ 12

*Raines v. Byrd*,
    521 U.S. 811 (1997) .......................................................................... *passim*

*Reeside v. Walker*,
    52 U.S. 272 (1850) ................................................................................... 5

*Rochester Pure Waters Dist. v. E.P.A.*,
    960 F.2d 180 (D.C. Cir. 1992) ................................................................. 2

*Sixty-Seventh Minn. State Senate v. Beens*,
    406 U.S. 187 (1972) ................................................................................ 10

*U.S. Dep't of Navy v. Fed. Labor Relations Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ............................................................... 4

*\*U.S. House of Representatives v. Burwell*,
    130 F. Supp. 3d 53 (D.D.C. 2015) .................................................... *passim*

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
    11 F. Supp. 2d 76 (D.D.C. 1998) ............................................................. 9

*\*United States v. AT&T*,
    551 F.2d 384 (D.C. Cir. 1976) ....................................................... 8, 9, 10

## TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

*United States v. Windsor*,
 133 S. Ct. 2675 (2013)..................................................................................................8

**Constitutional and Statutory Provisions**

U.S. Const. art. I, § 1, cl. 1.......................................................................................10, 14

U.S. Const. art. I, § 2, cl. 3................................................................................................9

U.S. Const. art. I, § 7, cl. 2..............................................................................................10

U.S. Const. art. I, § 9, cl. 7..................................................................................2, 4, 7, 16

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6 § 230 (2019).....................15

**Other Authorities**

II *Records of the Federal Convention* 618, *reprinted in* III THE FOUNDERS'
 CONSTITUTION (Philip B. Kurland & Ralph Lerner eds., 1987) .................................4

3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE
 FEDERAL CONSTITUTION (VIRGINIA) (Jonathan Elliot ed., 1836) ........................3, 4

WILLIAM C. BANKS & PETER RAVEN-HANSEN, NATIONAL SECURITY LAW AND THE
 POWER OF THE PURSE (1994) ..................................................................................4

JOSH CHAFETZ, CONGRESS'S CONSTITUTION, LEGISLATIVE AUTHORITY AND THE
 SEPARATION OF POWERS (2017).............................................................................3

*President Donald J. Trump's Address to the Nation on the Crisis at the Border*,
 White House (Jan. 8, 2019), https://www.whitehouse.gov/briefings-
 statements/president-donald-j-trumps-address-nation-crisis-border/ .....................14

*Remarks by President Trump in Meeting with Senate Minority Leader Chuck
 Schumer and House Speaker-Designate Nancy Pelosi*, White House (Dec. 11,
 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-
 trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-
 designate-nancy-pelosi/...........................................................................................14

Richard Rosen*, Funding "Non-Traditional" Military Operations: The Alluring
 Myth of A Presidential Power of the Purse*, 155 MIL. L. REV. 1 (1998) ...............2, 3

Morton Rosenberg, *Investigative Oversight: An Introduction to the Law, Practice
 and Procedure of Congressional Inquiry* (1995),
 https://fas.org/sgp/crs/misc/95-464.pdf...................................................................17

### TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

Joseph Story, 3 *Commentaries on the Constitution* § 1342 (1833), *reprinted in* III
   THE FOUNDERS' CONSTITUTION ...............................................................................5

Letter from Russell T. Vought, Acting Dir., Office of Mgmt. & Budget, to
   Senator Richard Shelby, Chairman, Senate Comm. on Appropriations (Jan. 6,
   2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/Final-
   Shelby-1-6-19.pdf ...............................................................................................14

The Federalist No. 51 (James Madison) .........................................................................6

The Federalist No. 58 (James Madison) .........................................................................3

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are former General Counsels of the U.S. House of Representatives.  They served during the past four decades under both Republican and Democratic Speakers of the House.

*William Pittard* served in the Office of General Counsel between 2011 and 2016; he was Acting General Counsel in 2016 under Speaker Paul D. Ryan.

*Kerry W. Kircher* served in the Office of General Counsel between 1995 and 2016; he was General Counsel between 2011 and 2016 under Speakers Ryan and John A. Boehner.

*Irvin B. Nathan* served as General Counsel between 2007 and 2010 under Speaker Nancy Pelosi.

*Geraldine R. Gennet* served in the Office of General Counsel between 1995 and 2007; she was Acting General Counsel between 1996 and 1997 and General Counsel between 1997 and 2007 under Speakers Pelosi, J. Dennis Hastert, and Newt Gingrich.

*Thomas J. Spulak* served as General Counsel between 1994 and 1995 under Speaker Foley.

*Charles Tiefer* served in the served in the Office of General Counsel between 1984 and 1995; he was Acting General Counsel in 1994 under Speaker Thomas S. Foley.

*Steven R. Ross* served as General Counsel between 1983 and 1993 under Speakers Foley, James C. Wright, Jr., and Thomas P. "Tip" O'Neill, Jr.

*Stanley Brand* served as General Counsel between 1976 and 1983 under Speaker O'Neill.

Each of the *amici* advised the U.S. House of Representatives on its institutional interests in connection with litigation before Article III courts and provided legal advice to the House

---

[1] Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that (1) this brief was authored entirely by counsel for *amici curiae* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund the preparation or submission of this brief; and (3) apart from *amici curiae* and its counsel, no other person contributed money to fund the preparation or submission of this brief.

leadership regarding appropriations disputes with the executive branch.  Individually as well as collectively, the *amici* have developed substantial knowledge and practical experience relevant to the issues of the House's standing in this case, and they seek to assist the Court by presenting legal argument that bears on this question.

## BACKGROUND

A threshold question in this case is whether the House of Representatives, as an institution, has standing to bring this lawsuit challenging President Trump's planned spending on building a border wall of billions of dollars that Congress has expressly refused to appropriate for that purpose.  The resulting injury to the House – a core element of standing – must be understood against the backdrop of the origins and meaning of the Appropriations Clause of the Constitution, which categorically provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."  U.S. Const. art. I, § 9, cl. 7.   The House's standing to sue the executive branch defendants for a violation of this constitutional provision, and this Court's role in adjudicating that dispute, hinge as well upon a proper understanding of the separation of powers.

### A.  The Vital Role Of The Appropriations Clause In The Separation Of Powers

The Framers' decision to assign to Congress "absolute control of the moneys of the United States" (*Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992) (internal quotation marks omitted)) was an essential feature of the constitutional design.   At the Constitutional Convention, it was uncontroversial that Congress should have "exclusive power over the federal purse." *Ibid.   See* Richard Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of A Presidential Power of the Purse*, 155 Mil. L. Rev. 1, 64-70 (1998) (reviewing Convention proceedings relating to the Appropriations Clause and concluding

that "while Convention delegates expressed disagreement over the relative roles of the House of Representatives and Senate in public finance, they never wavered from the understanding that both taxation and appropriation would fall within the exclusive domain of Congress"); see also *ibid.* at 70-83 (setting forth extensive evidence of this same shared understanding in the Convention debates relating to other provisions as well as in the ratification debates).

It would be difficult to overstate the critical importance of the Appropriations Clause in the view of the Framers:

> The House of Representatives cannot only refuse, but they alone can propose, the supplies requisite for the support of government. They, in a word, hold the purse that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government. This power over the purse may, in fact, be regarded as *the most complete and effectual weapon* with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.

THE FEDERALIST NO. 58 (James Madison) (emphasis added).  Moreover, as commentators have correctly explained, "the separation of purse and sword was the Federalists' strongest rejoinder to Anti-Federalist fears of a tyrannical president."   JOSH CHAFETZ, CONGRESS'S CONSTITUTION, LEGISLATIVE AUTHORITY AND THE SEPARATION OF POWERS 57 (2017); *see also* Rosen*, supra*, 155 MIL. L. REV. at 76-83.  Thus, when Antifederalist Patrick Henry charged "Your President may easily become king . . . . [and] prescribe the terms on which he shall reign master," James Madison replied that this was an impossibility because "[t]he purse is in the hands of the representatives of the people."  3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION (VIRGINIA) 58-59, 393 (Jonathan Elliot ed., 1836).  As Alexander Hamilton assured the New York ratifying convention, "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *ibid.* at 349.

Although "[t]here is no record of any debate about the Appropriations Clause" itself during the Convention (WILLIAM C. BANKS & PETER RAVEN-HANSEN, NATIONAL SECURITY LAW AND THE POWER OF THE PURSE 29 (1994)), the delegates did discuss (and decide to add) the companion provision requiring publication "from time to time" of "a regular Statement and Account of the Receipts and Expenditures of *all* public Money."   U.S. Const. art. I, § 9, cl. 7 (emphasis added). As that debate makes clear, the phrase "from time to time" was substituted for an inflexible annual publication directive, which was thought to be "impracticable" because, as Rufus King remarked, "the term expenditures" in the Appropriations Clause "went to *every minute shilling*."   II *Records of the Federal Convention* 618, *reprinted in* III THE FOUNDERS' CONSTITUTION 374 (Philip B. Kurland & Ralph Lerner eds., 1987) (emphasis added).   Like the absolute or categorical phrases "*[n]o* Money shall be drawn" and "*all* Public money" in the Appropriations Clause, this discussion shows that the Framers intended no exceptions to Congress's blanket authority to decide appropriations.   In addition, to the extent the Framers intended to give discretion in connection with the requirements concerning appropriations, they gave that discretion (in regard to publication) to Congress, not the Executive.

Courts have repeatedly recognized that the Appropriations Clause is "a bulwark of the Constitution's separation of powers among the three branches of the National Government."   *U.S. Dep't of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012).   As the Supreme Court has acknowledged, the clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."   *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).   The Court has recognized the stringency of this prohibition, explaining: "However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned."   *Reeside v. Walker*, 52 U.S.

272, 291 (1850).  "Any other course would give to the fiscal officers a most dangerous discretion."

*Ibid.*  The Constitution thus gives the discretion to decide how to spend the people's money to

Congress, and only Congress.  *See* Joseph Story, 3 *Commentaries on the Constitution* § 1342

(1833) , *reprinted in* III THE FOUNDERS' CONSTITUTION 378 ("[I]t is highly proper, that congress

should possess the power to decide, how and when any money should be applied for these

purposes.  If it were otherwise, the executive would possess an unbounded power over the public

purse of the nation; and might apply all its monied resources at his pleasure.  The power to control,

and direct the appropriations, constitutes a most useful and salutary check upon profusion and

extravagance, as well as upon corrupt influence and public peculation."); *ibid.* at 379 (observing

that under Appropriations Clause "Congress is made the guardian" of the "public treasure" and

that Congress's authority is "complete and perfect").

## B.  The Appropriations Dispute Giving Rise To This Lawsuit And This Court's Role In Resolving It

Plaintiff United States House of Representatives has set forth in considerable detail the

factual background out of which this litigation arises, as well as the procedural history of this case.

*See* Application for Preliminary Inj. at 4-19.  Rather than repeat those facts, *amici* adopt and

incorporate them herein.

At bottom, this lawsuit asks this Court to prevent the executive branch defendants from

infringing the House of Representatives' exclusive authority to exercise the appropriations power

vested solely in Congress by the Constitution.  The House's standing to bring this case, and this

Court's proper role in adjudicating it, hinge not only on the doctrine of standing but also on

principles of separation of powers embedded in the Constitution.  The Framers designed "the

interior structure of the government as that its several constituent parts may, by their mutual

relations, be the means of keeping each other in their proper places."  THE FEDERALIST NO. 51

(James Madison).  In other words, the Framers anticipated and welcomed conflict between the branches of government because the "great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means . . . to resist encroachments of the others." *Ibid.*  And, of course, the judiciary has always had a distinctive role to play within this tripartite design: "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Although the Framers anticipated such conflicts, the interbranch conflict underlying this case is exceptional and precipitated the longest federal government shutdown in history.  *See* Application for Preliminary Inj. at 7-11.  On February 14, 2019, after a lengthy interbranch debate over border-wall spending, Congress passed the Consolidated Appropriations Act, 2019, which appropriated $1.375 billion for certain fencing at the border, but restricted those expenditures to "operationally effective designs" that had been deployed before 2017.  *See ibid.* at 10-11.  On February 15, President Trump signed the bill into law, thereby funding the government and ending the shutdown. Compl. ¶ 37.  The same day, however, Mr. Trump expressed dissatisfaction with the $1.375 billion appropriated by Congress and announced that his Administration would instead spend up to $8.1 billion on a border wall. *Ibid.* ¶ 38.  Toward that end, Mr. Trump also declared a "national emergency" at the southern border pursuant to 10 U.S.C. § 2808(a).  *Ibid.* ¶ 42.  Congress reacted swiftly in opposition.  On February 26, the House by a vote of 245 to 182 adopted a joint resolution terminating Mr. Trump's declaration of a national emergency, and the Senate followed suit on March 14.  *Ibid.* ¶¶ 53-54.  On March 15, President Trump vetoed the joint resolution.  *Ibid.* ¶ 55.

**ARGUMENT**

**THE HOUSE HAS STANDING TO CHALLENGE PRESIDENT TRUMP'S PLANNED SPENDING OF FUNDS ON A BORDER WALL**

The standing inquiry is "[t]rained on 'whether the plaintiff is a proper party to bring a particular lawsuit.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n ("Arizona")*, 135 S. Ct. 2652, 2663 (2015) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To have standing, a plaintiff must have suffered an injury in fact – that is, "an invasion of a legally protected interest that is concrete and particularized and actual or imminent," *ibid.* (internal quotation marks and citation omitted), not "conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citation omitted). The injury-in-fact must also be traceable to the defendant's actions and redressable by the judicial relief sought. *Ibid*. In this case, the House's standing turns on the injury-in-fact requirement.[2]

When assessing standing, the Court must "assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003); *accord Arizona*, 135 S. Ct. at 2663. As explained below, the executive branch's decision to spend funds in a manner that Congress has not authorized is a direct, concrete, and particularized harm to the House. President Trump's decision to draw "[m]oney . . . from the Treasury" without an "Appropriation[] made by Law" (U.S. Const. art. I, § 9, cl. 7) harms the House's constitutional exclusive power over appropriations and, for that reason, has caused it an injury-in-fact giving rise to standing.

---

[2] Because the House's satisfaction of the "traceability" and "redressability" components of standing doctrine is not subject to reasonable dispute, we do not address them here.

I.      **The President's Proposed Expenditures Harm The House's Institutional Interest In Exercising The Appropriations Power**

    **A.  Legislatures Have Standing To Assert Institutional Injuries**

A long line of cases establishes that when legislatures sue as "institutional plaintiff[s] asserting an institutional injury," that is, an injury that "impact[s] all [m]embers," they satisfy Article III's injury-in-fact requirement. *Arizona*, 135 S. Ct. at 2664.  In *Arizona*, for instance, the Supreme Court held that the Arizona legislature had standing to challenge a ballot initiative, which "strip[ped] the Legislature of its alleged [constitutional] prerogative to initiate redistricting." *Ibid.* at 2663.  Although the Court ultimately ruled against the legislature on the merits, the legislature's assertion, as an institution, of an institutional injury gave rise to standing because it ensured the case "will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Ibid.* at 2665 (internal alterations and quotation marks omitted). Likewise, in *INS v. Chadha*, each House of Congress separately intervened to defend the provisions of the Immigration and Nationality Act allowing for each House to veto certain deportation decisions.  462 U.S. 919, 939 (1983).  The presence of the Houses of Congress, the Court held, gave rise to sufficient "concrete adverseness" to satisfy Article III's standing requirements. *Ibid.*; *see also ibid.* at 930 n.5, 931 n.6.[3]  As Justice Scalia later explained in dissent (in a case where the majority did not hold to the contrary), it was the threatened harm to Congress's institutional powers that gave rise to each House's injury-in-fact.[4]  *See United States v. Windsor*,

_____

[3] "The standing inquiry for an intervening-defendant is the same as for a plaintiff: the intervenor must show injury in fact, causation, and redressability." *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015).

[4] Courts have not deemed it necessary that *both* Houses sanction a lawsuit for standing purposes. Rather, each House of Congress may independently authorize an action to protect its own institutional interest. *See, e.g.*, *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) ("It is clear that the House as a whole has standing to assert its investigatory power and can designate a member to act on its behalf.").

133 S. Ct. 2675, 2700 (2013) (Scalia, J., dissenting) ("Because *Chadha* concerned the validity of a mode of congressional action – the one-house legislative veto – the House and Senate were threatened with destruction of what they claimed to be one of their institutional powers.").

*Arizona* and *Chadha* accord with a long line of cases from courts in this Circuit holding that the House has standing to sue in its institutional capacity to protect its institutional interests. Thus, in *United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976), the court of appeals allowed a Member duly authorized by the House to intervene on behalf of the House in a case concerning compliance with a House subpoena because "the House as a whole has standing to assert its investigatory power." *Ibid.* at 391. The rationale of *AT&T* has been repeatedly applied and is now beyond dispute. *See, e.g.*, *Comm. On the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 70 (D.D.C. 2008) (holding that committee duly authorized by House had standing to enforce subpoena and "the Court has never held that an institution, such as the House of Representatives, cannot file suit to address an institutional harm"); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 21 (D.D.C. 2013) (holding that House committee had standing to enforce subpoena, because action was "a suit specifically authorized by a legislative body to redress a clearly delineated, concrete injury to the institution."). Likewise, when the House of Representatives sued to challenge the method by which the 2000 Census would be conducted, this Court held that the House's "institutional interest in preventing its unlawful composition is a sufficient injury in fact for Article III." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998). (The House's composition turns on the Census's enumeration of each state's population. *See* U.S. Const. art. I, § 2, cl. 3).

Applying these principles, a district court in this Circuit recently held in *U.S. House of Representatives v. Burwell* that "[t]he House of Representatives as an institution . . . suffer[s] a

concrete, particularized injury [when] the Executive . . . draw[s] funds from the Treasury without a valid appropriation." 130 F. Supp. 3d 53, 74 (D.D.C. 2015). The court summarized the relevant case law as establishing that "when the institution itself files suit, it can obtain a remedy for the 'institutional' injury." *Ibid.* at 72. The "constitutional structure would collapse, and the role of the House would be meaningless," the district court reasoned, "if the Executive could circumvent the appropriations process and spend funds however it pleases." *Ibid.* at 71. Thus, the court concluded, where the House alleges that the Executive has spent funds "in contravention of the specific proscription in [the Appropriations Clause], the House as an institution has standing to sue." *Ibid.* at 71. That reasoning applies with equal force here.

The result in *Burwell* makes perfect sense. If the House has standing to sue over its ancillary powers, such as the power to enforce subpoenas, *e.g.*, *AT&T*, 551 F.2d 384, or to defend its (extra-constitutional) role in vetoing exercises of executive discretion, *see Chadha*, 462 U.S. 919, then it would be odd indeed if it did not also have standing to sue to preserve its core constitutional power of the purse.[5]

### B. The Cases Involving Suits By Individual Legislators Are Readily Distinguishable

Cases holding that *individual* members of Congress lack standing to challenge executive encroachment upon legislative territory are inapposite here. Claims by individual legislators of injuries that affect "all members of Congress in the same broad and undifferentiated manner are

---

[5] The Senate's non-participation in this case is irrelevant to the House's standing. The House and Senate are each independent, necessary actors in the legislative process. U.S. Const. art. I, § 1, cl. 1, *ibid.* § 7, cl. 2. Neither may authorize appropriations alone. But if the House could not proceed with an Appropriations Clause claim without the Senate's participation, it would have the practical effect of allowing the Senate to authorize whichever appropriations it and the Executive deemed desirable, thereby locking the House out of its constitutionally mandated role. *See also Sixty-Seventh Minn. State Senate v. Beens,* 406 U.S. 187, 194 (1972) ("A group of senators … had the right to intervene. The concurrence of the house was not necessary as it would have been to enact legislation.").

not sufficiently 'personal' or 'particularized'" to provide the concreteness required under Article III. *Kucinich v. Bush*, 236 F. Supp. 2d 1, 7 (D.D.C. 2002). Such injuries, rather, "are *institutional*," and ordinarily require the participation of the institution or its duly authorized representative. *Ibid.* Accordingly, "courts have found congressional authorization to be the 'key' distinguishing factor, 'moving' . . . 'to the permissible category of an institutional plaintiff asserting an institutional injury.'" *Cummings v. Murphy*, 321 F. Supp. 3d 92, 106 (D.D.C. 2018) (quoting *Miers*, 558 F. Supp. 2d at 71).

It is "neither novel nor unsettled" that institutional injuries cannot be claimed by individual legislators as the basis for standing, at least in the absence of institutional authorization of the lawsuit. *Kucinich*, 236 F. Supp. 2d at 4; *Cummings*, 321 F. Supp. 3d at 105 ("Individual Members of Congress generally do not have standing to vindicate the institutional interests of the house in which they serve."). For example, in *Raines v. Byrd*, the Supreme Court held that six members of Congress lacked standing to challenge the Line Item Veto Act. The Court explained that plaintiffs were asserting a "type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." 521 U.S. at 821. Because these individual plaintiffs both alleged a "wholly abstract and widely dispersed" institutional injury and had "not been authorized to represent their respective Houses of Congress," plaintiffs had "not alleged a sufficiently concrete injury to have established Article III standing." *Ibid.* at 829-30.

Following *Raines*, courts have consistently held that institutional injuries are too "widely dispersed" and "abstract" to provide an Article III injury for a subset of aggrieved congressional members. *Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999) (four members of the House of Representatives lacked standing to challenge the President's issuance of an executive order on

ground that it "denied them their proper role in the legislative process and, consequently, diminished their power as Members of Congress"); *see also Cummings*, 321 F. Supp. 3d 92 (seventeen members of House Oversight Committee lack standing to enforce a request for records from executive branch); *Kucinich v. Obama*, 821 F. Supp. 2d 110, 117-18 (D.D.C. 2011) (ten House members lacked standing to challenge unilateral executive military action because the injury "impacts the whole" House and is "felt no more acutely by the ten plaintiffs here as compared to their 425 colleagues"); *Kucinich*, 236 F. Supp. 2d at 4 (dismissing action brought by thirty-two members of Congress challenging the president's unilateral termination of a treaty because it was "squarely within the holding of *Raines*").  *But cf. Powell v. McCormack*, 395 U.S. 486 (1969) (House member-elect had standing to challenge the House's refusal to seat him or pay his salary).  *Raines* and its progeny are simply inapplicable here, where the House not only has authorized the lawsuit but also itself appears as a litigant seeking to vindicate its institutional interests.  *See* Compl. ¶ 56.

### C.  Congressional-Institutional Standing Comports With The Separation of Powers

"[T]he law of Art. III standing is built on a single basic idea – the idea of separation of powers."  *Chenoweth*, 181 F.3d at 114 (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)). Accordingly, the "standing inquiry has been especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines*, 521 U.S. at 819-20.  On the other hand, separation of powers implicates not only limits on the power of the Judiciary but also on Executive and Legislative power.  A suit by one or both of the Houses of Congress to vindicate an institutional interest seeks to restore, not upset, the intended separation of powers between the three branches of government.

Moreover, any fear that finding standing here would open the floodgates of the courts is simply unfounded.  The institutional injury cases that *Burwell* applied are (as described above) established and longstanding precedents, yet the House has filed appropriations lawsuits only twice: once in *Burwell* and then again in the present case.  Thus, judicial recognition of the principle that the House has standing to sue when it suffers institutional injury would hardly lead – and has not led – to the routine judicialization of spending disputes.  If there is any slippery slope to fear here, it is what would happen if the House *lacked* standing to enforce the Appropriations Clause: in such circumstances, the Executive would have an open invitation to flout Congress's appropriations decisions and to spend funds as it pleases without fear of consequences (save, perhaps, in extreme cases, that of impeachment).  As explained above (at pages 5-9), that is precisely the concern that led the Framers to include the Appropriations Clause in the Constitution.

## II.     The Injury To Congress's Institutional Interests Is Especially Clear Here Because Congress Rejected The Very Expenditures The President Plans To Make

The Court need not explore the outer limits of congressional standing to enforce the Appropriations Clause because the House plainly has standing where (as here) the Executive plans to make the very expenditures that Congress has expressly rejected.  In *Coleman v. Miller,* the Supreme Court recognized that even individual legislators have a "plain, direct and adequate interest in maintaining the effectiveness of their votes." 307 U.S. 433, 438 (1939).  The plaintiffs there were a group of twenty state legislators whose votes would have been sufficient to defeat ratification of a proposed constitutional amendment, but for the tie-breaking vote of the Lieutenant Governor.  The Court held they had standing to challenge the Lieutenant Governor's vote as invalid because the senators' "votes against ratification have been overridden and virtually held for naught . . . if they are right in their [merits] contentions." *Ibid.*  As the Court later explained, *Coleman* stands "for the proposition that legislators whose votes would have been sufficient to

defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823.

The D.C. Circuit applied that vote-nullification rationale in *Kennedy v. Sampson* to hold that an individual Senator had standing to challenge the President's use of a pocket veto. 511 F.2d 430, 435-36 (D.C. Cir. 1974). "Because it was the President's veto – not a lack of legislative support – that prevented the bill from becoming law," as the Court later described its holding, "those in the majority could plausibly describe the President's action as a complete nullification of their votes," giving rise to standing. *Chenoweth*, 181 F.3d at 117. Thus, "[c]omplete vote nullification is clearly a type of an institutional injury sufficient to support legislator standing." *Cummings*, 321 F. Supp. 3d at 105. And if *individual* legislators have standing to sue under a vote nullification theory, then *a fortiori* the House – which is vested as an institution with the Nation's legislative powers (*see* U.S. Const. art. I, § 1) – must have standing as well.[6]

Here, President Trump repeatedly requested – including on national television – that Congress appropriate over $5 billion for a border wall.[7] Congress, in dramatic fashion, refused, leading to the longest lapse in appropriations in the Federal Government's history. On February

---

[6] In *Burwell*, this Court determined it did not need to address whether the House had standing under *Coleman*. *See Burwell*, 130 F. Supp. 3d at 73 ("The Court need not reach this question, however, because it finds that the House suffers a sufficiently concrete and particularized injury by its displacement from the appropriations process.").

[7] *See, e.g., Remarks by President Trump in Meeting with Senate Minority Leader Chuck Schumer and House Speaker-Designate Nancy Pelosi*, White House (Dec. 11, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-meeting-senate-minority-leader-chuck-schumer-house-speaker-designate-nancy-pelosi/; *President Donald J. Trump's Address to the Nation on the Crisis at the Border*, White House (Jan. 8, 2019), https://www.whitehouse.gov/briefings-statements/president-donald-j-trumps-address-nation-crisis-border/; Letter from Russell T. Vought, Acting Dir., Office of Mgmt. & Budget, to Senator Richard Shelby, Chairman, Senate Comm. on Appropriations (Jan. 6, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/Final-Shelby-1-6-19.pdf.

14, 2019, Congress ultimately did vote to appropriate funds for the continued operation of the Federal Government and to appropriate only $1.375 billion for the construction of fencing along the border, with certain limitations. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6 § 230 (2019), 133 Stat. 13, 28. President Trump's decision the following day – the day he signed the Consolidated Appropriations Act – to spend the very sum that Congress had refused to appropriate on a border wall would, if not enjoined by this Court, "overrid[e] and virtually h[o]ld for naught" (*Coleman*, 307 U.S. at 438) Congress's decision *not* to appropriate the funds the President had requested. Thus, the House has standing here not just because President Trump's planned expenditure of unappropriated funds injures the House's exclusive appropriations power *in general*, but also because it would completely nullify the appropriations decisions Congress made in the 2019 Consolidated Appropriations Act *in particular*. A clearer case for institutional standing to enforce Congress's appropriations power is difficult to imagine.

## III. There Are No Alternative Legislative Remedies Available To Congress That Could Avoid or Mitigate The Clear Harm To Its Institutional Interests

The abstract or theoretical possibility that the House could pass *new* legislation specifically directing the President not to spend monies on the border wall in no way diminishes the injury-in-fact that the House has suffered. Some cases have hinted that the availability of a legislative remedy might diminish a legislative plaintiff's injury-in-fact. But any such argument here would be misplaced for at least three reasons.

*First*, the plaintiffs in the cases that have contained such hints were minorities of individual legislators who had failed to achieve their desired result through the legislative process. *E.g.*, *Raines*, 521 U.S. at 824 (six members of Congress could not premise standing on vote nullification theory when "their votes were given full effect. They simply lost that vote"); *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) ("Congress certainly could have passed a law forbidding the use

of U.S. forces in the Yugoslav campaign . . . Unfortunately, however, for [plaintiffs], this measure was *defeated*."); *Chenoweth*, 181 F.3d at 113 (four House Members who sued, after their "legislative efforts ha[d] failed," lacked standing). Accordingly, these cases simply stand for the proposition that the Executive does not cause any cognizable injury-in-fact, when Congress retains the power, but simply lacks the votes, to countermand executive action. In such circumstances, Congress has simply decided not to exercise its institutional power to direct executive action, so it can hardly be said to have been injured. Here, by contrast, Congress *has* voted not to provide $8 billion for a border wall, doing so after a drawn-out standoff with the executive branch that led to the longest government shutdown in history. Congress has used all of the political tools in its box.

*Second*, in this case the House and Senate *have gone a step further* and passed a joint resolution specifically disapproving President Trump's attempt to circumvent the Appropriations Clause by resorting to an unfounded declaration of a "national emergency" as a basis for disregarding Congress's appropriation decisions. *See* Compl. ¶ 42. President Trump has vetoed that resolution, leaving only the wholly unrealistic option of mustering a two-thirds vote in both the House and Senate to override that veto (and even then, there is no guarantee that President Trump would comply with that command any more than he intends to honor the appropriation decisions already signed into law). In any event, the Appropriations Clause requires that "Money . . . be drawn from the Treasury" only "in Consequence of Appropriations *made by Law*" (U.S. Const. art. I, § 9, cl. 7) (emphasis added), and that has occurred here through the ordinary process of bicameral approval and presentment. The Appropriations Clause does not require a two-thirds vote to enforce appropriations decisions it has already made in bills already signed by the President into law.

Here, it is clear that President Trump's decision to spend $8.1 billion on a border wall will not only injure the House's general institutional power over appropriations (*see supra*, Section I) but also nullify the House's specific vote to reject President Trump's request for the funds at issue here (*see supra*, Section II). *See Burwell*, 130 F. Supp. 3d at 73 ("[A]s the House argues, Congress cannot fulfill its constitutional role if it specifically denies funding and the Executive simply finds money elsewhere without consequence. Indeed, the harm alleged in this case is particularly insidious *because*, if proved, it would eliminate Congress's role vis-a-vis the Executive.").

*Third*, the mere theoretical availability of a rare or likely futile legislative remedy does not diminish a legislature's standing to seek judicial relief. For example, each House of Congress has the power to direct its Sergeant-At-Arms to jail contemnors, *see* Morton Rosenberg, *Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry* 10-11 (1995), https://fas.org/sgp/crs/misc/95-464.pdf, yet that rarely-used legislative remedy does not bar Congressional standing to enforce subpoenas. *See e.g.*, *Holder*, 979 F. Supp. 2d 1. Further, "the availability of the extreme measure of impeachment" is "not an adequate remedy" that might defeat standing. *Blumenthal v. Trump*, 335 F. Supp. 3d 45, 68 (D.D.C. 2018); *see also Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President"). Again, any new legislation here would require two-thirds majority in both the House and Senate to overcome the President's certain veto, and so would be an exercise not only in redundancy but also futility. *Cf. Honig v. Doe*, 484 U.S. 305, 327 (1988) (plaintiff may bypass administrative exhaustion requirements when complying with them would be futile). And there is no reason to think that President Trump would obey that legislative directive any more than he intends to honor

17

the previous appropriations decisions made by Congress and signed into law under his pen.  Such

a remote and unlikely option in no way diminishes the harm suffered by the House in this case.

## CONCLUSION

The Court should recognize the House's standing and proceed to adjudicate this case on its

merits.

Dated: May 6, 2019                                    Respectfully submitted,


                                                      /s/ Lawrence S. Robbins
                                                      Lawrence S. Robbins (D.C. Bar No. 420260)
                                                      Alan E. Untereiner (D.C. Bar No. 428053)
                                                      D. Hunter Smith (D.C. Bar No. 1035055)
                                                      Megan Browder* (CO Bar No. 49660)
                                                      Carolyn Forstein (D.C. Bar No. 230152)
                                                      2000 K Street, N.W., 4th Floor
                                                      Washington, DC 20006
                                                      Telephone: (202) 775-4500
                                                      Facsimile: (202) 775-4510
                                                      Email: lrobbins@robbinsrussell.com

                                                      *Counsel for* Amici Curiae

                                                      *Supervised by principals of the firm
                                                      pending admission to the D.C. Bar.