**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES HOUSE OF
REPRESENTATIVES,

               Plaintiff,

     v.

STEVEN T. MNUCHIN in his official capacity as
Secretary of the Department of Treasury, *et al.*,

               Defendants.

Civil Action No. 1:19-cv-00969 (TNM)

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.   Congress's Express Authorization of Border Barrier Construction ................................... 3

    II.  DHS's Recent Efforts to Expedite Border Barrier Construction ..................................... 5

    III. Congress's Authorization for DoD Support of DHS's Border Security Efforts ................. 5

    IV. DoD's Current Support for DHS's Efforts to Secure the Southern Border ........................ 6

    V.  The President's Proclamation Declaring a National Emergency ........................................ 7

    VI. Spending Authorities for Border Barrier Construction ..................................................... 9

        A.  Congress's Appropriations to DHS for Border Barriers in the CAA .......................... 10

        B.  10 U.S.C. § 284 & § 8005 of the DoD Appropriations Act ...................................... 10

        C.  10 U.S.C. § 2808 ...................................................................................................... 13

THE HOUSE'S CLAIMS ................................................................................................... 14

LEGAL STANDARD ......................................................................................................... 15

ARGUMENT ...................................................................................................................... 16

    I.   The House Lacks Standing to Maintain This Action. ...................................................... 16

        A.  The House Fails to Allege a Judicially Cognizable Injury. ....................................... 17

            1.  *Raines* Rejected the Standing of Legislators to Sue for Official-Capacity
               Injuries In All But the Narrowest of Circumstances. .......................................... 18

            2.  The D.C. Circuit Has Confirmed the Narrowness of Legislative Standing. .......... 21

            3.  The House's Standing Claim Fails Under Raines and D.C. Circuit Precedent. .... 22

            4.  The House Relies on Cases That Fail to Support Its Position. .............................. 25

        B.  This Suit Epitomizes the Separation-of-Powers Problems Inherent in Suits by the
           Legislative Branch. ................................................................................................. 32

II. The House Lacks a Cause of Action ................................................................................38

    A.  The House Has No Cause of Action Under the Appropriations Clause. ....................39

    B.  The House Has No Cause of Action Under the APA. .................................................41

III. The House Is Unlikely To Succeed On The Merits Of Its Constitutional Claims............42

IV. The House Is Unlikely To Succeed On The Merits Of Its Statutory Claims....................46

    A.  DoD's Transfer Of Funds Pursuant To § 8005 Is Lawful. .........................................46

    B.  The House Cannot Establish Article III Standing to Challenge Future Border
        Barrier Construction Under § 2808............................................................................51

V.  The House Has Not Established That an Irreparable Injury is Likely in the Absence
    of an Injunction. ...............................................................................................................53

VI. The Balance of Equities and Public Interest Weigh Against Injunctive Relief. ................55

CONCLUSION ....................................................................................................................... 55

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*,
   742 F.3d 1023 (D.C. Cir. 2014) ........................................................... 15

*Al-Aulaqi v. Panetta*,
   35 F. Supp. 3d 56 (D.D.C. 2014) ........................................................... 9

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ........................................................... 41

*American Petroleum Inst. v. Jorling*,
   710 F. Supp. 421 (N.D.N.Y. 1989) ........................................................... 54

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ........................................................... 37

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
   897 F.3d 314 (D.C. Cir. 2018) ........................................................... 54

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ........................................................... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ........................................................... 2, 38, 39, 40, 41

*BHM Healthcare Sols., Inc. v. URAC, Inc.*,
   320 F. Supp. 3d 1 (D.D.C. 2018) ........................................................... 16

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ........................................................... 25, 32, 35

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ........................................................... 35

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ........................................................... *passim*

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ........................................................... 53, 54

*Chenoweth v. Clinton*,
   181 F.3d 112 (D.C. Cir. 1999) ........................................................... *passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................... 17, 51, 52

*Coleman v. Miller*,
307 U.S. 433 (1939) ...................................................................................... 20, 21, 22, 24

*Comm. on Judiciary, U.S. House of Representatives v. Miers*,
558 F. Supp. 2d 53 (D.D.C. 2008) ................................................................................. 31, 32

*Comm. on Oversight and Gov't Reform v. Holder*,
979 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................................ 31

*Ctr. For Sci. In The Pub. Interest v. Food & Drug Admin.*,
No. Civ.A.03–1962 RBW, 2004 WL 2011467 (D.D.C. Aug. 6, 2004) ................................... 53

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ........................................................................................................ 17

*Dalton v. Specter*,
511 U.S. 462 (1994) ............................................................................................. 2, 43, 44

*Daughtrey v. Carter*,
584 F.2d 1050 (D.C. Cir. 1978) ......................................................................................... 32

*Dep't of Commerce v. U.S. House of Representatives*,
525 U.S. 316 (1999) ........................................................................................................ 42

*Dinh Tran v. Dep't of Treasury*,
351 F. Supp. 3d 130 (D.D.C. 2019) ..................................................................................... 9

*Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding*,
514 U.S. 122 (1995) ................................................................................................... 41, 42

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
565 U.S. 606 (2012) ........................................................................................................ 40

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ........................................................................................... 51

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................................................... 41, 42

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................................................ 40

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................................................... 54

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
639 F.3d 1078 (D.C. Cir. 2011) ......................................................................... 16

*Gringo Pass, Inc. v. Kiewit Sw. Co.*,
CV-09-251-TUC-DCB, 2012 WL 12905166 (D. Ariz. Jan. 11, 2012) ..................... 6

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ..................................................................................... 39, 40

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) ....................................................................... 29, 34

*INS v. Chadha*,
462 U.S. 919 (1983) ................................................................................ 30, 31, 34

*In re Border Infrastructure Envtl. Litig.*,
915 F.3d 1213 (9th Cir. 2019) ............................................................................. 4

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
746 F.2d 855 (D.C. Cir. 1984) ........................................................................... 46

*Landon v. Plasencia*,
459 U.S. 21 (1982) ........................................................................................... 55

*N. Am. Butterfly Ass'n v. Nielsen*,
Civil Case No. 17-2651 (RJL), 2019 WL 634596 (D.D.C. Feb. 14, 2019) ........... 4, 5

*Michigan Corrections Org. v. Michigan Dep't of Corrections*,
774 F.3d 895 (6th Cir. 2014) .......................................................................... 39, 40

*Moore v. U.S. House of Representatives*,
733 F.2d 946 (D.C. Cir. 1984) ........................................................................... 37

*Morrison v. Olson*,
487 U.S. 654 (1988) ........................................................................................... 35

*Munaf v. Geren*,
553 U.S. 674 (2008) ........................................................................................... 15

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
545 F. Supp. 2d 363 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009). 54

*Nev. Comm'n on Ethics v. Carrigan*,
   564 U.S. 117 (2011) ............................................................................................... 19

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................... 55

*OPM v. Richmond*,
   496 U.S. 414 (1990) ............................................................................................... 27

*OXY USA Inc. v. FERC*,
   No. 99-1073, 1999 WL 506736 (D.C. Cir. June 9, 1999) ...................................... 53

*Powell v. McCormack*,
   395 U.S. 486 (1969) ............................................................................................... 28

*Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*,
   835 F.2d 380 (1st Cir. 1987) ................................................................................. 54

*\*Raines v. Byrd*,
   521 U.S. 811 (1997) ....................................................................................... *passim*

*Salazar v. Ramah Navajo Chapter*,
   567 U.S. 182 (2012) ............................................................................................... 46

*Save Our Heritage v. Gonzalez*,
   533 F. Supp. 2d 58 (D.D.C. 2008) ......................................................................... 5

*Schlesinger v. Reservists Comm. to Stop War*,
   418 U.S. 208 (1974) ......................................................................................... 20, 40

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) .............................................................................. 16

*Spencer v. Kemna*,
   523 U.S. 1 (1998) ................................................................................................... 28

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016 ................................................................................. 18, 20, 36

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014) ........................................................................................... 51

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ............................................................................................... 46

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ................................................................. 55

*U.S. House of Representatives v. Burwell*,
  130 F. Supp. 3d 53 (D.D.C. 2015) .................................................. *passim*

*United States v. AT&T Co.*,
  551 F.2d 384 (D.C. Cir. 1976) ............................................. 28, 31, 32, 42

*United States v. Barnes*,
  295 F.3d 1354 (D.C. Cir. 2002) ................................................... 46, 47

*United States v. Windsor*,
  570 U.S. 744 (2013) ............................................................. 31, 34, 44

*Walker v. Cheney*,
  230 F. Supp. 2d 51 (D.D.C. 2001) ..................................................... 32

*Defs. of Wildlife v. Chertoff*,
  527 F. Supp. 2d 119 (D.D.C. 2007) ..................................................... 5

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ............................................................... 15, 16

*Young v. U.S. ex rel Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ..................................................................... 35

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ......................................................... 38, 39, 40

## CONSTITUTION

U.S. Const. art. III, § 2, cl. 1 ......................................................... 48

## STATUTES

2 U.S.C. § 692(a)(1) ..................................................................... 38

5 U.S.C. § 702 ........................................................................... 41

10 U.S.C. § 284 .................................................................... *passim*

10 U.S.C. § 2801(a) ..................................................................... 14

10 U.S.C. § 2808 .................................................................. *passim*

28 U.S.C. § 365 ................................................................................................ 38

31 U.S.C. § 1301 .............................................................................................. 34

50 U.S.C. §§ 1601 *et seq.* .............................................................................. 15

Pub. L. No. 67-13 (1921) ................................................................................ 27

Pub. L. No. 93-238, 87 Stat 1076 (1974) .................................................. 12, 13

Pub. L. No. 97-99, 95 Stat 1359 (1981) ......................................................... 13

Pub. L. No. 97-214, 96 Stat 153 (1982) ......................................................... 13

National Defense Authorization Act for Fiscal Year 1991,
    Pub. L. No. 101-510, 104 Stat 1485 (1990) ........................................... 10, 11

Pub. L. No. 104-208, 110 Stat. 3009 (1996) .................................................... 4

Department of Commerce, Justice, and State, The Judiciary, and Related Agencies Act, 1998,
    Pub. L. No. 105–119, 111 Stat 2440 (1997) ............................................... 38

Department of Defense and Emergency Supplimental Appropriations for Recovery From and
    Response to Terrorist Attacks on the United States Act, 2002,
    Pub. L. No. 107-117, 115 Stat 2230 .......................................................... 50

REAL ID Act of 2005,
    Pub. L. No. 109-13, 119 Stat 231 ................................................................ 4

Department of Defense, Emergency Supplimental Appropriations to Address Hurricanes in the
    Gulf of Mexico, and Pandemic Influenza Act, 2006,
    Pub. L. No. 109-148, 119 Stat 2680 (2005) ................................................ 50

Secure Fence Act of 2006,
    Pub. L. No. 109-367, § 3, 120 Stat. 2638 ..................................................... 4

Consolidated Appropriations Act, 2008,
    Pub. L. No. 110-161, 121 Stat 1844 (2007) .................................................. 4

Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs
    Appropriations Act, 2019,
    Pub. L. No. 115-244, 132 Stat 2897 (2018) ................................................ 49

Department of Defense and Labor, Health and Human Services, and Education
    Appropriations Act, 2019 and Continuing Appropriations Act, 2019,
    Pub. L. No. 115-245, 132 Stat 2981 (2018) ........................................ *passim*

Consolidated Appropriations Act, 2019,
Pub. L. 116-6, div. A, §§ 230-32, 133 Stat 13 .................................................................. *passim*

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

Declaration of National Emergency by Reason of Certain Terrorist Attacks,
66 Fed. Reg. 48,199 (Sept. 14, 2001) (Proc. No. 7463) .......................................... 14

Border Security and Immigration Enforcement Improvements,
82 Fed. Reg. 8793 (Jan. 25, 2017) ........................................................................... 5

Determinations Pursuant to Section 102 of IIRIRA, as Amended
83 Fed. Reg. 17,185-88 (April 24, 2019)................................................................... 5

Continuation of the National Emergency With Respect to Certain Terrorist Attacks,
83 Fed. Reg. 46,067 (Sept. 10, 2018) ....................................................................... 14

*Unconstitutional Restrictions on Activities of the Office of Sci. & Tech. Policy in Section 1340(a)*
*of the*
*Dep't of Def. & Full-Year Continuing Appropriations Act, 2011*,
2011 WL 4503236 (O.L.C. Sept. 19, 2011)............................................................... 27

**OTHER AUTHORITIES**

H.R. Rep. No. 103-200, 1993 WL 298896 ................................................................. 6, 11

Veto Message to the House of Representatives for H.J. Res. 46,
2019 WL 1219481 (Mar. 15, 2019) ...................................................................... 8, 55

Blocking Iraqi Government Property and Prohibiting Transactions with Iraq,
Exec. Order No. 12722 ............................................................................................. 14

National Emergency Construction Authority,
Exec. Order No. 12734 ............................................................................................. 14

National Emergency Construction Authority,
Exec. Order No. 13235 ............................................................................................. 14

*Border Security and Immigration Enforcement Improvements*,
Exec. Order No. 13767 ............................................................................................. 5

*Declaring a Nat'l Emergency Concerning the S. Border of the United States*,
Pres. Proc. No. 9844 ....................................................................................... 3, 7, 8, 55

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
1999 WL 258030 (Apr. 27, 1999) ...................................................................... 6, 11

*Senate Hearing on the DHS FY 2018 Budget*,
   2017 WL 2311065 (May 25, 2017) ........................................................................................ 4

*Presidential Memorandum for the Secretary of Defense, the Attorney General, and the Secretary
   of Homeland Security titled, "Securing the Southern Border of the United States."
   Presidential Memorandum*,
   2018 WL 1633761 (Apr. 4, 2018) ..................................................................................... 6, 7

Summary, H.J. Res. 46, 116th Cong., https://www.congress.gov/bill/116th-congress/house-joint-
   resolution/46 (last visited May 8, 2019) ................................................................................ 35

## INTRODUCTION

The House of Representatives asks this Court to enter a preliminary injunction barring the Executive Branch from using two statutes to fund and construct barriers along the southern border of the United States.  But this Court need not and cannot reach the merits of the House's claims because it lacks jurisdiction over this inter-branch dispute.  *See Raines v. Byrd*, 521 U.S. 811 (1997).  One House of Congress may not ask an Article III court to issue an injunction against the Executive Branch preventing it from implementing a statute.  This litigation between the political branches is "obviously not the regime that has obtained under our Constitution to date."  *Id.* at 828.

Disagreements between the Executive and Legislative Branches are routine, but with only a few modern, erroneous examples they have always been resolved by the political branches— each of which possesses "the necessary constitutional means and personal motives to resist encroachments of the other[ ]."  *The Federalist* No. 51 (James Madison).  That history reflects the bedrock separation-of-powers principles embodied in Article III's case-or-controversy requirement and the "restricted role for Article III courts," *Raines*, 521 U.S. at 828, which the Constitution gave "no influence over either the sword or the purse" and which the framers left to "take no active resolution whatever."  *The Federalist* No. 78 (Alexander Hamilton).  As the Court of Appeals and the Supreme Court have accordingly made clear, the House's belief that the Executive Branch is improperly executing a federal statute does not supply Article III standing or create a case or controversy fit for judicial resolution.  Federal courts do not sit to referee institutional disputes "between one or both Houses of Congress and the Executive Branch . . . on the basis of claimed injury to official authority or power."  *Raines*, 521 U.S. at 826.  The House's motion thus cannot be reconciled with the structure of the Constitution, controlling precedent, and historical practice.  To hold otherwise and address the merits of the House's motion would

"improperly and unnecessarily plunge[ ]" the Judiciary into a host of disputes between the political branches.  *Id.*

In addition to lacking standing and an actual Article III controversy, the House does not possess a cause of action.  Congress knows how to provide an express cause of action for legislators and has done so on certain occasions, but not for the type of action the House brings here.  In the absence of an express cause of action, the Court should hold that this is not "a proper case" to provide the "judge-made remedy" of an implied cause of action to enjoin alleged violations of the Appropriations Clause by agency officials.  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).  Moreover, the availability of such equitable relief depends on whether it "was traditionally accorded by courts of equity" and there is no historical tradition of courts enjoining the Executive Branch at the request of one House of Congress.  *Grupo Mexicano De Desarrollo*, 527 U.S. 308, 319 (1999).  Nor is there any basis to recognize a cause of action for the House under the Administrative Procedure Act (APA), which would be contrary to longstanding doctrines that prevent chambers of Congress from bringing suit under statutes of general applicability that confer a cause of action on private parties to challenge agency action.

But even if the House could overcome these fundamental issues, it still cannot establish a likelihood of success on the merits.  The House alleges Defendants are funding border barriers in violation of the Appropriations Clause, but the House's constitutional claims are unlikely to succeed because they contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  The dispute here is entirely about statutory issues regarding the Department of Defense's (DoD) use of § 8005 of the DoD Appropriations Act for Fiscal Year 2019, 10 U.S.C. § 284, and 10 U.S.C. § 2808 to fund border barrier construction.  Disagreements about whether

2

Executive action is authorized by, or consistent with, statutory authority do not raise distinct constitutional issues.  And on the merits of these statutory issues, the House has not established a violation of the statutory language in § 8005 or § 284, while with respect to § 2808, the House lacks standing for the additional reason that the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.

There is no serious dispute that the southern border is "a major entry point for criminals, gang members, and illicit narcotics."  Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation).  The increasing surge of migrants, the highest in over a decade, has placed a tremendous strain on the limited resources of the Department of Homeland Security (DHS) and exacerbated the risks to border security, public safety, and the safety of the migrants themselves. *See* Letter from Secretary of Homeland Security Kirstjen M. Nielsen to the United States Senate and House of Representatives (Mar. 28, 2019) (Nielsen Letter) (Exhibit 1).  Border barriers have historically proven to be an extremely effective tool for deterring and impeding illegal crossings into the United States.  *See* Declaration of Jerry B. Martin, Chief of U.S. Border Patrol Strategic Planning and Analysis Directorate (Exhibit 2).  A preliminary injunction would interfere with the Executive's ability to use its statutory authorities to respond to these concerns and harm the Executive's strong interest in border security and enforcement of counter-drug and immigration laws.

For these reasons, the House's motion for a preliminary injunction should be denied.

## BACKGROUND

### I.   Congress's Express Authorization of Border Barrier Construction

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may

be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996) (codified at 8 U.S.C. § 1103 note). Since then, Congress has amended IIRIRA three times to expand the Executive's authority to construct barriers along the southern border. In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and granted the Secretary of Homeland Security authority to waive any "laws that might impede the expeditious construction of security infrastructure along the border." *See* H.R. Rep. 109-72, at 171 (May 3, 2005). The REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306, empowers the Secretary of Homeland Security "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."

Congress amended IIRIRA again as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations. Pub. L. No. 109-367, § 3, 120 Stat. 2638. In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border." Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) (IIRIRA § 102(b)).

Relying on these authorities, DHS has installed approximately 650 miles of barriers along the southern border. *See* Senate Appropriations Hr'g on the DHS FY 2018 Budget, 2017 WL 2311065 (May 25, 2017) (Test. of then-DHS Secretary John Kelly). Courts have consistently denied relief in cases challenging construction of barriers under IIRIRA. *See, e.g.*, *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019); *N. Am. Butterfly Ass'n v. Nielsen*, 2019

WL 634596 (D.D.C. Feb. 14, 2019); *Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007).

## II.   DHS's Recent Efforts to Expedite Border Barrier Construction

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."   Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  In order to "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order required agencies to "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.  In furtherance of this directive DHS has issued waivers pursuant to IIRIRA to expedite construction of border barrier projects over the past two years, including two recent waivers for projects in Arizona and New Mexico, the funding for which the House challenges in this case.  *See, e.g.*, Determinations Pursuant to Section 102 of IIRIRA, as Amended, 83 Fed. Reg. 17185-88 (April 24, 2019).

## III.   Congress's Authorization for DoD Support of DHS's Border Security Efforts

Congress also has expressly authorized DoD to provide a wide range of support to DHS at the southern border, including the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(b)(7); *see id.* §§ 271-84 (authorizing DoD to provide various forms of assistance to civilian law enforcement agencies).  Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats.  *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs of Staff) (Exhibit 3).  More recently,

Presidents George W. Bush and Barack Obama deployed military personnel to the southern border to support DHS's border security efforts.  *Id.*

For decades, U.S. military forces have played an active role in barrier construction and reinforcement on the southern border.  Military personnel were critical to construction of the first modern border barrier near San Diego, California in the early 1990s as well as other border fence projects.  *See* H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (commending DoD for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (military personnel constructed over 65 miles of barrier fencing).  In 2006, the National Guard improved the southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, and more than 19 miles of new all-weather road, and performing road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012).

**IV.**   **DoD's Current Support for DHS's Efforts to Secure the Southern Border**

On April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* at *1.  The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.*

6

To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at *2. The President also directed the Secretary of Defense to request the use of National Guard personnel to assist in fulfilling this mission. *Id.* In October 2018, the President expanded the military's support to DHS to include active duty military personnel. *See* Joint Statement of Rood and Gilday. Over the course of the last year, military personnel have provided a wide range of border security support to DHS, including hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See id.*

## V.   The President's Proclamation Declaring a National Emergency

On February 15, 2019, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States." *See* Proclamation. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years.

*Id.* "Because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

To achieve its purpose, the Proclamation makes available to the Acting Secretary of Defense the authority under 10 U.S.C. § 2808, which provides that, "without regard to any other provision of law," the Secretary of Defense "may undertake military construction projects, and

may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." *See id.*; 10 U.S.C. § 2808(a).

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019). The President relied upon statistics published by U.S. Customs and Border Protection (CBP) as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019; (2) CBP's seizure of more than 820,000 pounds of drugs in 2018; and (3) arrests in fiscal years 2017 and 2018 of 266,000 aliens previously charged with or convicted of crimes. *See id.* The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America. *See id.* The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.* Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity. *See id.* With additional surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point." *See id.* The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border has continued to deteriorate, and DHS is facing "a system-wide meltdown." *See* Nielsen Letter (Exhibit 1). "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *Id.* In March 2019, there were over 103,000 apprehensions of undocumented migrants along the southern border, the highest one-month total in over a decade. *See* DHS Southwest Border Migration Statistics FY 2019 (Exhibit 4); U.S. Border Patrol Apprehension Statistics Since FY 2000 (Exhibit 5). Over 92,000 of these apprehensions were between ports of entry, compared with 66,884 in February and 47,984 in January. *See* CBP Transcript March FY19 Year to Date Statistics (Exhibit 6); Exhibit 4.[1]

## VI.   <u>Spending Authorities for Border Barrier Construction</u>

On the same day the President issued the Proclamation, the White House publicly released a fact sheet announcing the sources of funding to be used to construct additional barriers along the southern border. In addition to the $1.375 billion appropriation to DHS as part of the Consolidated Appropriations Act, 2019 (CAA), *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019), the fact sheet identifies three additional sources of funding, which it explains will be used sequentially and as needed: (1) About $601 million from the Treasury Forfeiture Fund; (2) Up to $2.5 billion of DoD funds transferred for support for counterdrug activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from DoD military construction projects for military construction pursuant to 10 U.S.C. § 2808, a construction authority made available by the President's declaration of a national emergency. *See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019) (Exhibit 7). The House's motion challenges only the funding under § 284 and § 2808. *See* U.S. House of

---

[1] The Court may take judicial notice of the official U.S. Government documents and the publicly available information cited herein and attached. *See Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 133 n.5 (D.D.C. 2019); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

Representative's Appl. For Prelim. Inj. (House Mot.) at 6, ECF No. 17.

### A.     Congress's Appropriations to DHS for Border Barriers in the CAA

The CAA, signed into law on February 15, 2019, consolidated separate appropriations acts for different federal agencies into one bill, including the DHS Appropriations Act for Fiscal Year 2019.  *See* Pub. L. 116-6, div. A.  As relevant here, § 230 appropriated $1.375 billion to CBP "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."  *See id.* § 230(a)(1).  Congress placed three restrictions on the use of these funds.  First, Congress mandated that border barriers constructed in this area "shall only be available for operationally effective designs . . . such as currently deployed steel bollard designs that prioritize agent safety."  *Id.* § 230(b).  Second, Congress imposed a restriction stating that "none of the funds made available by this Act or prior Acts are available for the construction of pedestrian fencing" within five specified areas within the Rio Grande Valley Sector.  *See id.* § 231 (listing various locations including "the National Butterfly Center" and "Santa Ana Wildlife Refuge").  Third, Congress imposed advance notice and consultation requirements on CBP in the event barrier construction occurs within five designated cities or census designated places.  *See id.* § 232.  In appropriating these funds to CBP, Congress did not modify any other law or impose a general appropriations restriction that would prevent other government agencies from invoking their preexisting statutory authorities or funding to engage in border barrier construction.

### B.     10 U.S.C. § 284 & § 8005 of the DoD Appropriations Act

10 U.S.C. § 284 authorizes DoD to provide "support for the counterdrug activities . . . of any other department or agency of the Federal Government," including for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(a); (b)(7).  Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991.  Pub. L. No. 101-510, § 1004,

104 Stat. 1485 (1990).   Congress regularly renewed § 1004 and praised DoD's involvement in building barrier fences along the southern border.  *See* Nat'l Def. Authorization Act for FY 1994, H.R. Rep. No. 103-200, at 330-31, 1993 WL 298896 (1993) (House Armed Services "commends" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in "the San Diego-Tijuana border area"); H.R. Rep. No. 110-652, 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource" and recommending a $5 million increase to DoD's budget to continue construction); *see* also Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Testimony of Barry R. McCaffrey, Director of the Office of National Drug Control Policy) (testifying about the "vital contributions" made by DoD to construct 65 miles of barrier fencing, 111 miles of roads, and 17 miles of lighting "to support the efforts of law enforcement agencies operating along the Southwest Border").   In light of the threat posed by illegal drug trafficking, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1147 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on federal land along certain portions of the southern border.  *See* Declaration of Kenneth Rapuano ¶ 3, Ex. A (Exhibit 8).  The request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting.  *Id*.  On March 25, 2019, the Acting Secretary of Defense approved two projects in Arizona and one in New Mexico.  *Id.* ¶¶ 4, 7-9 (describing details and locations of the projects).  DoD has awarded contracts to support these projects and construction will begin no sooner than May 25, 2019.  *Id.* ¶¶ 9-10.

In September 2018, Congress appropriated $517 million for DoD's counter-narcotics support activities for Fiscal Year 2019, to include projects undertaken pursuant to § 284. *See* Dep't of Def. and Labor, HHS, and Educ. Appropriations Act 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, Title VI, 132 Stat. 2981 (2018). In order to devote additional resources to border barrier construction, on March 25, 2019, the Acting Secretary of Defense authorized the transfer of $1 billion to the counter-narcotics support appropriation from Army personnel funds that had been identified as excess to current requirements. *See* Rapuano Decl. ¶ 5. The Acting Secretary of Defense directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act for Fiscal Year 2019, Pub. L. 115-245, div. A, 132 Stat. 2981, 2999 (Sept. 28, 2018), which provides in relevant part:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred: *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress[.]

The Acting Secretary concluded the requirements of this provision were satisfied because the transfer of funds was "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated" and "the item for which funds are requested" had not "been denied by the Congress." *See* Rapuano Decl. ¶ 5.

The transfer authority in § 8005 has been available to DoD in substantially the same form since the fiscal year 1974 Defense Appropriations Act. *See* Pub. L. 93-238, § 735, 87 Stat. 1076 (Jan. 2, 1974). Congress added this provision to provide DoD with reprogramming flexibility in

light of the recognition that "plans do change and an operation as large as the Department of Defense must have financial flexibility during a given year" while also seeking to "tighten congressional control of the re-programming process."  H. Rep. 93-662, at 16-17 (Nov. 26, 1973). Congress made these amendments in response to incidents in which "the Department [of Defense] has requested that funds which have been specifically deleted in the legislative process be restored through the reprogramming process."  *Id.* at 16.  The "denied by Congress" provisions were inserted to communicate to DoD that "henceforth no such requests will be entertained."  *Id.*

C.     **10 U.S.C. § 2808**

First enacted as part of the 1982 Military Construction Authorization Act, Pub. L. No. 97-99, § 903, 95 Stat. 1359 (1981), and later amended by the Military Construction Codification Act of 1982, Pub. L. No. 97-214, § 2, 96 Stat. 153 (codifying 10 U.S.C. §§ 2801–08), 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

In enacting this provision, Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and wanted to fill "a gap that now exists with respect to restructuring construction priorities in the event of a declaration of war or national emergency." H.R. Rep. No. 97-44, at 72 (1981).

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or

construction of a defense access road (as described in section 210 of title 23)."  10 U.S.C. § 2801(a).  Congress in turn defined the term "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."  *Id.* § 2801(c)(4); *see also id.* § 2801(a) (defining "military construction project").

Presidents have invoked the military construction authority under § 2808 on two prior occasions.  First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait.  *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990).  Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001.  *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001).  The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019) (listing projects worth $1.4 billion between 2001 and 2014).

Here, the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.  *See* Rapuano Decl. ¶¶ 14, 15.  DoD is currently undertaking an internal review process to inform any decision by the Acting Secretary of Defense, including assessments by the Chairman of the Joint Chiefs of Staff and the DoD Comptroller that are due to the Acting Secretary by May 10, 2019.  *See id.*

### THE HOUSE'S CLAIMS

The House initiated this action on April 5, 2019.  *See* Compl., ECF No. 1.  Approximately two weeks later, on April 23, 2019, the House filed the motion for preliminary injunction presently

before the Court.  *See* ECF No. 17.  The motion seeks injunctive relief on two separate claims. *See* House Mot. at 1; Proposed Order.  First, the House seeks to enjoin the use of any money transferred pursuant to § 8005 for purposes of border barrier construction under § 284.  The House does not challenge the authority of the Executive to build border fencing under § 284, nor does the House contest that DoD may use appropriated funds for § 284 fence construction.  *See* House Mot. at 30.  Rather, the House's motion is directed solely against the use of § 8005 to transfer additional money into the counter-narcotics-support appropriation from which § 284 fence construction is funded*.  See id.*  Second, the House seeks an injunction prohibiting DoD from using § 2808 for any border barrier construction.  The House does not challenge the President's declaration of a national emergency pursuant to the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*—a necessary perquisite for invoking § 2808.  *See* House Mot. at 34.  Instead, the House contends that DoD has not satisfied other requirements of § 2808.  *See id.*

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.* at 20.  The Court of Appeals has emphasized that the "first and most important factor" is whether the moving party has "established a likelihood of success on the merits."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  "When a plaintiff has not shown a likelihood of success on the merits, [we need not] consider the other factors."  *Greater New*

*Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S at 22.[2] For the reasons discussed below, the House cannot meet this heavy burden.

## ARGUMENT

I. <u>**The House Lacks Standing to Maintain This Action.**</u>

The House's claim that a single House of Congress can invoke the jurisdiction of an Article III court to resolve a disagreement between the political branches over the Executive's exercise of statutory authority is irreconcilable with the "restricted role for Article III courts" in our constitutional structure and history. *Raines*, 521 U.S. at 828. The Framers predicted that the political branches would disagree—indeed, they counted on it—and thus gave Congress and the Executive the necessary tools to resolve those disagreements themselves. But nowhere does the Constitution contemplate Article III courts resolving these inter-branch disputes. Rather, it makes clear that the duty of Article III courts is to resolve cases or controversies instigated by a party suffering particularized and legally cognizable injury. Supreme Court and D.C. Circuit precedent accordingly establish that the harm asserted by the House—an alleged dilution of its legislative

---

[2] In *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), the Court of Appeals noted that *Winter* called into question the "sliding-scale approach" to consideration of the preliminary injunction factors that had been the law of this Circuit. The Court read "*Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction" such that a "movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm." *Id.* at 393; *see BHM Healthcare Sols., Inc. v. URAC, Inc.*, 320 F. Supp. 3d 1, 7 (D.D.C. 2018). Noting a split among the circuits on the interpretation of *Winter*, the Court of Appeals held that it did not need to resolve the question because the movant in *Sherley* failed to establish an entitlement to a preliminary injunction under the "less demanding sliding-scale" approach. *Id.* This Court need not address this issue here, as the House's claims for relief fail under either standard.

authority—is not a judicially cognizable injury sufficient to confer Article III standing.  Were the Court to conclude otherwise, it would vastly expand the role of Article III courts and upend the constitutional design by conscripting courts as the umpires of endless political battles between Congress and the Executive.

### A.    The House Fails to Allege a Judicially Cognizable Injury.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies."  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  "One element of the case-or-controversy requirement" is that all plaintiffs "must establish that they have standing to sue."  *Raines*, 521 U.S. at 818.  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper*, 568 U.S. at 408; *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2695 (2015) (Scalia, J., dissenting) ("[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.").  The Supreme Court has "always insisted on strict compliance with this jurisdictional standing requirement."  *Raines*, 521 U.S. at 819.  Indeed, because the relaxation of the standing requirement "is directly related to the expansion of judicial power," *Clapper*, 568 U.S. at 408–09, the inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [an Article III court] to decide" a claim alleging that action "taken by one of the other two branches of the Federal Government was unconstitutional," *id.* at 409 (quoting *Raines*, 521 U.S. at 819-20).

To establish "the irreducible constitutional minimum" of Article III standing, a plaintiff

must show an injury in fact that is fairly traceable to the defendant's challenged actions and likely to be redressed by the requested relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As the Supreme Court has stressed, in a case involving the standing of federal legislators, an asserted injury does not constitute an Article III injury-in-fact unless it is "legally and judicially cognizable." *Raines*, 521 U.S. at 819. "This requires, among other things, that the plaintiff have suffered an invasion of a legally protected interest which is concrete and particularized, and that the dispute is traditionally thought to be capable of resolution through the judicial process." *Id.* (citations, quotation marks, and ellipsis omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("We have always taken [Article III's case-or-controversy requirement] to mean cases and controversies of the sort traditionally amenable to[,] and resolved by[,] the judicial process."). *Raines* further emphasized that to demonstrate Article III standing a plaintiff must allege a "*personal injury*" demonstrating "that he has a 'personal stake' in the alleged dispute" such that the alleged harm is "particularized as to him." *Raines*, 521 U.S. at 818-20.

Here, the asserted basis of the House's suit is the allegation that Defendants' exercise of their authority under § 8005 and § 2808 to further barrier construction projects at the southern border does not "comply with Congress's specific statutory limitations." House Mot. at 29. The House claims these alleged statutory violations usurp its constitutional appropriations authority, causing institutional harm to the House, *id.* at 23, and putting it "at a severe disadvantage within our system of government," *id.* at 24. As further explained below, the "institutional injury" alleged by the House does not meet Article III standing requirements.

### 1.    *Raines* Rejected the Standing of Legislators to Sue for Official-Capacity Injuries In All But the Narrowest of Circumstances.

As the Supreme Court held in *Raines*, a "dilution of institutional legislative power" is not a "personal, particularized, concrete, [or] otherwise judicially cognizable" injury sufficient to

establish Article III standing.  521 U.S. at 820, 826.  In *Raines*, individual Members of Congress brought suit to challenge the Line Item Veto Act, which gave the President the authority to cancel spending provisions in an appropriations bill without vetoing the bill in its entirety.  The Members argued that the Act altered "the legal and practical effect" of their votes on "bills containing such separately vetoable items," depriving them of "their constitutional role in the [legislative process]," and "alter[ing] the constitutional balance of powers between the Legislative and Executive Branches."  *Id.* at 816.  The district court held that the Members had standing under D.C. Circuit precedent, which "ha[d] repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers."  *Id.*  The Supreme Court reversed on direct appeal.[3]

Although the Court acknowledged that a legislator could sue for any injury that resulted in the loss of a "private right" (like a salary), *id.* at 821, it found that the Members' claimed "institutional injury" of "the diminution of legislative power" was "wholly abstract and widely dispersed" because the injury "necessarily damage[d] all Members of Congress and both Houses of Congress equally."  *Id.* at 829.  The Court held that, in such circumstance, the Members "d[id] not have a sufficient 'personal stake' in th[e] dispute," *id.* at 830 (citation omitted), as the "loss of political power" was not claimed in a "private capacity" but was "solely because they are Members of Congress," *id.* at 821.  "If one of the Members were to retire tomorrow," the Court said, "he would no longer have a claim; the claim would be possessed by his successor instead."  *Id.*; *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal

---

[3] Although the Members had statutory authority to bring suit, the Court held that the statutory grant of authority "eliminate[d] any prudential standing limitations" but "[could] not erase Article III's standing requirements."  *Raines*, 521 U.S. at 820 n.3.

right to it."). As the Court explained, the alleged injury essentially "runs . . . with the Member's seat, a seat which the Member holds . . . as a trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S. at 821.

The Court further determined that the dispute at issue was not "traditionally . . . capable of resolution through the judicial process." *Id.* at 819; *see also Spokeo*, 136 S. Ct. at 1547 (the Article III standing doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood"); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) ("Our system of government leaves many crucial decisions to the political processes."). "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed *injury to official authority or power*." *Raines*, 521 U.S. at 826 (emphasis added); *see also United States v. Windsor*, 570 U.S. 744, 790 (2013) (Scalia, J., dissenting on the merits, with no majority opinion on the standing issue) ("The opinion [in *Raines*] spends three pages discussing famous, decades-long disputes between the President and Congress . . . that would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has[.]").

Indeed, *Raines* acknowledged a single exception to the general principles prohibiting legislative standing—*Coleman v. Miller*, 307 U.S. 433 (1939). *Raines*, 521 U.S. at 821. In *Coleman*, the Supreme Court held that state legislators who challenged a tie-breaking vote by the state lieutenant governor to ratify a proposed amendment to the U.S. Constitution had asserted an institutional injury that was sufficient to confer Article III standing. *Id.* at 822. *Raines* emphasized, however, the narrowness of *Coleman*'s holding, clarifying that "at most" it stood for the

proposition that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823.  It also made sure to highlight that *Coleman* involved "*state* legislators," *id.* at 821, and it specifically did not determine that *Coleman* had any "applicability to a similar suit brought by federal legislators," *id.* at 824 n.8.

## 2.   The D.C. Circuit Has Confirmed the Narrowness of Legislative Standing.

Following *Raines*, the D.C. Circuit similarly held that Members of Congress have no standing to challenge Executive action on the basis of claimed injury to their legislative powers. In *Chenoweth v. Clinton*, several Members brought suit to challenge President Clinton's American Heritage Rivers Initiative after unsuccessful legislative efforts to prevent the program's implementation.  181 F.3d 112, 113 (D.C. Cir. 1999).  The Members claimed that the President's establishment of the program through an Executive Order "deprived them of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving the program. *Id.*; *see id.* at 116 ("[The Members'] injury, they say, is the result of the President's successful effort 'to usurp Congressional authority by implementing a program, for which [he] has no constitutional authority, in a manner contrary to the Constitution.'").  The D.C. Circuit held that the alleged injury to the Members' "authority as legislators" was "identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'"  *Id.* at 115 (quoting *Raines*, 521 U.S. at 816).  If, as in *Raines*, a statute that allegedly divests the Members of their "constitutional role in the [legislative process]" does not give them standing to sue, the D.C. Circuit reasoned, "then neither does an Executive Order that allegedly deprives congressmen of their right to participate and vote on legislation in a manner defined by the Constitution."  *Id.* (quotations and alteration

omitted); *see id.* at 116 (recognizing *Raines*'s "narrow interpretation" of *Coleman*).

The D.C. Circuit reached a similar conclusion in *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000).   In *Campbell*, several Members of the House challenged President Clinton's use of U.S. forces in NATO airstrikes against Yugoslavia in the late 1990s, claiming that the President violated the War Powers Resolution and usurped Congress's authority under the War Powers Clause. *Id.* at 20.  Although Congress voted down a declaration of war and a resolution authorizing the airstrikes, the Members were unsuccessful in legislating an end to U.S. involvement in the Yugoslav conflict and so they filed suit. *Id.*  The D.C. Circuit held under *Raines* that the Members lacked standing to pursue their claims, which essentially alleged that the President violated statutory limitations and acted in excess of his authority without a congressional declaration of war. *Id.* at 22.  As the Court explained, although *Raines* recognized the narrow *Coleman* exception, it did not hold that "legislators have standing whenever the government does something Congress voted against" or "anytime a President allegedly acts in excess of statutory authority." *Id.*  The Court further noted that, like the plaintiffs in *Raines*, the Members in *Campbell* enjoyed "ample legislative power" to have stopped U.S. participation in the conflict. *Id.* at 23.

### 3.   The House's Standing Claim Fails Under *Raines* and D.C. Circuit Precedent.

Applying the cases discussed above, the House fails to assert a judicially cognizable injury sufficient to confer Article III standing.  The House alleges that the Executive Branch has acted in excess of its authority (here, statutory authority) and as a result has allegedly usurped the House's constitutionally-prescribed authority to control the federal purse.   A "dilution" of legislative authority or "divest[ure]" of a "'constitutional role' in the legislative process," *Chenoweth*, 181 F.3d at 115 (citation omitted), is precisely the type of alleged injury that *Raines* (followed by *Chenoweth* and *Campbell*) held does not confer legislative standing.

22

*Raines*'s reasoning applies equally to a case, like this one, that is brought on behalf of a House of Congress as opposed to its individual Members.  Such suits have no more support in historical experience.  In recounting the long-history of historical practice that "cut against" legislator standing, *Raines* focused on confrontations between the Executive and Congress as a whole, not merely individual Members of either House.  *See Raines*, 521 U.S. at 826-28.  As *Raines* explained, those "political battles" were waged "between the President and Congress."  *Id.* at 827. Thus, just like a case brought by an individual Member, this suit does not involve a dispute "traditionally thought to be capable of resolution through the judicial process" under Article III. *Id.* at 819.

It is true that *Raines* "attach[ed] some importance to the fact that [the plaintiffs] ha[d] not been authorized to represent their respective Houses of Congress," but that fact was not dispositive. *Id.* at 829.  Nor could it be in this case.  Congress has not created any applicable cause of action giving the House a basis to sue, *see infra* at 38-42, and thus it has no greater authority to bring a case on behalf of Article I than the individual legislators in *Raines*.  And moreover, as the House concedes, House Mot. at 27, it is suing only for alleged "official capacit[y]" injuries to seats held by its Members as "trustee[s] for their constituents," rather than "as a prerogative of personal power."  *Raines*, 521 U.S. at 821.  That claimed injury is no less "abstract" or "widely dispersed" when alleged by the collective of its Members than when alleged by its individual Members.  *Id.* at 829; *see id.* at 832 (holding that the general harm of an "alleged . . . continuing deprivation of federal legislative power" is "shared by all the members of the official class who could suffer that injury, the Members of Congress").

Nor does the House's standing claim fall within the "very narrow possible *Coleman* exception to *Raines*."  *Campbell*, 203 F.3d at 23.  The House does not challenge—nor has the

Executive taken—any action that has "nullified" the House's appropriations power. *Id.* at 22.  The dispute between the branches is one of statutory interpretation—*i.e.*, the House claims that the Executive Branch's planned border barrier construction projects go beyond the asserted statutory authority under § 8005 and § 2808.  As the D.C. Circuit held in *Campbell*, claims that "the government does something Congress voted against" or "act[ed] in excess of statutory authority" are not "analogous to a *Coleman* nullification."[4]  *Id.*

Indeed, as in each of the cases discussed above, the challenged Executive actions do not strip the House of any "legislative remedy."  *Id.* at 23; *see id.* at 22 (explaining that the availability of political self-help is "the key to understanding [*Raines*'s] treatment of *Coleman* and its use of the word nullification.").  The House had and continues to "enjoy ample legislative power" to alleviate its purported harm and is fully capable of defending its interests without resort to the Judiciary.  *Id.*  The House could, for example, repeal or amend the terms of any statutory authority that it has conferred on the Executive Branch.  *See Chenoweth*, 181 F.3d at 116.  It could decline to enact legislation or withhold funding for the President's preferred programs.  Or it could use its legislative authority to bring about the result it seeks here by simply withholding appropriations, or by amending the terms of the relevant appropriations statutes to expressly restrict the transfer or expenditure of funds under § 8005 or § 2808 for the purpose of barrier construction along the southern border.  *See Raines*, 521 U.S. at 824; *Campbell*, 203 F.3d at 23.  Notably, the House recently included such an appropriation restriction on the use of military construction money for border barriers in the pending bill for military construction projects for fiscal year 2020, confirming that it is fully capable of using its constitutional tools to protect its interests.  *See* Fiscal Year 2020 Military Construction Bill § 612 (Exhibit 9).  In short, the House "possesse[s] political

---

[4] Perhaps acknowledging this, the House does not even cite *Coleman* to support its claim.

tools with which to remedy [its] purported injury," and both Supreme Court and D.C. Circuit precedent require that it "turn to politics instead of the courts." *See Campbell*, 203 F.3d at 24.

### 4.    The House Relies on Cases That Fail to Support Its Position.

Ignoring the most relevant precedents of the Supreme Court and D.C. Circuit, the House instead relies primarily on a decision from another Judge of this Court in *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015) (Collyer, J.).  *See* House Mot. at 24-25.  In *Burwell*, the House sued the Secretaries of Health and Human Services (HHS) and of the Treasury, alleging that their respective departments were expending unappropriated funds to make certain payments to insurers under a cost-sharing provision of the Patient Protection and Affordable Care Act (ACA).  The House alleged that the Executive's expenditure of funds violated of the Appropriations Clause and thus divested it of "its most defining constitutional function." *Id.* at 70.  The court held that the House had pled a legally cognizable "institutional" injury based on its "Non-Appropriation Theory." *Id.*  That decision was incorrect, as it misapplied and ignored binding precedent.

First, *Burwell* offered no authority for its novel theory of legislative standing.  The court recognized that "[i]f the invocation of Article I's general grant of legislative authority to Congress were enough to turn every instance of the Executive's statutory non-compliance into a constitutional violation, there would not be decades of precedent for the proposition that Congress lacks standing to affect the implementation of federal law." *Id.* at 74 (citation omitted).  It nevertheless dismissed the Supreme Court's guidance that our "Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Id.* (quoting *Bowsher v. Synar*, 478 U.S. 714, 722 (1986)).  *Burwell* declared without support that this principle was relevant only to "statutory" and not to "constitutional" claims, like

the House's "Non-Appropriation Theory."[5]  *Id.* at 75.

Nor did *Burwell* identify any meaningful difference between the House's statutory and constitutional claims in that case.  The court acknowledged that the merits of the House's Appropriations Clause claim would "inevitably involve some statutory analysis," because "the Secretaries' primary defense [would] be that an appropriation *has* been made, which will require reading the statute."  *Id.* at 74 n.24.  The court nonetheless believed that the statutory dispute was inconsequential because "that is an antecedent determination to a constitutional claim."  *Id.*  But the statutory issues were not "antecedent" to the constitutional claim in *Burwell*, and they clearly are not "antecedent" to the constitutional claims here; they are the entire basis of the House's lawsuit.  *See infra* at 42-46.  There are no Appropriation Clause principles at issue in this case— because the Executive is not claiming that it can spend funds in the absence of congressional authorization—and there is no substantive difference between the House's constitutional and statutory claims.  The only question is whether the border wall funding at issue is authorized by § 8005 and § 2808.  That is an issue of statutory interpretation that does not depend on the Constitution.

Nor does *Burwell*'s approach have any limiting principle.  *Burwell* would open the door of Article III courts for any dispute in which a House of Congress asserts that the Executive Branch has misunderstood the scope of an appropriations statute such that it is allegedly spending federal monies inconsistent with the views of the House or Senate.  Any claim that an Executive Branch

---

[5] On this basis, *Burwell* dismissed for lack of standing the House's claim that the Treasury Secretary disregarded and essentially amended the ACA's employer mandate provision by taking regulatory actions that delayed its effect and narrowed its scope.  *Burwell*, 130 F. Supp. 3d at 75. Although the House framed that claim in constitutional terms as well, the court declared that "the heart of the alleged violation remains statutory, not constitutional: the House alleges not that [the Treasury Secretary] has disobeyed the Constitution, but that he disobeyed the ACA as enacted."  *Id.* at 70.

agency has erroneously interpreted a substantive statute tied to the expenditure of funds could be recast as a violation of the Appropriations Clause, on the theory that the applicable appropriations law did not permit the expenditure of funds for an allegedly unlawful purpose.  *See OPM v. Richmond*, 496 U.S. 414, 424 (1990) (holding that "the straightforward and explicit command of the Appropriations Clause" barred payment of a claim for federal benefits not authorized by the relevant substantive statute).  Nor is there any principled basis to confine this theory to the Appropriations Clause.  Whenever the Executive is asserted to have exceeded its delegated authority—such as by issuing a regulation for which the House believes there is no statutory basis—the House could advance a garden-variety statutory-authority claim in the guise of a constitutional claim alleging that the Executive committed a "bicameralism and presentment" violation by issuing binding decrees without a legislative basis.  These sorts of political disputes between the branches over Executive Branch authority are ubiquitous in our history; they are, and have always been, resolved through the political process.[6]

*Burwell* erroneously held that it would "not consider separation of powers in the standing analysis," believing that "[t]he doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable.'"  *Burwell*, 130 F. Supp. 3d at 66 (citing *Powell v.*

---

[6] For example, when Congress was concerned about unauthorized Executive Branch spending in the aftermath of World War I, it responded not by threatening litigation, but by creating the General Accounting Office (now the Government Accountability Office) to provide independent oversight of the Executive Branch's use of appropriated funds.  *See* Budget and Accounting Act, 1921, Pub. L. No. 67-13, § 312(a), 42 Stat. 20, 25 (creating the GAO); *see also, e.g.*, 67 Cong. Rec. 987 (1921) (statement of Rep. James William Good).  Even when the Executive Branch has disregarded an explicit restriction on spending on the ground that it was unconstitutional, *see* Unconstitutional Restrictions on Activities of the Office of Sci. & Tech. Policy in Section 1340(a) of the Dep't of Def. & Full-Year Continuing Appropriations Act, 2011, 2011 WL 4503236 (O.L.C. Sept. 19, 2011), Congress did not bring suit.  Rather, it used its political powers to respond by cutting the Executive's funding.  *See* Jeffrey Mervis, Congress Slashes Budget of White House Science Office, Science, Nov. 15, 2011.

*McCormack*, 395 U.S. 486, 512 (1944)).  Prior to the Supreme Court's decision in *Raines*, the D.C. Circuit had concluded that it should "[k]eep[ ] distinct [its] analysis of standing and [its] consideration of the separation of powers issues raised when a legislator brings a lawsuit concerning a legislative or executive act." *Chenoweth*, 181 F.3d at 114.  But the D.C Circuit has since explicitly recognized that this aspect of its prior legislative standing cases is "untenable in the light of *Raines*." *Id.* at 115.  Instead, *Raines* "require[s] [a court] to merge [its] separation of powers and standing analyses." *Id.* at 116; *Spencer v. Kemna*, 523 U.S. 1, 11–12 (1998) (holding that it is error to treat standing and separation of powers as distinct concerns).  As explained below, *see infra* at 32-36, the separation of powers bars the House's claim of standing.

*Burwell* failed to give effect to *Raines*, relying instead on the D.C. Circuit's pre-*Raines* decision in *United States v. AT&T Co.*, 551 F.2d 384 (D.C. Cir. 1976), in which the United States sued AT&T to enjoin the company from complying with a subpoena issued by a House subcommittee.  The D.C. Circuit allowed the House to intervene as a defendant, noting that it was "the real defendant in interest since AT&T, while prepared to comply with the subpoena in the absence of a protective court order, has no stake in the controversy beyond knowing whether its legal obligation is to comply with the subpoena or not." *Id.* at 385.  Although the Court held in summary fashion that the "the House as a whole has standing to assert its investigatory power," it did so without analysis or support in a discussion that amounts to four sentences. *Id.* at 391.  The force of the Court's holding is further undermined by the fact that it pre-dates *Raines*.  Moreover, *AT&T*'s unique procedural posture makes it a particularly ill-suited comparator.  The separation-of-powers concerns that *Raines* emphasized in the legislative standing analysis are significantly greater in this case than in *AT&T* where the House only intervened in a suit between the Executive and a private party.  And in any event, intervention to defend a legislative subpoena provides no

support for the proposition that the House has standing to sue to compel the Executive Branch, in its exercise of statutory authority, to comply with the House's understanding of a previously enacted statute.

*Burwell* also failed to discuss the reasoning of *Chenoweth* or *Campbell*, which emphasized that legislators may not short-circuit the legislative process by bringing suit against the Executive Branch. *See Chenoweth*, 181 F.3d at 116-17; *Campbell*, 203 F.3d at 23. Instead, it held incorrectly that Congress lacks legislative recourse when it comes to disputes over Executive Branch spending. *Burwell*, 130 F. Supp. 3d at 73 (holding that the House had standing because eliminating funding for the challenged cost-sharing payments was "*exactly* what the House tried to do"). As the D.C. Circuit emphasized in *Harrington v. Bush*, the Executive Branch's alleged misuse of funding "does not invade the lawmaking power of Congress;" "all the traditional alternatives related to the 'power of the purse' remain intact." 553 F.2d 190, 213 (D.C. Cir. 1977); *see Campbell*, 203 F.3d at 24 ("'if at first you don't succeed, try and try again'–[plaintiffs should] either work for repeal of the Act, or seek to have individual spending bills made exempt" (citation omitted)).

The House's reliance on *Arizona State Legislature* is equally unavailing. *See* House Mot. at 25-26. In that case, the Supreme Court held that a state legislature had standing to challenge a state initiative that removed congressional redistricting authority from the state legislature. The Court reasoned that the initiative—which amended the state constitution—"would 'completely nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan." *Ariz. State Legislature*, 135 S. Ct. at 2665 (quoting *Raines*, 521 U.S. at 823–24). In so holding, the Court emphasized that the case before it "does not touch or concern the question whether Congress has standing to bring a suit against the President" because "[t]here is no federal

analogue to Arizona's initiative power," whereas "a suit between Congress and the President would raise separation-of-powers concerns." *Id.* at 2665 n.12.  Here, the Executive's use of its authority pursuant to § 8005 and potentially § 2808, does not purport to "strip[ ]" the House of its legislative powers in the appropriations process.  *Id.* at 2663.  To the contrary, it is acting under express statutory authority granted by Congress.  Nor do the Executive's challenged actions prevent the House from exercising its appropriations authority with respect to these statutory authorities—or the funding of border barrier construction in general—in the future.  Indeed, the House has already initiated the legislative process to restrict the Executive's use of § 2808 in the next fiscal year.  *See* Fiscal Year 2020 Military Construction Bill § 612 (Exhibit 9).  And, of course, the separation-of-powers concerns that were absent in *Arizona State Legislature* are at their apex here.[7]

The House's reliance on *INS v. Chadha*, 462 U.S. 919 (1983), for its institutional plaintiff argument fares no better.  *See* House Mot. at 24 n.81; *see also* Br. of Former General Counsels of the U.S. House of Representatives as *Amici Curiae* at 8, ECF No. 33-1.  The Court's statement in *Chadha* that "Congress is the proper party to defend the validity of a statute" when the Executive Branch concedes that the statute is unconstitutional was made while discussing "prudential, as opposed to Art[icle] III," concerns about adverse presentation.  *Chadha*, 462 U.S. at 940; *see id.* at 939-40 (recognizing that an Article III case or controversy existed without regard to Congress's participation).  It thus made no difference whether Congress was an amicus or a party in the court

---

[7] The House's status as an "institutional plaintiff" also differs from *Arizona State Legislature*. House Mot. at 26.  The Arizona Legislature commenced its suit "after authorizing votes in *both of its chambers*." *Ariz. State Legislature*, 135 S. Ct. at 2664 (emphasis added).  Only the House of Representatives has initiated this action.  The legislative authority provided in the Appropriations Clause, however, is vested in both the House and the Senate, not in one or the other working independently.

of appeals.  That is why in *Windsor*, the Court relied on *Chadha* to ground its Article III jurisdiction on the Executive Branch's appeal, *id.* at 761-62, and not to find that the House had Article III standing for its own appeal (as the House had argued), *id.* at 758-59, 761-62; *see id.* at 760 ("[T]he words of *Chadha* make clear its holding that the refusal of the Executive to provide the relief sought suffices to preserve a justiciable dispute as required by Article III.").  Indeed, while the majority in *Windsor* did not directly address the House's standing claim, a three-Justice dissent rejected the House's position.  *See id.* at 783-85 (Scalia, J., dissenting).

Moreover, *Chadha* involved a statute that gave both the House and the Senate the ability to vote on the propriety of an Executive action and the House was participating in the case solely to preserve that procedural authority.  The House was *not* seeking a judicial decree commanding the Executive to do something (or to refrain from doing something).  This case, by contrast, does *not* involve any statutory entitlement to take an action internal to Congress (such as take a vote in the House), and is instead an attempt by the House to enlist this Court in its effort to exercise Article II power.  Thus even if *Chadha* had found some form of appellate standing for the House—which it did not—that case would nonetheless be limited to highly unique circumstances not present here.  *See id.* at 783-85 (Scalia, J., dissenting) (similarly distinguishing *Chadha*).

The scattered cases involving congressional subpoena enforcement are likewise incorrect and inconsistent with the Constitution's fundamental design, as well as irreconcilable with *Raines*.  The few post-*Raines* opinions that the House cites were by other Judges of this Court and, like *Burwell*, erroneously relied on the D.C. Circuit's pre-*Raines* decision in *AT&T*.  *See Comm. on Oversight and Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 20 (D.D.C. 2013) (Berman Jackson, J.); *Comm. On the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 68 (D.D.C. 2008) (Bates, J.).

But even assuming these cases were somehow correct, they would not apply in this case because the House is not asserting its "investigatory power," House Mot. at 26 (quoting *AT&T*, 551 F.2d at 391), and there is no Article I power to implement federal law that is analogous to Congress's investigatory power.   Even courts that have (erroneously) recognized Congress's authority to enforce subpoenas have distinguished attempts to enforce federal law.  *See Miers*, 558 F. Supp. 2d at 75 ("[A]lthough Congress does not have the authority to enforce the laws of the nation, it does have the 'power of inquiry.'"); *see also Walker v. Cheney*, 230 F. Supp. 2d 51, 72 (D.D.C. 2001) (distinguishing claims of congressional standing to compel compliance with subpoena from claims of "alleged injury to legislative power more generally," which are foreclosed by *Raines*).   In this case, the House is attempting nothing less than to "supervis[e] [Executive] officers charged with the execution of the laws it enacts." *Bowsher*, 478 U.S. at 722. The separation of powers does not permit such overreach.

**B.      This Suit Epitomizes the Separation-of-Powers Problems Inherent in Suits by the Legislative Branch.**

The Constitution carefully defines the separation of Congress's power to enact the law, the Executive's power to implement the law, and the Judiciary's power to interpret the law.  "[O]nce Congress makes its choice in enacting legislation, its participation ends.  Congress can thereafter control the execution of its enactment only indirectly—by passing new legislation." *Bowsher*, 478 U.S. at 733-34; *see also Daughtrey v. Carter*, 584 F.2d 1050, 1057 (D.C. Cir. 1978) ("Once a bill becomes law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public.").   As explained above, in our constitutional system, Congress's belief that the Executive is acting in excess of its statutory authority or violating a statutory restriction, even if that allegedly results in a concomitant constitutional violation, does not give rise to the sort of dispute that is "capable of resolution through the judicial process."

*Raines*, 521 U.S. at 819.

More than two centuries of constitutional tradition confirm that understanding.  Of the innumerable "confrontations between one or both Houses of Congress and the Executive Branch" in our Nation's history, none have been resolved through a suit "brought on the basis of claimed injury to official authority or power," *Raines*, 521 U.S. at 826; *see id.* at 826-28 (describing examples), with the single exception of *Burwell*'s erroneous decision.  *See also Ariz. State Legislature*, 135 S. Ct. at 2695 (Scalia, J., dissenting) ("What history and judicial tradition show is that courts do not resolve direct disputes between two political branches of the same government regarding their respective powers.").  "Our regime contemplates a more restricted role for Article III courts," *Raines*, 521 U.S. at 828-29, that does not extend to the "amorphous general supervision of the operations of government," *id.* at 828-29.  But that is exactly what the House seeks here.

Indeed, this suit is a paradigmatic example of the "separation-of-powers problems inherent in legislative standing." *Campbell*, 203 F.3d at 21.  Accepting the House's claim of standing would interfere with the proper functioning of all three branches of government.

First, permitting the House to pursue this suit "meddl[es] in the internal affairs of the legislative branch" by allowing one House of Congress to use litigation to circumvent the legislative process. *Id.* (quoting *Chenoweth*, 181 F.3d at 116).  Although the House describes this suit as a vindication of its appropriations power, what it really seeks is a departure from the method established by the Constitution for the Legislative Branch to work its will.  If the House wanted to bar the Executive from using its authority pursuant to § 8005 or § 2808 to undertake barrier construction at the southern border, it would be necessary for the House to obtain the concurrence of the Senate and present the resulting measure to the President.  The expedient of filing a lawsuit—here, by a single House of Congress—frustrates that constitutional design and

33

undermines legislative accountability.  As Justice Scalia aptly put it:  "If majorities in both Houses of Congress care enough about the matter, they have available innumerable ways to compel executive action without a lawsuit . . . . But the condition is crucial; Congress must care enough to act against the President itself, not merely enough to instruct its lawyers to ask *us* to do so." *Windsor*, 570 U.S. at 791 (2013) (Scalia, J., dissenting).  Thus, "[t]o accomplish what has been attempted by one House of Congress in this case requires action in conformity with the express procedures of the Constitution's prescription for legislative action:  passage by a majority of both Houses and presentment to the President." *Chadha*, 462 U.S. at 958.[8]

There is no doubt that Congress could expressly restrict or bar the Executive's use of § 8005 and § 2808 "were a sufficient number in each House so inclined." *Campbell*, 203 F.3d at 21.  Express restrictions on the use of federal funds are a familiar feature of federal legislation. Indeed, Congress imposed express restrictions on the use of the $1.375 billion it appropriated to DHS in fiscal year 2019 for barrier construction in the Rio Grande Valley Sector.  Pub. L. No. 166-6, § 231 (prohibiting construction in certain locations); *id.* § 232 (imposing consultation and public comment requirements for construction in certain locations).  Congress did not, however, impose any restrictions on the Executive's exercise of § 8005 or § 2808, or any other statutory authority for border barrier construction.  Indeed, Congress attempted to override the President's national emergency declaration, but that effort failed to garner enough support to overcome the

---

[8] These principles apply with full force to claims implicating Congress's appropriations power. *Raines* itself involved a dispute over the President's authority to cancel spending authorized by Congress.  *See* 521 U.S. at 813-15.  *Chenoweth* involved a claim that an Executive Branch program was unlawful because, *inter alia*, it "violate[d] the Anti-Deficiency Act, 31 U.S.C. § 1301 *et seq*." and the "Spending Clause[ ] of … the Constitution" by spending federal funds without an appropriation.  181 F.3d at 113.  And, in *Harrington*, the D.C. Circuit dismissed for lack of standing a legislator's Appropriations Clause claim related to the funding and reporting provisions of the CIA Act.  553 F.2d at 213.

President's veto.  *See* Summary, H.J. Res. 46, 116th Cong., https://www.congress.gov/bill/116th-congress/house-joint-resolution/46.  Under D.C. Circuit precedent, the House's inability to avail itself of the constitutionally-prescribed legislative process is dispositive.  "Because the parties' dispute is . . . fully susceptible to political resolution," it must be resolved through "political self-help rather than resort to the Article III courts."  *Campbell*, 203 F.3d at 21, 24.

Second, the House's claim of standing would allow one chamber of Congress to assume for itself the President's responsibility to execute the law.  The Constitution entrusts "to the President, and not to the Congress," "the responsibility to 'take Care that the Laws be faithfully executed.'"  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).  The "responsibility for conducting civil litigation in the courts of the United States for vindicating public rights . . . may be discharged only by persons who are 'Officers of the United States'" within the Executive Branch.  *Id.* at 140 (quoting U.S. Const., art. II, § 2, cl. 2).  That responsibility "cannot possibly be regarded as merely in aid of the legislative function of Congress."  *Id.* at 138.  *See also Young v. U.S. ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 817 (1987) (Scalia, J., concurring) (Congress's "dependen[ce] on the Executive . . . for enforcement of the laws it enacts" is "a carefully designed and critical element of our system of Government"); *cf. Bowsher*, 478 U.S. at 727 ("The dangers of congressional usurpation of Executive Branch functions have long been recognized.").  Indeed, as *Morrison v. Olson* demonstrates, even where Congress has perceived a potential for a conflict-of-interest in the Executive's investigation and prosecution of its own officials, Congress has responded by creating procedures for the appointment of an independent counsel within the Executive Branch, *not* by seeking to enforce the law *itself*.  487 U.S. 654, 659-60 (1988) (reviewing the constitutionality of the Ethics in Government Act's independent counsel provisions).

Third, the House's claim untethers the Judiciary from the traditional understanding of an

Article III case or controversy.  Standing doctrine, as an integral feature of the separation of powers, reflects the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere."  *Raines*, 521 U.S. at 820.  The Supreme Court has repeatedly admonished against extending the doctrine of standing beyond its traditional bounds— particularly when doing so would thrust the courts into assessing the constitutionality of the other branches' actions.  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," and the doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood."  *Spokeo*, 136 S. Ct. at 1547 (citing *Raines*, 521 U.S. at 820).

Against the long history of non-litigiousness between the political branches, which demonstrates that "[o]ur regime contemplates a more restricted role for Article III courts" *Raines*, 521 U.S. at 828, the House instead urges the Court to "improperly and unnecessarily plunge[ ]" itself into an open-ended "bitter political battle" between the House and the President, *id.* at 827. The Court should reject this extraordinary invitation.

\* \* \*

For all the reasons discussed above, the House lacks Article III standing.  But even if the Court were to conclude that the House can demonstrate standing, it should decline to entertain the House's claims under the doctrine of equitable discretion.  Given the momentous separation-of-powers concerns that this suit presents, the Congress should, at a minimum, be required to enact legislation prohibiting the expenditures it seeks to stop before calling upon the Judiciary to take its side in an inter-branch dispute.  In this case, of course, the enactment of such legislation would end the controversy without the need for further judicial involvement.  And, indeed, as noted above, there is pending legislation in the House to restrict the use of § 2808.  The Court should not

preempt that ongoing legislative process through issuance of a preliminary injunction, which is a remedy guided by equitable principles. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542-44 (1987) (emphasizing "the fundamental principle that an injunction is an equitable remedy").

This Circuit's precedents strongly support refusing judicial review on prudential or equitable grounds. Before *Raines*, the D.C. Circuit applied a broader conception of legislative standing than the one reflected in the Supreme Court's later decisions. In *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984), for example, the Court held that "congressmen had standing to object to the purportedly unconstitutional origination of a revenue-raising bill in the Senate." *Chenoweth*, 181 F.3d at 115 (discussing *Moore*). But despite finding Article III standing, the Court's pre-*Raines* decisions recognized the serious separation-of-powers concerns presented and dismissed the suits in the exercise of equitable discretion because the congressional plaintiffs had not exhausted their legislative remedies. Thus, in *Moore*, the Court held that "the district court properly dismissed [the plaintiffs'] complaint [under circuit precedent] because their 'rights [could] be vindicated by congressional repeal of the [offending] statute.'" *Id.* (quoting *Moore*, 733 F.2d at 956). The Court's "conclusion that the plaintiffs had standing to sue, in other words, got them into court just long enough to have their case dismissed because of the separation of powers problems it created." *Chenoweth*, 181 F.3d at 115

*Raines* has since made clear that suits like *Moore* do not satisfy Article III, and the same is true here. But the D.C. Circuit's pre-*Raines* decisions also show that even if a case brought by a congressional plaintiff could satisfy Article III, it nonetheless should be dismissed where legislative remedies are available but have gone unused. Here, as in those cases, the House's rights could "be vindicated by congressional" action. *Id.* at 115. And the House's suit presents

separation-of-powers problems of the highest order.  Accordingly, declining to review the House's claims would be the proper course of judicial restraint.

## II.     <u>The House Lacks a Cause of Action.</u>

Even if the House had standing to pursue its claims, it lacks a cause of action under which it could bring them in this Court.  Congress is well aware of how to create an express cause of action for itself or for individual legislators.  *See* 2 U.S.C. § 692(a)(1) (cause of action for individual legislators to challenge Line Item Veto Act); 28 U.S.C. § 365 (cause of action for the Senate to seek civil enforcement of a subpoena against the Executive Branch in specified circumstances); Depts' of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 209(b), (d)(2)-(3), 111 Stat. 2440, 2482 (1997) (cause of action for the House, Senate, or individual legislators to challenge Census methodology). The House lacks such a cause of action here, and there is no indication Congress has taken the extraordinary step of allowing one of its chambers to sue the Executive Branch.  As the Supreme Court explained in *Raines*, an express cause of action such as the one provided by the Line Item Veto Act "significantly lessens the risk of unwanted conflict with the Legislative Branch," 521 U.S. at 820 n.3, that occurs when one House of Congress seeks unilaterally to affect conduct outside the Legislative Branch.

In the absence of express authority to bring this suit, the House's complaint suggests two general sources for a potential cause of action: the Appropriations Clause and the APA.  But this is not "a proper case" for the "judge-made remedy" of an implied cause of action to enjoin alleged violations of the Appropriations Clause by agency officials.  *Armstrong*, 135 S. Ct. at 1384; *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).  Likewise, recognizing a cause of action for Congress under the APA would run counter to longstanding doctrines that prevent chambers of

Congress from bringing suit under statutes of general applicability that confer a cause of action on private parties to challenge agency action. Because the House has no authority to bring these claims, it cannot succeed on the merits.

### A.    The House Has No Cause of Action Under the Appropriations Clause.

The Supreme Court has recognized that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity," and as such is available only in "some circumstances" that present "a proper case." *Armstrong*, 135 S. Ct. at 1384. Although equity is "flexible," the Court has cautioned the judiciary to avoid creating remedies that were "historically unavailable from a court of equity" because "Congress is in a much better position" to perceive "new conditions that might call for a wrenching departure from past practice." *Grupo Mexicano*, 527 U.S. at 322, 333. More recently, the Court has emphasized that inferring a cause of action is a "significant step under separation-of-powers principles" because in doing so, courts intrude on the prerogatives of the entire "Congress, [which] . . . has a substantial responsibility to determine" whether suit should lie against individual officers and employees. *Abbasi*, 137 S. Ct. at 1856. Although *Abassi* recognized the existence of "traditional equitable powers," *id.*, Congress's grant of equitable authority to the courts is confined to the "boundaries of traditional equitable relief," which is "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution," *Grupo Mexicano*, 527 U.S. at 318, 322.

These concerns are mitigated in the "classical[ ]" type of implied equitable suit, which "permit[s] potential defendants in legal actions to raise in equity a defense available at law," because these suits merely shift the timing and posture of litigating a legal question that Congress already authorized to be adjudicated in federal court. *Michigan Corrections Org. v. Michigan Dep't of Corrections*, 774 F.3d 895, 906 (6th Cir. 2014); *see, e.g.*, *Free Enter. Fund v. Public Co.*

*Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).   But in this case, the House is arguing

for an equitable cause of action to enforce its powers under the Appropriations Clause even though

it is "not subject to or threatened with any enforcement proceeding," and thus the parties' dispute

otherwise would not be in federal court *at all* but for the House's actions.   *See Douglas v. Indep.*

*Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting).   Without the

mitigating factors typically surrounding implied causes of action, the House's attempt to wield the

Constitution "as a cause-of-action-creating *sword*" poses serious separation-of-powers

concerns.   *See Michigan Corrections Org.*, 774 F.3d at 906.   For instance, in *Grupo Mexicano*, the

Court reversed a preliminary injunction prohibiting the defendant from transferring funds because,

even though the district court's order was analogous to an equitable action called a "creditor's

bill," such actions were historically only available to judgment creditors.   *Grupo Mexicano*, 527

U.S. at 319–20.   Likewise, the fact that *private parties* have historically been able to obtain

injunctive relief against federal executive officials does not suggest that *federal legislators* can

obtain such relief.

Although *Burwell* recognized "an implied cause of action under the Constitution itself," its

reasoning is unpersuasive.   130 F. Supp. 3d at 78.   Since *Burwell*, the Supreme Court has strongly

cautioned lower courts against creating implied remedies.   *See Abbasi*, 137 S. Ct. at 1856-57.

*Burwell* distinguished *Armstrong* on the basis that the House and Senate were the "only two

possible plaintiffs" who could enforce the rights protected by the Appropriations Clause.   130 F.

Supp. 3d at 79.   Of course, "[t]he assumption that, if respondents have no standing to sue, no one

would have standing is not a reason to find standing."   *Schlesinger*, 418 U.S. at 227.   But Congress

is not the only entity that has alleged harm at the hands of the decisions challenged here.   Indeed,

the House is actually participating as an amicus in actions brought by other entities to enjoin

construction along the southern border, and presumably agrees that the plaintiffs in those cases have standing. *See State of California et al. v. Trump et al.*, Case No. 4:19-cv-00872-HSG (N.D. Cal.). Finally, the concerns in *Armstrong* are, if anything, heightened when a House of Congress is the party seeking the implied cause of action because it can fill that gap through an Act of Congress. Even if congressional suits to enforce the Appropriations Clause are "desirable . . . as a policy matter," the House cannot use implied cause-of-action doctrine to achieve what it has been denied through the political process. *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

*Burwell*, citing *Arizona State Legislature*, also erred in holding that the House did not need an express cause of action because it is not a private party. 130 F. Supp. 3d at 78. The respondents in *Arizona State Legislature* limited their threshold challenges to standing, and did not contest whether the Arizona legislature had a cause of action under the Elections Clause. And even though the Supreme Court entertained a federal constitutional claim brought by a *state* legislative body, the Court recognized that "a suit between Congress and the President would raise separation-of-powers concerns absent here." *Arizona State Legislature*, 35 S. Ct. at 2665 n.12. Those concerns weigh heavily against recognizing an implied cause of action under the Appropriations Clause in this case.

### B.   The House Has No Cause of Action Under the APA.

The APA creates a cause of action for a "person" who is "aggrieved by" or suffers "legal wrong because of" federal agency actions. 5 U.S.C. § 702. It thus incorporates "the universal assumption" that laws authorizing suits by "'person[s] adversely affected or aggrieved' leave[ ] private interests (even those favored by public policy) to be litigated by *private* parties." *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding*, 514 U.S. 122, 132 (1995) (emphasis added) (citations omitted); *cf. Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (requiring an "express statement by Congress" before subjecting President to APA review

in light of separation-of-powers concerns).  The House has, in the past, disclaimed that it has power to bring "suit under the myriad of general laws authorizing aggrieved persons to challenge agency action," dismissing as "speculative" the possibility that it would attempt "to afford itself broad standing to challenge the lawfulness of Executive conduct."   Brief for U.S. House of Representatives at 17, 22 & n.25, *U.S. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999), 1998 WL 767637 (citing *Newport News Shipbuilding*, 514 U.S. at 128).  This case presents no occasion for departing from that longstanding rule.

In *Burwell*, the court held that *Newport News* was not controlling because it addressed "agencies acting in [their] governmental capacity," not the legislature, 130 F. Supp. 3d at 78, but the underlying interpretive assumption that "private interests (even those favored by public policy) [are] to be litigated by private parties," continues to apply.  *Newport News*, 514 U.S. at 139.  And despite *Burwell*'s assertion that "there *is* precedent for the House filing suit to vindicate its rights in other contexts," none of the cases it cited (which are also cited in footnote 81 of the House's motion) involved the APA.  *Burwell*, 130 F. Supp. 3d at 78.  APA actions are a far cry from precedents relied upon by the House where a chamber of Congress sued to assert investigatory and oversight authority, *see generally AT&T Co.*, 551 F.2d at 390–91, or where Congress created a specific cause of action to proceed in Court.  Nothing in the APA's text or context suggests it was intended to authorize unprecedented suits between the Legislative and Executive Branches, and the near-total absence of such suits in the seventy years since the APA was enacted confirms as much.

## III.   The House Is Unlikely To Succeed On The Merits Of Its Constitutional Claims.

Even assuming the House had standing to bring this lawsuit and a cause of action, its purported constitutional claims under the Appropriations Clause are unlikely to succeed on the merits.  The House's constitutional claims do nothing more than allege statutory violations of

§ 8005 and § 2808.  The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton*, 511 U.S. at 473.  Defendants are not relying on independent Article II authority to undertake border construction.  Further, Defendants are not claiming that they can spend funds in the absence of congressional authorization.  This case thus raises no issue of constitutional dimension, and the Appropriation Clause claims amount to nothing more than statutory claims in disguise.  The outcome of this case (to the extent it presents a justiciable controversy at all) turns on the meaning of the disputed statutes—a purely statutory dispute that has no constitutional basis.

The Supreme Court's decision in *Dalton* makes this clear.  The issue in *Dalton* was whether a presidential order closing a military base was subject to review under the APA.  *Id.* at 464-66.  The Court of Appeals for the Third Circuit held that the order was unconstitutional because the President lacked statutory authority.  *Id.* at 471.  The Supreme Court unanimously rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  *Id.* at 471.  Citing a long line of cases, the Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration."  *Id.* at 474.

By asserting that actions in excess of statutory authority are constitutional violations, the House is doing precisely what the Court rejected in *Dalton*.  The House asserts no constitutional violation separate from the alleged statutory violations.  The House also does not allege that Defendants' compliance with any of the statutes would be unconstitutional.  Instead, the House's argument focuses entirely on "whether defendants' proposed expenditures comply with Congress's specific statutory limitations[.]"  House Mot. at 29.  Indeed, the House's merits

argument on its Appropriations Clause claim is devoted entirely to parsing the meaning and interpretation of the statutory elements of § 8005 and § 2808.  *See id.* at 29-40.   But these allegations of ultra vires statutory actions do not state independent constitutional claims.  *See Dalton*, 511 U.S. at 473-74.  Moreover, because Defendants concede that the only source of their authority is statutory, "no constitutional issue whatever is raised."  *Id.* at 474 n.6.

The House relies significantly on the decision in *Burwell* to support its position that there is an Appropriations Clause violation here, but that decision did not address *Dalton* and, as explained above, its rationale would transform countless statutory disputes into "constitutional" cases.  "[I]f every claim alleging that the President exceeded his statutory authority were considered a constitutional claim," then constitutional challenges would be "broadened beyond recognition."  *Id.* at 474.  It would require little creativity for a legislative plaintiff to recast a claim that an agency has erroneously interpreted a statute tied to the appropriations of funds into an asserted violation of the Appropriations Clause.  The Framers rejected such a "system in which Congress can hale the Executive before the courts … to correct a perceived inadequacy in the execution of its laws."  *Windsor*, 570 U.S. at 788-89 (2013) (Scalia, J., dissenting).

Even accepting the framework of *Burwell*, this case is distinguishable.  In *Burwell* the Court held that the House had standing to pursue its allegation that the Executive had drawn "funds from the Treasury without a valid appropriation." 130 F. Supp. 3d at 74.  In so ruling, the Court distinguished between disputes about "the implementation, interpretation, or execution of federal statutory law," which the Court stated that the House would not have standing to bring, and a claim that "the appropriations process is itself circumvented," which the Court held that the House would have standing to bring, *id*. at 74-75.

Defendants have not circumvented the appropriations process or contravened the will of Congress by funding border barrier construction using permanent statutory authorities that Congress has provided to DoD.  Congress did not address in its appropriations to DHS in the CAA whether the Executive Branch could utilize *other* statutory authorities that Congress provided to *other* agencies for border barrier construction.  The appropriations to DHS simply appropriated funds for border barrier construction in certain locations.  *See* Pub. L. 116-6, div. A, §§ 230-32.  Congress's specific appropriation to DHS does not prohibit the Acting Secretary of Defense from utilizing statutory authorities available to DoD.  This case is therefore distinguishable from *Burwell*, which involved a dispute over whether HHS could utilize a permanent appropriation to the agency to fund payments in the absence of a specific appropriation to that same agency for such payments.

Had Congress wished to restrict all other border barrier construction—including construction where other statutory authorities authorized funding—it could have done so by imposing appropriations riders, as it has done in the past, including elsewhere in the very same appropriations act.  *See, e.g.*, *id*. § 219 ("None of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security").  Indeed, the House's recent bill to restrict the use of military construction money for border barriers illustrates that the House knows how to limit the use of funds through legislation when it wants to do so.  *See* Fiscal Year 2020 Military Construction Bill § 612 (Exhibit 9).  Moreover, the President had already made clear prior to the CAA's passage his intention to use alternative statutory sources to fund border barrier construction, *see* House Mot. at 8-10, but Congress nonetheless did not include any rider forbidding it.  The absence of such provisions precludes any inference that

Congress intended to, or actually did, foreclose the use of other available authorities. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (the "doctrine disfavoring repeals by implication applies with full vigor when the subsequent legislation is an appropriations measure").

"An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation, not by Congress['s] expectations of how the funds will be spent, as might be reflected by legislative history." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012); *see Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 860 (D.C. Cir. 1984) (Scalia, J.) ("The issue here is not how Congress expected or intended the Secretary to behave, but how it required him to behave, through the only means by which it can (as far as the courts are concerned, at least) require anything – the enactment of legislation.  Our focus, in other words, must be upon the text of the appropriation.").  Because nothing in the text of the appropriations to DHS in the CAA restrict the use of other statutory authorities for border barriers, the history of negotiations between the President and Congress regarding fiscal year 2019 appropriations for border barrier construction is irrelevant to the purported constitutional issues in this case.

For these reasons, the House has not established a likelihood of success on the merits of its Appropriation Clause claims.

**IV.**   **The House Is Unlikely To Succeed On The Merits Of Its Statutory Claims.**

**A.**    **DoD's Transfer Of Funds Pursuant To § 8005 Is Lawful.**

The House also cannot establish a likelihood of success on the merits of its claim that DoD violated the requirements of § 8005 by transferring funds between DoD accounts in order to supplement funding available for border wall construction under § 284.  As with any statute, the Court must start with the plain meaning of the text, looking to the "language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United*

*States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002) (citation omitted).  The House's arguments fail both on the language of the statute itself and its broader context.

First, the House argues that DoD's transfer violates § 8005's requirement that transfers be for "higher priority items, based on unforeseen military requirements," because the "supposed need to transfer money does not arise from unforeseen circumstances."  House Mot. at 31-32.  But § 8005 uses the term "unforeseen" in the specific context of the budgeting process—not whether a particular development was predictable.  Congress does not appropriate funds to DoD on a "line item basis," and § 8005 is a grant of authority to DoD to make "changes in the application of financial resources from the purposes originally contemplated and budgeted for, testified to, and described in the justifications submitted to congressional committees in support of budget requests."  H. Rep. No. 93-662, at 15–16.  The need for DoD to exercise its § 284(b)(7) authority to provide support for counter-drug activities did not arise until February 2019, when DHS requested support from DoD to construct fencing in drug trafficking corridors.  *See* 10 U.S.C. § 284(a)(1) (authorizing DoD to support counter-drug activities only once "such support is requested").  Accordingly, the need to provide support for these projects was an unforeseen military requirement at the time of the President's fiscal year 2019 budget request.  *See* Rapuano Decl., Ex. C, at 1-2.  And it remained an unforeseen military requirement through Congress's passage of DoD's fiscal year 2019 budget in September 2018, which was five months *before* DHS's request.  *See* Pub. L. No. 115-245, 132 Stat. 2981.  DoD's need to provide counter-drug assistance under § 284 in response to DHS's request was thus not accounted for in DoD's fiscal year 2019 budget and is accordingly "based on unforeseen military requirements" for purposes of § 8005.

Second, the House asserts that DoD violated § 8005 because Congress denied "the Administration's repeated demands for border wall funding." House Mot. at 32. Again, this takes the statutory language out of its relevant context. Congress has not "denied" any request by DoD to fund "the item" referenced in the transfer—namely counter-drug activities funding, including fence construction, under § 284. The House assumes that § 8005 should be read to refer to a legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities. But Congress's affirmative appropriation of $1.375 billion to CBP for the construction of "primary pedestrian fencing" in the Rio Grande Valley Sector in furtherance of CBP's mission under IIRIRA, Pub. L. 116-6, div. A, § 230, does not constitute a "denial" of appropriations to DoD for its counter-drug activities in furtherance of DoD's mission under § 284. The statutory language of § 8005 is located in, and directed to, DoD's appropriations, and nothing in the DHS appropriations statute indicates that Congress "denied" a request to fund DoD's statutorily authorized counter-drug activities, which expressly include fence construction  10 U.S.C. § 284(b)(7). Nor did Congress otherwise restrict the use of available appropriations for that purpose. *See* Pub. L. No. 116-6. And because Congress never denied DoD funds to undertake the § 284 projects at issue, the House's claim fails.

Third, the House argues that border fencing cannot be built using funds transferred pursuant to § 8005 because the statute "does not authorize transferring funds for 'military construction.'" House Mot. at 33. The House, however, overstates the scope and application of the "military construction" exception in § 8005. Section 8005 provides, in relevant part, that the Secretary of Defense may "transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any

subdivision thereof[.]"  The text thus lists the two types of "funds" and "appropriations" that may be transferred under § 8005:  1) "working capital funds" or 2) "funds made available in this Act" (*i.e.*, the DoD FY19 Appropriations Act) "for military functions (except military construction)." There is no violation of this restriction in this case because DoD has not transferred military construction funds or appropriations.  Neither the surplus Army personnel funds from which the original $1 billion was transferred, nor the counter-narcotics support line of the Drug Interdiction and Counter-Drug Activities, Defense, to which the funds were transferred, constitute military construction funds or appropriations.  *See* Pub. L. 115-245, title I (military personnel appropriation); title VI (Drug Interdiction and counter-drug activities appropriation); *see also* Rapuano Decl. ¶ 5, Ex. D (explaining transfer of appropriations).

As the House well knows, in the appropriations context, "military construction" is a term of art that generally refers to the Military Construction and Veterans Affairs budget (also known as the MILCON budget).  The MILCON budget is overseen by different congressional committees and is separate from the annual DoD appropriations act.  *See* Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs Appropriations Act, 2019, Pub. L. No. 115-244, 132 Stat. 2897.  When the "military construction" limitation in the precursors to § 8005 first appeared in the 1970s, the DoD appropriations act sometimes included both general appropriations to DoD and specific appropriations for military construction.  *See* DoD Appropriations Act, 1972, § 736 (Dec. 18, 1971).  The language was further modified in DoD's 1979 appropriations act to "appropriations or funds made available in this Act to the Department of Defense for military functions (except military construction)."  DoD Appropriations Act, 1979, § 834 (Oct. 13, 1978).  But even in this statute, Congress had appropriated funds for "ammunition facilities authorized in military construction authorization Acts."  *Id.* tit. IV ("Procurement of

Ammunition, Army").  And from time to time, Congress has included supplemental MILCON funding in a DoD appropriations act.[9]  In these situations, the "except military construction" parenthetical precludes DoD from including these MILCON funds in a transfer action under section 8005.

The history of this provision demonstrates that the "military construction" limitation was understood by Congress to refer to specifically designated military construction appropriations or funds added to the DoD appropriations bill, not to general activities within the DoD appropriations bill that merely involve some element of construction.  This distinction has been long understood by both DoD and Congress, even if supplemental MILCON funds are not always included in DoD's appropriations bill.  For example, in 2007, Congress approved a proposed transfer of funds under § 8005 from the "military personnel, army" account into the "drug interdiction and counter-drug" account for the purpose of "construction of an infrastructure project" in Nicaragua.  *See* Reprogramming Application & Congressional Approvals, Sept. 2007 (Exhibit 10).  Had Congress not intended § 8005 to be used in this manner for the purpose of construction projects, it could have indicated its disagreement.  Instead, all of the pertinent Congressional committees, including the House and Senate, stated they had no objection to the transfer.  *See id.*  Further, Congress has permitted the transfer of funds under § 8005 to support DoD's involvement in CBP's border security mission, which included using the National Guard to construct border barriers.  *See* Reprogramming Application & Congressional Approvals, Sept. 2006 (transferring funds to

---

[9] *See, e.g.*, Department of Defense & Emergency Supplemental Appropriations for Recover from & Response to Terrorist Attacks on the United States Act, 2002, Pub. L. No. 107-117, § 8005 (transfer authority), ch. 10 (military construction appropriations); Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006, Pub. L. No. 109-148, § 8005 (transfer authority), ch. 7 (military construction appropriations),

support the National Guard's involvement in Operation Jump Start, the DoD mission in 2006-08 to support CBP's border security efforts, which included construction efforts by the National Guard) (Exhibit 11); *see also* Joint Statement of Rood and Gilday (describing Operation Jump Start and National Guard's role in "building more than 38 miles of fence") (Exhibit 3). Congress's failure to object to the use of § 8005 for construction projects undermines the House's argument, and provides no sound basis to enjoin Defendants' transfer of funds here.

**B.     The House Cannot Establish Article III Standing to Challenge Future Border Barrier Construction Under § 2808.**

The House is also unlikely to succeed on its claim that DoD violated § 2808. In addition to the Article III standing issues described above, the House's assertion of Article III standing with respect to this claim suffers from the additional flaw that the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 375 n.2 (D.C. Cir. 2017) ("A plaintiff unlikely to have standing is *ipso facto* unlikely to succeed").

Article III requires that cases be decided in the concrete context of an actual case or controversy, not in the abstract. U.S. Const. art. III, § 2, cl. 1. As relevant here, [a]n allegation of future injury may suffice [for standing] if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper*, 568 U.S. at 414 n.5). "[A]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted). By limiting the judicial power to instances in which specific individuals have suffered concrete injuries, standing requirements "serve[ ] to prevent the judicial process from being used to usurp the powers of the political branches." *Id*. at 408.

The House lacks standing because the Acting Secretary of Defense has not yet decided to

undertake or to authorize any barrier construction projects under § 2808.  *See* Rapuano Decl. ¶¶ 13-15.  DoD is currently undertaking an internal review process to inform any decision by the Acting Secretary of Defense regarding the use of § 2808, including assessments by the Chairman of the Joint Chiefs of Staff and the DoD Comptroller that are due to the Acting Secretary by May 10, 2019. *See id.* ¶ 14-15.  "When a decision is made to undertake military construction projects authorized by" § 2808, the statute requires that DoD notify Congress of its decision and provide information about the costs of the approved projects.  10 U.S.C. § 2808(b).  Accordingly, Congress will be notified after any decision is made to utilize § 2808 for border barrier construction.

The fact that the President invoked § 2808 in the national emergency declaration is not sufficient to establish standing where the decision to undertake or authorize barrier construction projects under § 2808 lies with the Acting Secretary of Defense.  Article III jurisdiction cannot rest on speculation by the House that DoD may use § 2808 to construct yet-to-be-identified border barriers.  This type of contingent "possible future injury" is not sufficient to establish Article III jurisdiction.  *See Clapper*, 568 U.S. at 409.  In the same vein, without a decision by the Acting Secretary to undertake or authorize barrier construction projects pursuant to § 2808, there has been no violation of § 2808 whatsoever.

The nature of DoD's decisionmaking regarding any future use of § 2808 further illustrates why the House lacks standing to bring this claim.  Before authorizing § 2808 construction, the Acting Secretary of Defense will determine that the project is "necessary to support such use of the armed forces."  10 U.S.C. § 2808(a).  That determination can be considered only within the context of the Acting Secretary of Defense authorizing specific military construction projects presented to him for approval.  Moreover, in order to fund any projects under § 2808, DoD will need to defer construction of an equal amount of appropriated, but unobligated, military

construction projects.   The Court should not decide the House's § 2808 claim until specific decisions about its use have been made, let alone before they have been made in a manner that would injure the House.   *See, e.g.*, *OXY USA Inc. v. FERC*, 1999 WL 506736, at *1 (D.C. Cir. June 9, 1999) (per curiam) (holding that "petitioner has failed to demonstrate that it has suffered an injury-in-fact" because the agency has made "no determination" as to the contested issue); *Ctr. For Sci. In Pub. Interest v. FDA*, 2004 WL 2011467, at *5 (D.D.C. Aug. 6, 2004) (same).

### V.   The House Has Not Established That an Irreparable Injury is Likely in the Absence of an Injunction.

The Court of Appeals has established "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).   To satisfy this standard, "the injury must be beyond remediation."   *Id.*   "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.   The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."   *Id.* at 297. In addition, "the injury must be both certain and great; it must be actual and not theoretical."   *Id.* The movant "must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."   *Id.* (internal quotations omitted).

The House cannot satisfy this demanding standard for the same reasons it lacks standing. *See supra* at 16-38.   The House does not allege any tangible or concrete harm stemming from border barrier construction, such as an injury to property or the environment.   Instead, the House asserts a far more abstract claim that it will suffer an "institutional injury" absent an injunction. House Mot. at 40.   But this claimed violation concerning the structural relationship between the Executive Branch and the House is insufficient to establish irreparable injury.   "[W]hile a violation of constitutional rights can constitute *per se* irreparable harm, . . . *per se* irreparable harm is caused

only by violations of 'personal' constitutional rights . . . to be distinguished from provisions of the Constitution that serve 'structural' purposes, like the Supremacy Clause." *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008), *rev'd on other grounds*, 556 F.3d 114 (2d Cir. 2009); *see Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (cases holding that a constitutional deprivation amounts to irreparable harm "are almost entirely restricted to cases involving alleged infringements of free speech, association, privacy[,] or other rights as to which temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief"); *American Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431 (N.D.N.Y. 1989) (differentiating for purposes of irreparable injury "personal constitutional rights" and "provisions of the Constitution that serve structural purposes").  Indeed, the cases the House cites to support its position involve individual rights cases that are well far afield from this case.  *See* House Mot. at 41; *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (religious organization's deprivation of free speech rights); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (the requirement that an individual pay allegedly unconstitutional taxes or risk criminal penalties); *England*, 454 F.3d at 302-04 (Establishment Clause violations).  These cases do not support the House's position that a legislative plaintiff suffers an irreparable institutional injury based on the Executive Branch's actions undertaken pursuant to disputed statutory authority.

In any event, the House's alleged institutional injury is not "irreparable" under the law of this Circuit.  As explained above, the House's constitutional claims are nothing more than allegations of statutory violations and it has not suffered, nor will it suffer, constitutional injury. The House will also have the opportunity to pursue and vindicate its institutional interests in the full course of this litigation.  "[I]t is the resolution of the case on the merits, not whether the

injunction is [granted], that will affect [separation of powers and federalism] principles." *Texas v. United States*, 787 F.3d 733, 767-68 (5th Cir. 2015).  Moreover, the alleged institutional injury is not beyond remediation because the House "has a broad range of legislative authority it can use" to bring about the result it seeks in this lawsuit.  *Campbell*, 203 F.3d at 23; *see supra* at 24-25.  Most obviously, the House can change or restrict § 2808 and § 8005 through the legislative process.  The House's alleged injury is thus not irreparable.

## VI.    The Balance of Equities and Public Interest Weigh Against Injunctive Relief.

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against granting the House's motion.  These factors merge when the Executive is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The House has not established that its alleged harm would outweigh the public interest.  As explained above, the House cannot establish an Article III injury sufficient to confer standing and its abstract claim of "institutional injury" is not irreparable.  In contrast, preventing the construction of border barriers would harm the Executive's "weighty" interest in border security and enforcement of immigration laws.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  Here, the President has declared a national emergency along the southern border and the situation there is continuing to worsen due to the increasing numbers of migrants that are overwhelming DHS's resources, thereby constraining the resources available for drug interdiction and law enforcement priorities at the border.  *See* Proclamation; Veto Message; Nielsen Letter.  Border walls have proven to be extremely effective at stopping drugs and migrants from unlawfully crossing the southern border.  *See* Martin Decl. (Exhibit 2).  In these circumstances, a preliminary injunction prohibiting the construction of additional barriers would harm the public's interest in border security and public safety.

## CONCLUSION

For the reasons explained above, the motion for preliminary injunction should be denied.

DATE:  May 8, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN G. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ *Andrew I. Warden*
ANDREW I. WARDEN
Senior Trial Counsel (IN Bar No. 23840-49)


*/s/ Kathryn C. Davis & Michael J. Gerardi*
KATHRYN C. DAVIS (D.C. Bar No. 985055)
MICHAEL J. GERARDI (D.C. BAR NO. 1017949)
RACHAEL L. WESTMORELAND
LESLIE COOPER VIGEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470

*Attorneys for Defendants*