**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES HOUSE OF )
OF REPRESENTATIVES, )
                                      )
        Plaintiff, )
                                      )
vs. )    Case Action No. 19-cv-00969-TNM
                                      )
STEVEN T. MNUCHIN, in his official )
capacity as Secretary of the United States )
Department of the Treasury, *et al.*, )
                                      )
        Defendants. )
_____ )

## BRIEF OF *AMICUS CURIAE* THE AMERICAN CENTER FOR LAW AND JUSTICE IN SUPPORT OF DEFENDANTS

ANDREW J. EKONOMOU (Ga. Bar # 242750)*   JAY ALAN SEKULOW (D.C. Bar # 496335)
HARRY G. HUTCHISON (MI Bar # P39669)*    *Counsel of Record*
MILES L. TERRY (D.C. Bar # 1011546)*      STUART J. ROTH (D.C. Bar # 475937)
**THE AMERICAN CENTER FOR LAW & JUSTICE**   JORDAN SEKULOW (D.C. Bar # 991680)
625 Bakers Bridge Avenue                 MARK GOLDFEDER (NY # 5275649)
Suite 105-121                            BENJAMIN P. SISNEY (D.C. Bar # 1044721)
Franklin, TN  37067                   **THE AMERICAN CENTER FOR LAW & JUSTICE**
Telephone: (800) 296-4529           201 Maryland Avenue, N.E.
Facsimile: (202) 546-9309           Washington, D.C.  20002
Email: mterry@aclj.org              Telephone: (202) 546-8890
*Counsel for Amicus Curiae*         Facsimile: (202) 546-9309
                                Email: bsisney@aclj.org
                                Email: sekulow@aclj.org
                                *Counsel for Amicus Curiae*

*\* Not admitted in this jurisdiction; joining admitted counsel pursuant to LCvR 83.2(c).*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4) and 26.1, *Amicus Curiae* The American Center for Law and Justice states and affirms it is a nonprofit organization that has no parent and issues no stock. Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(E), *Amicus Curiae* affirms that no party's counsel authored the brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and, no person—other than the *amicus curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................................................. 1

ARGUMENT ................................................................................................................................ 1

I.  PLAINTIFF FAILS TO MAKE THE CLEAR SHOWING REQUIRED TO OBTAIN THE EXTRAORDINARY AND DRASTIC RELIEF IT SEEKS .................................................. 1

II.  PLAINTIFF ACCEPTS THE EMERGENCY DECLARATION, AND ASKS THE COURT TO ENJOIN ONLY (1) DEFENDANTS' UTILIZATION OF 10 U.S.C. § 284 APPROPRIATED FUNDS TO COUNTER INTERNATIONAL CRIMINAL ACTIVITY AND DRUG TRAFFICKING ACROSS THE BORDER INDEPENDENT OF THE DECLARATION; AND (2) THE PRESIDENT'S REFERENCE TO 10 U.S.C. § 2808, A STATUTE NOT EVEN UTILIZED BY DEFENDANTS .................................................... 3

III. DEFENDANTS' UTILIZATION OF §284(B)(7) DRUG-INTERDICTION FUNDS AND TRANSFER OF ADDITIONAL FUNDS PURSUANT TO § 8005 OF THE FY 2019 DOD APPROPRIATIONS ACT IS LAWFUL BECAUSE IT IS AUTHORIZED BY CONGRESS AND DETERMINED TO BE FOR UNFORESEEN MILITARY REQUIREMENTS .......... 6

A. Defendants' § 8005 Transfer of Appropriated Funds to the DOD's § 284 Drug-Interdiction Account, and Utilization of Those Funds to Support the DHS in Securing the Border With Roads, Fences, and Lighting Pursuant to § 284(b)(7), is Lawful ..................................... 7

    1. Plaintiff's Contention That There is No *Unforeseen* Military Requirement for a Border Wall is Inapposite to It's Challenge of Defendants' § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting .......... 8

    2. Congress Has Not Denied, *but Instead Has Expressly Authorized*, Defendants' § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting ............................................................................................. 12

    3. Defendant DOD's § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting in Support of Defendant DHS is Not for "Military Construction" as That Term is Well Known to Mean ......................... 14

B. Defendants are Securing the Border Pursuant to and Consistent With Statutes, Appropriations, and Authorizations Enacted by Congress ............................................ 15

IV. ADJUDICATION OF PLAINTIFF'S CLAIMS WOULD REQUIRE THIS COURT TO SUBSTITUTE ITS JUDGMENT IN NATIONAL SECURITY AND IMMIGRATION-RELATED POLICY MATTERS FOR THAT OF THE POLITICAL BRANCHES ............ 16

CONCLUSION ................................................................................................................. 17

# TABLE OF AUTHORITIES

## CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ..................................................................2

*Cardenas v. United States*, 826 F.3d 1164 (9th Cir. 2016)........................................................ 17

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948)..................... 5

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007)........................................................ 1

*Fiallo v. Bell*, 430 U.S. 787 (1977) ........................................................................................ 17

*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) ........................................................................ 16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................................ 4

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ................................................................ 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 2, 5

*Mathews v. Diaz*, 426 U.S. 67 (1976)................................................................................... 5, 14

*McConnell v. FEC*, 540 U.S. 93 (2003) ...................................................................................1

*Munaf v. Geren*, 553 U.S. 674 (2008) .....................................................................................1

*Regan v. Wald*, 468 U.S. 222 (1984)................................................................................... 5, 14

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ..................................................................2

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018).................................................................1, 4, 5, 14

*United States v. Texas*, 136 S. Ct. 2271 (2016)...................................................................... 1

*University of Texas v. Camenisch*, 451 U.S. 390 (1981)............................................................2

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)......................................................... 1

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................ 16

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015).................................................. 16

# STATUTES

10 U.S.C. § 284 ............................................................................................................ *passim*

10 U.S.C. § 284(a)(1) .................................................................................................. 10

10 U.S.C. § 284(b) ..................................................................................................... *passim*

10 U.S.C. § 2808 ........................................................................................................ *passim*

10 U.S.C. § 12302(a) .................................................................................................... 5

50 U.S.C. § 1631 .................................................................................................... 3, 5, 9, 13

Administrative Procedure Act, 79 Pub. L. No. 404, 60 Stat. 237 (1946) ..................................... 4

Department of Defense and Labor, Health and Human Services, and Education
    Appropriations Act, 2019, § 8005, Pub. L. No. 115-245, 132 Stat. 2981 (2018) .......... *passim*

FY 2019 Consolidated Appropriations Act, Pub. L. No. 116-6,
    133 Stat. 13 (2019) ............................................................................................... 13

# OTHER AUTHORITY

U.S. Const. art. II ........................................................................................................... 16

Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc.
    No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ................................................................ 3, 9

H.J. Res. 46 (2019) ........................................................................................................ 3

Letter, Acting DOD Secretary Patrick Shanahan, to DHS Secretary Kirstjen Nielsen
    (Mar. 25, 2019) ...................................................................................................... 11

Office of the Secretary of Defense, DOD Serial No. FY 19-01 RA, Reprogramming
    Action (Mar. 25, 2019) ......................................................................................... 11, 12

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* the American Center for Law and Justice (the "ACLJ") is an organization dedicated to the defense of constitutional liberties and structures secured by law.  Counsel for the ACLJ have presented oral argument, represented parties, and submitted *amicus* briefs before the United States Supreme Court and numerous state and federal courts around the country in cases concerning the First Amendment, national security, and immigration law, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 136 S. Ct. 2271 (2016); *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); and *McConnell v. FEC*, 540 U.S. 93 (2003).  The ACLJ has been active in advocacy and litigation concerning the need for protecting the Constitution, the First Amendment, the separation of powers, the national security of the United States of America, and the immigration laws in place that protect American citizens from harm. The ACLJ submits this brief on behalf of over 150,000 of its members who support a secure border.

Pursuant to LCvR 7(o)(5) and FRAP 29(a)(4)(D), *Amicus Curiae* seeks leave to file this brief for the reasons set forth in its Motion for Leave filed contemporaneously herewith.

## ARGUMENT

## I.     PLAINTIFF FAILS TO MAKE THE CLEAR SHOWING REQUIRED TO OBTAIN THE EXTRAORDINARY AND DRASTIC RELIEF IT SEEKS.

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (noting a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). For such extraordinary relief to be, in fact, extraordinary and drastic, it must not be lightly or routinely granted. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4]

that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (internal quotations and citations omitted). In this Circuit, "the first and most important factor" is "whether petitioners have established a likelihood of success on the merits." *Id.* "[S]liding scale" or not, *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011), establishing each and every element of this standard is, admittedly, a heavy burden. But that is precisely the way it is meant to be, as a preliminary injunction provides extraordinary relief without the benefit of a full trial or merits hearing. *See University of Texas v. Camenisch*, 451 U.S. 390, 396 (1981) ("[W]here a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy.").

In the realm of weighty national security decisions, like those made by Defendants here and reflected in the challenged executive actions, judicial intervention without a full trial or merits hearing can be dangerous.  At the very least, a plaintiff seeking such an extraordinary and drastic remedy must satisfy its heavy burden by providing convincing and extensive legal analysis, which Plaintiff fails to do.[1] Mere dislike for Defendant's policies, or regret that Congress has (1) long recognized the President's powers to declare and address a national emergency and (2) provided him with separate appropriations to secure the border from international drug trafficking and related activity, cannot be enough – especially when a plaintiff asks a Court to bar Defendants' lawful actions concerning duly appropriated funds *expressly taken with actual congressional assent in the interest of national security*.

---

[1] Among other defects in Plaintiff's case, it's likelihood of success on the issue of standing is anything but clear. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992) (concerning standing; explaining that certain matters are "the function of Congress and the Chief Executive" and not the federal courts).

## II. PLAINTIFF ACCEPTS THE  EMERGENCY DECLARATION, AND ASKS THE COURT TO ENJOIN ONLY (1) DEFENDANTS' UTILIZATION OF 10 U.S.C. § 284 APPROPRIATED FUNDS TO COUNTER INTERNATIONAL CRIMINAL ACTIVITY AND DRUG TRAFFICKING ACROSS THE BORDER INDEPENDENT OF THE DECLARATION; AND (2) THE PRESIDENT'S REFERENCE TO 10 U.S.C. § 2808, A STATUTE NOT EVEN UTILIZED BY DEFENDANTS.

On February 15, 2019, the President of the United States proclaimed the existence of a national emergency under the National Emergencies Act, 50 U.S.C. § 1631, *et seq.*, necessitating, among other actions, the construction of a wall across the southern border. Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ("Emergency Declaration"). It is both indisputable and undisputed that both Congress and the President followed the executive and legislative procedure set forth by Congress itself in the National Emergencies Act to provide a political check on the President's power concerning national emergencies.[2] It is equally indisputable and undisputed that, consistent with that procedure, Congress was unwilling to terminate the President's Emergency Declaration.

No doubt fully aware of these facts, and in spite of all the political bluster, hyperbole, and threats of legal action, Plaintiff, tellingly, does not challenge the validity of the Emergency Declaration. Instead, Plaintiff raises only two challenges: (1) Defendants' utilization of 10 U.S.C. § 284(b)(7) drug-interdiction account appropriation funds – and certain funds to be transferred to

---

[2] While both Chambers of Congress voted on a House Joint Resolution, H.J. Res. 46, to terminate the President's Emergency Declaration, they failed to do so with enough votes to override a Presidential veto.  On March 15, 2019, the President in fact vetoed the Joint Resolution. Veto Message to the House of Representatives for H.J. Res. 46 (Mar. 15, 2019), https://www.whitehouse.gov/briefings-statements/veto-message-house-representatives-h-j-res-46/ ("I am returning herewith without my approval H.J. Res. 46, a joint resolution that would terminate the national emergency I declared regarding the crisis on our southern border in Proclamation 9844 on February 15, 2019, pursuant to the National Emergencies Act."). And, on March 26, 2019, the U.S. House of Representatives, by a vote of 248 to 181, falling well short of the constitutionally required two-thirds threshold, failed to override the President's veto.

that account pursuant to § 8005 of the Department of Defense and Labor, Health and Human Services, and Education Appropriations Act ("FY 2019 DOD Appropriations Act"), Pub. L. No. 115–245 (to be printed at 132 Stat. 2981, 2999) (2018) – to support the construction of roads, fences, and lighting at certain locations Defendants have determined to be necessary in light of national security interests;[3] and, (2) The President's reference to 10 U.S.C. § 2808 within his Emergency Declaration.

Congress enacted the National Emergencies Act both recognizing the President's power to declare a national emergency and granting to him certain statutory resources to utilize in his discretion. It is thus not the Plaintiff's job to determine whether or not there is an emergency on the southern border. Defendants have made this determination based on the legitimate criteria they have reviewed and in accordance with what they view as necessary to serve vital national security interests. At all times, Defendants have proceeded under their duly authorized powers. "[T]he Executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2421–22 (2018) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010)). That is to say, whether Plaintiff likes it or not, from an objective legal perspective, there is an undisputed national emergency.

Dealing with the underlying facts giving rise to the President's Emergency Declaration has engendered unforeseen incidental costs, including such unforeseen military requirements as additional roads, fences, and lighting. Thankfully, in a different statute, Congress has explicitly

---

[3] Plaintiff also purports to make an Administrative Procedures Act ("APA"), 79 Pub. L. No. 404, 60 Stat. 237 (1946), argument that *Amicus Curiae* leaves for Defendants to refute directly, although *Amicus Curiae* notes Plaintiff's APA arguments suffer from the same flawed legal analysis that belies their § 284 drug-interdiction account and § 8005 transfer arguments which *Amicus Curiae* does address herein – in addition to a flawed application of the APA itself.

allowed the Executive Branch to transfer funds for just such an unforeseen military requirement. Pursuant to well-established jurisprudential and separation of powers principles, the courts are not properly situated to intervene and substitute policy judgments for that of the political branches – especially when issues of national security, foreign affairs, and immigration are involved.[4]

To be sure, the § 284 drug-interdiction account funds (and the § 8005 transfer of additional funds to that account) are not specifically dependent upon the President's Emergency Declaration. [*See* Plaintiff's Application for a Preliminary Injunction ("Plaintiff's Application"), Doc. # 17, p. 22 ("Authority under this section [§ 284(b)] does not depend on the President's declaration of a national emergency.")]. But, Defendants' utilization of those funds does not occur in a vacuum and obviously has ripple effects, some foreseen and some unforeseen.[5] The unchallenged Emergency Declaration and the national security and humanitarian crisis leading to the issuance

---

[4] *See Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976) ("Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."); *Trump v. Hawaii*, 138 S. Ct. 2392, 2419–20 (2018) (quoting *Mathews*, 426 U.S. at 81–82; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (rejecting plaintiffs' incorrect position that "would enable the courts, with the permission of Congress, to assume a position of authority over the governmental acts of another and co-equal department, to become virtually continuing monitors of the wisdom and soundness of Executive action." (internal quotations and citations omitted)); *see also Trump v. Hawaii*, 138 S. Ct. at 2421 ("But we cannot substitute  our own assessment for the Executive's predictive judgments on such matters," *i.e.*, whether an executive branch policy was wise, effective or does little to serve national security interests, "all of which 'are delicate, complex, and involve large elements of prophecy.'" (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948))); *Regan v. Wald*, 468 U. S. 222, 242–243 (1984) (declining invitation to conduct an "independent foreign policy analysis").

[5] Consistent with 50 U.S.C. § 1631, the President specifically cited two statutes, 10 U.S.C. § 2808 (concerning authority to utilize the DOD for military construction projects) and 10 U.S.C. § 12302(a) (concerning authority to order reserve members to active duty) as a source of law available to him when he determines military action is necessary to resolve the emergency. Among others, these substantively unchallenged determinations made by the President, and expressly authorized by Congress, demonstrate the propriety of DOD involvement to assuage the border emergency.

of that Emergency Declaration, while not controlling, are still informative and relevant to a proper understanding of the § 284(b) actions of Defendants that Plaintiff does challenge.

With respect to Plaintiff's 10 U.S.C. § 2808 challenge, "the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808." [Defendants' Opposition, Doc. # 36, p. 62]. And again, "the Acting Secretary of Defense has not yet decided to undertake or to authorize any barrier construction projects under § 2808." [*Id.* at pp. 62–63 (citing Rapuano Decl. ¶¶ 13-15)]. As Defendants make clear, pursuant to 10 U.S.C. § 2808(b), "Congress will be notified after any decision is made to utilize § 2808 for border barrier construction," and this will only occur after the Secretary of Defense, pursuant to 10 U.S.C. § 2808(a), has "determine[d] that the project is "necessary to support such use of the armed forces." [Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendants' Opposition"), Doc. # 36, p. 63]. This has not happened, and therefore, Plaintiff's § 2808 challenge is simply premature: Plaintiff lacks standing. [*See id.* at pp. 61–64].

**III.    DEFENDANTS' UTILIZATION OF §284(b)(7) DRUG-INTERDICTION FUNDS AND TRANSFER OF ADDITIONAL FUNDS PURSUANT TO § 8005 OF THE FY 2019 DOD APPROPRIATIONS ACT IS LAWFUL BECAUSE IT IS AUTHORIZED BY CONGRESS AND DETERMINED TO BE FOR UNFORESEEN MILITARY REQUIREMENTS.**

Plaintiff believes it "is likely to succeed on the merits of its claims that defendants are expending transferred funds under sections 284 . . . on the construction of a border wall without a valid appropriation in violation of the Appropriations Clause and the APA." [Plaintiff's Application, Doc. # 17, p. 38]. As to § 284(b), Plaintiff concedes Defendants are authorized to use the funds appropriated to that account, 10 U.S.C. § 284(b)(7), but contends that Defendants are not authorized to transfer *additional* funds into that account by way of § 8005 of the FY 2019

Department of Defense (DOD) Appropriation Act. Pub. L. No. 115-245, § 8005 (2018) (to be printed at 132 Stat. 2981, 2999).

Plaintiff contends Defendants' utilization of the authority granted by § 8005 exceeds the limitations contained in that provision for three reasons: "*First*, section 8005 only authorizes transfers of funds 'for higher priority items, based on unforeseen military requirements.'" [Plaintiff's Application, Doc. # 17, p. 40]. "*Second*, section 8005 does not authorize the transfer of funds in cases 'where the item for which funds are requested has been denied by the Congress.'" [*Id.* at 41]. "*Finally*, section 8005 does not authorize transferring funds for 'military construction.'" [*Id.* at 42]. Each of these arguments fails to warrant the extraordinary and drastic relief Plaintiff seeks.

> **A.      Defendants' § 8005 Transfer of Appropriated Funds to the DOD's § 284 Drug-Interdiction Account, and Utilization of Those Funds to Support the DHS in Securing the Border With Roads, Fences, and Lighting Pursuant to § 284(b)(7), is Lawful.**

Section 284(b) provides that "[t]he purposes for which the Secretary [of Defense] may provide support" to other agencies include "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b), (b)(7). According to the transfer authority granted in § 8005 of the 2019 DOD Appropriations Act, the Secretary of Defense may:

> [T]ransfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof . . . : *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress.

Pub. L. No. 115-245, § 8005 (2018) (to be printed at 132 Stat. 2981, 2999).

1. **Plaintiff's Contention That There is No *Unforeseen* Military Requirement for a Border Wall is Inapposite to It's Challenge of Defendants' § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting.**

According to Plaintiff, "section 8005 only authorizes transfers of funds 'for higher priority items, based on unforeseen military requirements.'" [Plaintiff's Application, Doc. # 17, p. 40]. Plaintiff contends the § 8005 transfer is unlawful because the need for "a border wall" is not unforeseen. [*Id.* ("[D]efendants' supposed need to transfer money does not arise from unforeseen circumstances. President Trump has been demanding $5 billion for a border wall since summer 2018, and he has been complaining about a supposed crisis at the border since the start of his campaign."); *id.* at 40-41 ("The purported need to build a border wall was entirely foreseen – Congress simply disagreed with President Trump's opinion that $5 billion for a border wall was necessary and proper.")].

From the outset, Plaintiff's question is false as it is based on a false premise: Section 284(b)(7) support for construction of roads, fences and lighting installation is NOT "a border wall."[6] It is not "a purported need to build a border wall" [Plaintiff's Application, Doc. # 17, p. 40] to which § 8005's "unforeseen" restriction applies. Instead, the "unforeseen" restriction applies to roads, fences, and lighting to be constructed by the Department of Defense (DOD) to support other agencies in countering international criminal and drug trafficking activity at the southern border pursuant to 10 U.S.C. § 284(b)(7). That is explicitly what the § 8005 funds are being transferred to accomplish.

---

[6] The proper question, which Plaintiff fails to advance, would be whether Department of Defense ("DOD") support to the Department of Homeland Security ("DHS") for the construction of roads, fences and lighting installation along the border is unforeseen. As explained below, Defendants have determined, within the congressionally enacted appropriation and transfer structure, that it is. The DHS specifically requested the DOD's support for roads, fences and lighting, and the DOD approved the request and notified Congress, as required.

Plaintiff conflates the two issues, and in doing so, presents the wrong question. Its fallacious argument on this point fails for this reason alone, but further analysis reveals additional material flaws. Not only are Defendants not asking that this money be used for a border wall, as Plaintiff means by the term, the President and Defendants *have* identified an unforeseen military requirement *for just such DOD support*. It is the President and Defendants who, within the statutory framework enacted by Congress, *e.g.*, the National Emergencies Act, 50 U.S.C. § 1631, *et seq.*; 10 U.S.C. § 284(b); FY 2019 DOD Appropriations Act, Pub. L. No. 115-245, § 8005, get to make that call, not Plaintiff.

*First*, the President illustrated his determination on this matter, in part, by declaring a national emergency consistent with the National Emergencies Act, 50 U.S.C. § 1631, *et seq.*, enacted by Congress. As the President explained in his Emergency Declaration, "despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years"; and, "[b]ecause of the gravity of the current emergency situation, it is necessary for the Armed Forces to provide additional support to address the crisis." Declaring a Nat'l Emergency Concerning the S. Border of the United States, Pres. Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019). *Amicus Curiae* agrees with Plaintiff that "[a]uthority under this section [10 U.S.C. § 284] does not depend on the President declaring a national emergency." [Plaintiff's Application, Doc. # 17, p. 39]. However, both the fact of the President's Emergency Declaration and the determinations contained therein, inform the discussion and highlight the Plaintiff's errant view on this point.

*Second*, the Department of Homeland Security ("DHS") identified the unforeseen nature of its need by and within its request to the DOD for § 284 support. On February 25, 2019, the DHS requested the DOD "[t]o support DHS's action under Section 102 of IIRIRA," explaining that

"DHS is requesting that DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences, roads, and lighting within the Project Areas to block drug-smuggling corridors across the international boundary between the United States and Mexico." DHS Memorandum, Request for Assistance Pursuant to 10 U.S.C. § 284, 2 (Feb. 25, 2019), available at https://tinyurl.com/y4ru6s2g. Within its request for support, the DHS explained that, "[w]ithin the Project Areas, DHS is experiencing large numbers of individuals and narcotics being smuggled into the country illegally." *Id.* at 1. The DHS also explained that:

> [t]he Project Areas identified are adjacent to some of the most densely populated metropolitan areas of Mexico and are also home to some of the strongest and most violent drug cartels in the world. *Deterring and preventing illegal cross-border activity will help stem the flow of illegal narcotics and entries in these areas. Similarly, the improved ability to impede, deny, and be mobile within the Project Areas creates a safer operational environment for law enforcement*.

*Id.* at 2 (emphasis added). Further, as an example, the DHS explained that with respect to the Yuma Sector,

> [t]he replacement of *ineffective pedestrian fencing in this area is necessary because the older, wire mesh design is easily breached and has been damaged to the extent that it is ineffective*. Additionally, this area is notorious for border violence and narcotics smuggling. Furthermore, while the deployment of vehicle barrier in the Yuma Sector initially curtailed the volume of illegal cross-border vehicular traffic, *transnational criminal organizations quickly adapted their tactics* switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States. Thus, in order to respond to these changes in tactics, DHS now requires pedestrian fencing.

*Id.* at 4 (emphasis added). The DHS's request for DOD support also identified and described similar facts concerning other sectors of the border. *See id.* at 3 (addressing El Centro Sector); *id.* at 5 (addressing Tucson Sector); *id.* at 8 (addressing El Paso Sector). Congress clearly provided that the DHS may request and the DOD may provide support in just such instances. 10 U.S.C. § 284(a)(1) (authorizing DOD to support counter-drug activities of other agencies when "such support is requested").

*Third*, the DOD identified the unforeseen nature of the need for support both by and within its notifications to the DHS and to Congress concerning its § 284(b)(7) support for the DHS and § 8005 funds transfer in furtherance of that support. In the DOD's March 25, 2019, response to DHS's request for support, Defendant Acting Secretary of Defense Patrick Shanahan expressly cited the DOD's statutory authority under 10 U.S.C. § 284(b)(7) and acknowledged that "[t]he work requested by DHS to block these identified drug smuggling corridors involves construction of fences (including a linear ground detection system), construction of roads, and installation of lighting (supported by grid power and including imbedded cameras)." Letter, Acting DOD Secretary Patrick Shanahan, to DHS Secretary Kirstjen Nielsen (Mar. 25, 2019) (on file with the Pentagon), available at https://tinyurl.com/y2wcu8fe. "Accordingly, at this time, I have decided to undertake Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 by constructing 57 miles of 18-foot-high pedestrian fencing, constructing and improving roads, and installing lighting as described in your February 25, 2019 request." *Id.* According to the DOD's notification to Congress, "This reprogramming action provides funding in support of higher priority items, based on unforeseen military requirements, than those for which originally appropriated; and is determined to be necessary in the national interest." Office of the Under Secretary of Defense (Comptroller), DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019), https://tinyurl.com/March25Transfer. Plaintiff cites this source [*see* Plaintiff's Application, Doc. # 17, p. 13 n. 57], but fails to address the material contents thereof.

The DOD also explained in its notification to Congress that:

> Funds are required to provide support for counter-drug activities of the Department of Homeland Security (DHS). DHS has identified areas along the southern border of the United States that are being used by individuals, groups, and transnational criminal organizations as drug smuggling corridors, and determined that the construction of additional physical barriers and roads in the vicinity of the United States border is necessary in order to impede and deny drug smuggling activities.

DHS requests DoD assistance in the execution of projects to replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing, construct roads, and install lighting.

DOD Serial No. FY 19-01 RA, Reprogramming Action (Mar. 25, 2019).

The bottom line is that Plaintiff's contention that there is no unforeseen military requirement for a border wall is both a fallacy and red herring. Meanwhile, the requirement for roads, fences, and lighting constructed by the DOD to support the DHS in countering international criminal activity and drug trafficking at our Nation's southern border was determined to be – and at all times correctly procedurally identified as – unforeseen by Defendants. The § 8005 "unforeseen" restriction, therefore, does not bar Defendants' fund transfers into DOD's drug-interdiction account for § 284(b)(7) support. Plaintiff fails to establish a likelihood of success on this contention.

> **2. Congress Has Not Denied, *but Instead Has Expressly Authorized*, Defendants' § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting.**

Plaintiff contends that "section 8005 does not authorize the transfer of funds in cases 'where the item for which funds are requested has been denied by the Congress.'" [Plaintiff's Application, Doc. # 17, p. 41]. Plaintiff surmises that "Congress's rejection of President Trump's request for $5 billion for a border wall was clear" [*id.* at 41 (citing pp. 7-11)] and incorrectly concludes that the rejection amounts to a congressional denial. The only facts identified by the Plaintiff in support of this argument may be summed up as a politically tilted description of the President's efforts to have Congress appropriate more than the $1.375 billion it did appropriate for *a border wall*. [*See id.* at 20 ("No other funding was designated by Congress for the construction of *a border wall*." (emphasis added))].

It does not appear that Plaintiff contends that the Defendants' § 8005 transfer action violates any provision of the FY 2019 Consolidated Appropriations Act ("CAA"), Pub. L. No. 116-6 (to be printed at 133 Stat. 13) (2019), or that the CAA somehow amended any other relevant legislation – such as § 8005 of the FY 2019 DOD appropriations Act, 10 U.S.C. § 284(b)(7) (or the National Emergencies Act, 50 U.S.C. § 1631, *et seq.*, or 10 U.S.C. § 2808, for that matter). Instead, Plaintiff merely contends that the CAA evidences a denial by Congress because Congress did not include the full amount of the President's "*informal* request for $5 billion" as "a down payment for his wall" [Plaintiff's Application, Doc. # 71, pp. 16-17 (emphasis added)] or all of his "formal budget request" for $1.6 billion for a wall [*id.* at 17; *id.* ("Congress and the President reached an impasse on appropriations for a border wall.")]. Plaintiff points to no provision of the CAA that purports to deauthorize Defendant DOD's existent and separate § 8005 transfer and utilization of § 284(b)(7) drug-interdiction account funds for roads, fences and lighting. Plaintiff points to nothing constituting an institutional denial by Congress. [*See* Defendants' Opposition, Doc. # 36, p. 56].

In fact, Congress did *not deny* Defendant DOD's ability to transfer § 8005 funds to DOD's drug-interdiction account for the Secretary of Defense to support other federal agencies in the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7). And not only has that authority *not been denied* by Congress, to the contrary, *it has been expressly granted* via 10 U.S.C. § 284(b)(7) and § 8005 of the FY 2019 DOD Appropriations Act.

In sum, Congress has expressly authorized the transfer and use of appropriated funds to do precisely what Defendants are transferring funds via § 8005 to do. This is no unconstitutional usurpation. To the contrary, Defendants' transfer is both expressly authorized and lawful. The only

unconstitutional usurpation would be for a court, out of dislike for a particular policy, to invade the province of the political branches, take sides, and change the rules in the middle of the game by allowing some unhappy members of Congress to undo actual congressional actions. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2419–21 (2018); *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976); *Regan v. Wald*, 468 U. S. 222, 242–243 (1984). Courts should be especially reluctant to interfere in cases where as here, the challenged actions are taken against the backdrop of what the President of the United States has, pursuant to his legal authority, declared to be a national emergency.

3.   **Defendant DOD's § 8005 Transfer and Utilization of § 284(b)(7) Drug-Interdiction Account Funds for Roads, Fences and Lighting in Support of Defendant DHS is Not for "Military Construction" as That Term is Well Known to Mean.**

"*Finally*," Plaintiff contends, "section 8005 does not authorize transferring funds for 'military construction.'" [Plaintiff's Application, Doc. # 17, p. 42]. But, strikingly absent from this part of its brief is any contention that any of the funds Defendants transferred (or will transfer) pursuant to § 8005 constitute military construction funds or appropriations. These § 284(b)(7) drug-interdiction support funds requested by the DHS, and approved, transferred, and reprogrammed by the DOD via § 8005, are separate and distinct from the 10 U.S.C. § 2808 funds, and subject to different limitations. On this point, *Amicus Curiae* adopts Defendants' explanation of the well-established fact and understanding of the term of art, "military construction" – and its relation to the Military Construction and Veterans Affairs budget (a.k.a., the "MILCON budget"). [*See* Defendants' Opposition, Doc. # 36, pp. 60-62]. The funds Defendants have transferred via § 8005, which Plaintiff challenges here, are simply not MILCON budget funds, and the restriction within § 8005 against the transfer of MILCON budget funds is irrelevant in this case. The relief requested here by Plaintiff is not just extraordinary and drastic, but it is also wrong. Moreover, as

explained above, Defendant DOD has not utilized § 2808 funds or made the initial determination or notification to Congress that such military construction is necessary.

**B.    Defendants are Securing the Border Pursuant to and Consistent With Statutes, Appropriations, and Authorizations Enacted by Congress.**

From the National Emergencies Act and related statutes authorizing DOD support, to the § 284(b)(7) DOD drug-interdiction account and § 8005 transfer authority, Congress has indisputably both recognized the prospect of and created a statutory structure wherein the DOD provides support to the DHS. In any of those circumstances, supporting the DHS becomes the DOD's "job" – whether building a wall or merely roads, fences, and lighting.

To illustrate: In his Emergency Declaration, *declared consistent with a congressional act*, the President recognized the need for the DOD to support the DHS and directed the required support *pursuant to specific statutes enacted by Congress*. And, while not directly tied to or dependent upon the President's powers asserted and recognized by the National Emergencies Act, *Congress has expressly authorized funds for the Secretary of Defense to support other federal agencies, including the DHS*, in the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(b)(7); and granted the authority to transfer funds via § 8005 of the FY 2019 DOD Appropriations Act into the DOD's § 284 drug-interdiction account. Hence, Congress has expressly created a structure wherein the DOD can and does support the DHS.[7] Plaintiff's assertion

---

[7] Again, the §284(b)(7) funds and § 8005 transfer mechanism challenged by Plaintiff were authorized by Congress irrespective of a National Emergencies Act declaration. In other words, the President could utilize this funding mechanism without having to first declare a national emergency. That the President has taken the separate and further step of declaring a national emergency *evidences the unforeseen military requirement* for the § 8005 transfer.

that somehow the DOD is not allowed to help the DHS counter drug activity and protect the border is as ridiculous as it is flawed. So, too, is Plaintiff's assertion that Defendants are acting *ultra vires*.

IV.    **ADJUDICATION OF PLAINTIFF'S CLAIMS WOULD REQUIRE THIS COURT TO SUBSTITUTE ITS JUDGMENT IN NATIONAL SECURITY AND IMMIGRATION-RELATED POLICY MATTERS FOR THAT OF THE POLITICAL BRANCHES.**

Congress has clearly authorized the use of § 284(b) DOD drug-interdiction account funds to support the DHS in the construction of roads, fences, and lighting on our nation's international border. Congress has also clearly authorized the DOD to transfer funds into that account via § 8005. Congress has also expressly provided that the President may cite and utilize 10 U.S.C. § 2808 upon declaring a national emergency, although Defendant DOD has not made such a determination. Defendants have correctly navigated Congress's statutory framework, have lawfully utilized funds, and have taken no *ultra vires* action. All that is left upon which this Court could pass judgment, then, is the favorability and wisdom of a policy, which would require the Court to delve into national security matters reserved by the United States Constitution for the political branches.

The United States Constitution grants to the President inherent foreign affairs and national security powers. U.S. Const. art. II; *Harisiades v. Shaughnessy*, 342 U.S. 580, 588 (1952) (recognizing that immigration control is an integral part of article II authorities "in regard to the conduct of foreign relations [and] the war power"). And, as demonstrated *supra*, he and the Defendants have utilized those powers *within a congressionally enacted and appropriated structure*. Where, as here, a President's executive action is based on this convergence of authority, the President's "authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083–84 (2015) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952)).

Moreover, the Constitution "is not a suicide pact," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), and the first responsibility of the United States government is national defense and security. The President's Emergency Declaration and Defendants' utilization of § 284 DOD drug-interdiction account funds and § 8005 transfer of additional funds into that account were based on precisely that responsibility. Defendants' actions challenged by Plaintiff are closely tethered to discretionary powers vested in the Executive Branch by the Constitution *and authorized by Congress* and clearly fall within the President's well-established constitutional and statutory authority.

It is undeniable that the admission of, or refusal to admit, any refugee or alien is a sovereign act of the United States. "The Supreme Court has 'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). This kind of power, if it means anything, must include the power to protect and secure the border. The Preliminary Injunction Plaintiff seeks would contravene the President's constitutional and statutory authority to protect the border as well as the considered judgment of Congress that the President should have funds available to do so. Defendants' § 8005 transfer does precisely that which Congress vested – and funded – the President and Defendants with the power to do.

## CONCLUSION

The bottom line is that Congress *did* appropriate the funds being utilized by the Defendants to secure portions of the Southern Border and authorized the transfer of additional funds for that purpose. 10 U.S.C. § 284(b)(7); FY 2019 DOD Appropriations Act, § 8005. Defendants are utilizing and transferring appropriated funds for the right purposes and within the constraints

17

imposed by Congress. Court intervention – especially in the form of preliminary injunctive relief – attempting to give some unhappy members of Congress and certain of their constituents the result that the actual representative body of Congress is politically unwilling or unable to achieve within the constitutional structure would violate separation of powers principles and improperly invade the provinces of the political branches.

Even if Plaintiff succeeded in overcoming the multiple legal and factual flaws underlying its case (*e.g.*, establishing standing), which it does not, only the question of whether the Defendants possessed the authority to use appropriated funds for these particular purposes can properly be before this Court for review. What is not before this Court is a determination of the favorability and wisdom of the President's national security policy decisions. For these reasons and others, *Amicus Curiae* respectfully urges this Court to deny Plaintiff's Application for a Preliminary Injunction.

Dated:  May 15, 2019                                     Respectfully submitted,

ANDREW J. EKONOMOU (Ga. Bar # 242750)*     JAY ALAN SEKULOW (D.C. Bar # 496335)
HARRY G. HUTCHISON (MI Bar # P39669)*           *Counsel of Record*
MILES L. TERRY (D.C. Bar # 1011546)*             STUART J. ROTH (D.C. Bar # 475937)
THE AMERICAN CENTER FOR LAW & JUSTICE     JORDAN SEKULOW (D.C. Bar # 991680)
625 Bakers Bridge Avenue                          MARK GOLDFEDER (NY # 5275649)
Suite 105-121
Franklin, TN  37067                               /s/ *Benjamin P. Sisney*
Telephone: (800) 296-4529                         BENJAMIN P. SISNEY (D.C. Bar # 1044721)
Facsimile: (202) 546-9309                         THE AMERICAN CENTER FOR LAW & JUSTICE
Email: mterry@aclj.org                            201 Maryland Avenue, N.E.
*Counsel for Amicus Curiae*                       Washington, D.C.  20002
                                                  Telephone: (202) 546-8890
                                                  Facsimile: (202) 546-9309
                                                  Email: bsisney@aclj.org
                                                  Email: sekulow@aclj.org
                                                  *Counsel for Amicus Curiae*

* *Not admitted in this jurisdiction; joining admitted counsel pursuant to LCvR 83.2(c).*

18

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2019, I caused a true and correct copy of the foregoing Motion of the American Center for Law and Justice for Leave to File its *Amicus Curiae* Brief and the proposed Brief of *Amicus Curiae* to be filed via the U.S. District Court for the District of Columbia's CM/ECF system, which pursuant to LCvR 5.4(d), satisfies the requirement of a certificate of service or other proof of service.

/s/ *Benjamin P. Sisney*
BENJAMIN P. SISNEY (D.C. Bar # 1044721)
**THE AMERICAN CENTER FOR LAW AND JUSTICE**
201 Maryland Avenue, N.E.
Washington, D.C.  20002
Telephone: (202) 546-8890
Facsimile: (202) 546-9309
Email: bsisney@aclj.org
*Counsel for Amicus Curiae*