**U.S. HOUSE OF REPRESENTATIVES**,

Plaintiff,

v.

Case No. 1:19-cv-00969 (TNM)

**STEVEN T. MNUCHIN, in his official capacity as Secretary of the Department of the Treasury** *et al.*,

Defendants.

## MEMORANDUM OPINION

Few ideas are more central to the American political tradition than the doctrine of separation of powers.  Our Founders emerged from the Revolution determined to establish a government incapable of repeating the tyranny from which the Thirteen Colonies escaped.  They did so by splitting power across three branches of the federal government and by providing each the tools required to preserve control over its functions.  The "great security against a gradual concentration of the several powers in the same department," James Madison explained, "consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others." *The Federalist No. 51*.

This is a case about whether one chamber of Congress has the "constitutional means" to conscript the Judiciary in a political turf war with the President over the implementation of legislation.  The U.S. House of Representatives seeks to enjoin the Secretaries and Departments of the Treasury, Defense, Homeland Security, and the Interior (collectively, the "Administration") from spending certain funds to build a wall along our southern border.  The House argues that this expenditure would violate the Appropriations Clause of the Constitution

and usurp Congress's authority. This harm, the House suggests, constitutes an "institutional injury" supporting Article III standing.

The Administration disagrees. The Judiciary cannot reach the merits of this dispute, it contends, because the Constitution grants the House no standing to litigate these claims. The Administration is correct. The "complete independence" of the Judiciary is "peculiarly essential" under our Constitutional structure, and this independence requires that the courts "take no active resolution whatever" in political fights between the other branches. *See The Federalist No. 78* (Alexander Hamilton). And while the Constitution bestows upon Members of the House many powers, it does not grant them standing to hale the Executive Branch into court claiming a dilution of Congress's legislative authority. The Court therefore lacks jurisdiction to hear the House's claims and will deny its motion.

## I.

The House and the President have been engaged in a protracted public fight over funding for the construction of a barrier along the border with Mexico. Following the longest partial shutdown of the Federal Government in history, Congress passed the Consolidated Appropriations Act of 2019 (the "CAA"), which provided $1.375 billion for new border fencing in the Rio Grande Valley. *See* Pub. L. No. 116-6 (2019). The President had sought much more. *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. On Appropriations (Jan. 6, 2019) (requesting "$5.7 billion for construction of a steel barrier for the Southwest border").[1]

---

[1] The Court takes judicial notice of the government documents cited in this Opinion as "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

On the same day he signed the CAA into law, President Donald Trump declared that "a national emergency exists at the southern border of the United States." Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) ("National Emergency Declaration"). The President determined that the "current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests." *Id*. He noted that the "southern border is a major entry point for criminals, gang members, and illicit narcotics" and that the problem of "large-scale unlawful migration" has "worsened in certain respects in recent years." *Id*. "Because of the gravity of the current emergency situation," he added, "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id*.

Congress passed a joint resolution to void the President's National Emergency Declaration. *See* 165 Cong. Rec. S1882 (Mar. 14, 2019). Explaining the vote, Speaker Nancy Pelosi remarked that "[w]e would be delinquent in our duties as Members of Congress if we did not overturn what the President is proposing. He is asking each and every one of us to turn our backs on the oath of office that we took to the Constitution of the United States." *See* Speaker Pelosi's Floor Speech on Privileged Resolution, House of Representatives (Feb. 27, 2019).

The President vetoed the resolution. *See* Veto Message to the House of Representatives for H.J. Res. 46, White House (March 15, 2019). Some Members of the House tried unsuccessfully to override this veto. *See* 165 Cong. Rec. H2815 (Mar. 26, 2019). For the override to be operative, the Senate would have also had to vote to support it by a super-majority. It did not attempt to do so. So the "veto of the President was sustained and the joint resolution was rejected." *Id*. The House then filed this suit.

Upon a declaration of a national emergency "that requires the use of armed forces," the Secretary of Defense "may authorize the Secretaries of the military departments to undertake

military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The White House explained that Section 2808 would be one of three sources of funding the Administration would use, on top of the $1.375 billion Congress appropriated through the CAA, to build the border wall. *See* President Donald J. Trump's Border Security Victory, White House (Feb. 15, 2019), ECF No. 36-7. It plans to use sequentially: (1) $601 million from the Treasury Forfeiture Fund; (2) up to $2.5 billion in funds transferred for "Support for Counterdrug Activities" under 10 U.S.C. § 284; and (3) up to $3.6 billion reallocated from Department of Defense military construction projects under Section 2808. *Id*.

The House does not challenge the President's declaration of an emergency under the National Emergencies Act. *See* Compl., ECF No. 1, at 39-43; Hr'g Tr. 81:23-25.[2] Nor does it contest the use of the Treasury Forfeiture Fund to build the wall. *See* Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mot."), ECF No. 17, at 21. Instead, it argues that 10 U.S.C. §§ 284 and 2808 do not authorize the use of funds for building a border wall and that the Administration's planned spending therefore violates the Appropriations Clause of the Constitution and the Administrative Procedure Act (the "APA"). Compl. 39-42.

The Administration rejects the House's interpretation of the statutes. *See* Defs.' Opp. to Mot. for Prelim. Inj. ("Defs.' Opp."), ECF No. 36, at 57-64. But primarily, it contends that the House lacks standing to raise its arguments here. *Id*. at 28. There are "no Appropriations Clause principles at issue in this case," the Administration claims, precisely *because* the parties are contesting the meaning of bills that Congress has validly passed using its Appropriations power. *Id*. at 37. And quarrels over how to implement a law do not support legislative standing, as the

---

[2] All citations are to the page numbers generated by this Court's CM/ECF system.

"Constitution does not contemplate an active role for Congress in the supervision of officers charged with the execution of the laws it enacts." *Id*. at 36 (quoting *Bowsher v. Synar*, 478 U.S. 714, 722 (1986)).

The parties submitted thorough briefing on these issues, and the House's application for a preliminary injunction is now ripe. The Court also heard oral arguments from both sides and has reviewed the memoranda submitted by *amici curiae*.

## II.

Before it may consider the merits of the House's motion, the Court must first confirm its jurisdiction over this case. Article III of the Constitution limits the jurisdiction of federal courts to "actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). One element of the "case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Id*.

Article III's standing requirements are "built on separation-of-powers principles" and serve "to prevent the judicial process from being used to usurp the powers of the political branches." *Id*. Thus, "when reaching the merits of the dispute would force [it] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," the Court's standing inquiry must be "especially rigorous." *Id*. (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). The power of federal courts to hear cases "is not an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian Coll. v. Am. Utd. for Sep. of Church and State, Inc.*, 454 U.S. 464, 471 (1982).

As the plaintiff, the House "bear[s] the burden of establishing standing." *Commonwealth v. U.S. Dep't of Educ.*, 340 F. Supp. 3d 7, 12 (D.D.C. 2018). The Court "presumes that it lacks

jurisdiction unless the contrary appears affirmatively from the record." *Id*. (cleaned up).  To establish standing, the House must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper*, 568 U.S. at 409.  For an injury to be legally cognizable, the dispute must be "traditionally thought to be capable of resolution through the judicial process."  *Raines*, 521 U.S. at 819.

## III.

The Administration concedes, and the Court agrees, that only the first prong of the standing analysis—injury that is concrete and particularized—is at issue here.  *See* Defs.' Opp. at 28-43.  Applying the "especially rigorous" analysis required, the Court finds that the House has failed to allege such an injury.  So the Court must deny the House's motion.

### A.

Two Supreme Court decisions—*Raines* and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015)—guide the Court's inquiry.  Neither directly addresses whether one House of Congress has standing to allege an institutional injury to the Appropriations power.  Perhaps unsurprisingly, while the House urges the Court to conclude that this case is more like one (*Arizona State Legislature*), the Administration believes this case is more like the other (*Raines*).

In *Raines*, six federal legislators sued to contest the constitutionality of the Line Item Veto Act.  *See* 521 U.S. at 813-14.  The plaintiffs had voted against it.  *Id*. at 814.  They sued the Executive Branch, arguing that the Act "unconstitutionally expands the President's power," "divests the [legislators] of their constitutional role in the repeal of legislation," and "alters the constitutional balance of powers."  *Id*. at 816.  They claimed, in other words, that "the Act causes

a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821.

The Supreme Court found that the legislators lacked standing. Beginning its analysis, it emphasized the "time-honored concern about keeping the Judiciary's power within its proper constitutional sphere." *Id.* at 820. That concern required it to "carefully inquire" about whether the legislators' "claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id.* The Court concluded that it was not. *Id.* at 830.

The legislators could not allege that "the Act will nullify their votes," the Court explained, because "[i]n the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process." *Id.* at 824. Their votes on the Act itself "were given full effect." *Id.* "They simply lost that vote." *Id.* It therefore held that "these individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.* at 830.

By contrast, in *Arizona State Legislature*, the Supreme Court held that a state legislature had standing to challenge the constitutionality of a proposition adopted by Arizona's voters by referendum. *See* 135 S. Ct. at 2659. Proposition 106 amended the Arizona Constitution to remove redistricting authority from the legislature and vest it in an independent commission. *Id.* at 2658. The legislature alleged that the Proposition violated its authority under the Elections Clause of the U.S. Constitution, which provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art. I, § 4, cl. 1.

The Court characterized the Arizona Legislature as "an institutional plaintiff asserting an institutional injury," that "commenced this action after authorizing votes in both of its

chambers." *Ariz. State Leg.*, 135 S. Ct. at 2664. It noted that Arizona's constitution prohibits the legislature from "adopt[ing] any measure that supersedes a [voter-initiated proposition]" unless the measure "furthers the purposes of the initiative." *Id.* This limitation, when combined with Proposition 106, would "completely nullify" any vote by the state's legislature, "now or in the future," that purported to adopt a redistricting plan. *Id.* at 2665. The Court thus concluded that the legislature had standing. *Id.*

**B.**

Read together, *Raines* and *Arizona State Legislature* create a spectrum of sorts. On one end, individual legislators lack standing to allege a generalized harm to Congress's Article I power. On the other end, both chambers of a state legislature do have standing to challenge a nullification of their legislative authority brought about through a referendum.

The House sees this case as largely indistinguishable from *Arizona State Legislature*. It alleges that the Administration's "usurpation" of the Appropriations power "inflicts a significant harm to the House as an institution." Pl.'s Mot. at 32. Permitting the Administration to "offend the Appropriations Clause" by spending funds in an unauthorized way would "affect the balance of powers in a manner that puts the House at a severe disadvantage within our system of government." *Id.* at 33. This form of institutional injury has, in the House's view, "consistently" been recognized as conferring standing upon institutional plaintiffs. *Id.*

But, as the Administration notes, the holding in *Arizona State Legislature* is narrower than the House suggests. *See* Defs.' Opp. at 40-41. The Supreme Court emphasized that its holding "does not touch or concern the question whether Congress has standing to bring a suit against the President." *Ariz. State Leg.*, 135 S. Ct. at 2665 n.12. It explained that there is "no federal analogue to Arizona's initiative power, and a suit between Congress and the President

would raise separation-of-powers concerns absent here." *Id*. The Administration also highlights that here, "[o]nly the House of Representatives has initiated this action." Defs.' Opp. at 41 n.7. The Arizona Legislature, however, filed its suit after authorizing votes in both of its chambers. *Id*. (citing *Ariz. State Leg.*, 135 S. Ct. at 2664).

For its part, the House questions the relevance of *Raines*. There, "only six Members of Congress" alleged a "wholly abstract and widely dispersed" injury. Pl.'s Reply in Supp. of Its Mot. for Prelim. Inj. ("Pl.'s Reply"), ECF No. 45 at 12. And both Houses of Congress "actively opposed" the lawsuit. *Id*. This is why, the House argues, *Arizona State Legislature* described *Raines* as "holding specifically and only that individual members of Congress lack Article III standing" to allege a nullification of their legislative power. *Id*. at 12-13 (quoting *Ariz. State Leg.*, 135 S. Ct. at 2664). *See also* Amicus Br. of Former General Counsels of the U.S. House of Reps. ("Former General Counsels' Amicus Br."), ECF No. 35 at 18 ("*Raines* and its progeny are simply inapplicable here, where the House not only has authorized the lawsuit but also itself appears as a litigant seeking to vindicate its institutional interests.").

This case falls somewhere in the middle of these two lodestars. Both therefore guide the Court's analysis. But, as explained below, the factors considered by the *Raines* Court are more relevant here. Application of these factors reveals that the House lacks standing to challenge the Administration's actions.

**1.**

Consider first historical practice and precedent. As the *Raines* Court explained, it is "evident from several episodes in our history that in analogous confrontations between one or

both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826.[3]

For example, Congress passed the Tenure of Office Act over President Andrew Johnson's veto in 1867. *Id*. The Act provided that if an Executive Branch official's appointment required confirmation by the Senate, the President could not remove him without the Senate's consent. *Id*. Undeterred, President Johnson fired his Secretary of War. *Id*. A week later, the House impeached the President, but the Senate acquitted him. *Id*.

Arguably, either the President could have sued Congress over the constitutionality of the Act or Congress could have sued the President for violating it. Yet neither occurred. Had a federal court "entertained an action to adjudicate the constitutionality of the Tenure of Office Act immediately after its passage in 1867" it would have "been improperly and unnecessarily plunged into the bitter political battle being waged between the President and Congress." *Id*. at 827. So too here.

Similar episodes abound throughout our history. In 1933, President Franklin D. Roosevelt fired an official from his Senate-confirmed position at the Federal Trade Commission. The Federal Trade Commission Act permitted removal only for "inefficiency, neglect of duty, or malfeasance in office." *Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935). The President removed the official without providing a reason. *Id*. The Senate likely had a "strong[] claim of diminution of" its Advice and Consent power. *Raines*, 521 U.S. at 826. Yet the Senate made no effort to challenge this action in court.

---

[3] *Arizona State Legislature* does not discuss the importance of historical practice in the context of legislative standing. That case, however, did not "touch or concern the question whether Congress has standing to bring a suit against the President," and it suggested that when this question arises, an "especially rigorous" standing analysis is required. 135 S. Ct. at 2665 n.12. This more exacting inquiry requires consideration of historical practice, as evidenced by the discussion in *Raines*.

In *INS v. Chadha*, 462 U.S. 919 (1983), a private plaintiff sought judicial review of his deportation order claiming the Immigration and Nationality Act's one-House veto was unconstitutional. Under a diminution of institutional power theory, the "Attorney General would have had standing to challenge the one-House veto provision because it rendered his authority provisional rather than final." *Raines*, 521 U.S. at 828. But the Executive brought no such suit.

And, applying the same line of reasoning, Congress could have challenged the validity of presidential pocket vetoes, first exercised by President Madison in 1812. But the pocket veto went unchallenged for over 100 years until President Coolidge pocketed a bill expanding Indian tribes' rights to damages for lost tribal lands and certain tribes sued. *See The Pocket Veto Case*, 279 U.S. 655, 673 (1929). *See also* Tara L. Grove *et al.*, *Congress's (Limited) Power to Represent Itself in Court*, 99 Cornell L. Rev. 571, 583-93 (2014) (discussing these and many other times when Congress declined to seek judicial intervention in the face of the Executive's non-defense of or alleged non-compliance with a federal law).

More still, the Administration notes that, "when Congress was concerned about unauthorized Executive Branch spending in the aftermath of World War I, it responded not by threatening litigation, but by creating the General Accounting Office . . . to provide independent oversight of the Executive Branch's use of appropriated funds." Defs.' Opp. at 38.

This history is persuasive. In the 230 years since the Constitution was ratified, the political branches have entered many rancorous fights over budgets and spending priorities. These fights have shut the Federal Government down 21 times since 1976, when Congress enacted the modern-day budget process. *See* Mihir Zaveri *et al.*, *The Government Shutdown was the Longest Ever. Here's the History.*, N.Y. Times (Jan. 25, 2019). Given these clashes, the paucity of lawsuits by Congress against the Executive would be remarkable if an alleged injury

to the Appropriations power conferred Article III standing upon the legislature. *See United States v. Windsor*, 570 U.S. 744, 790 (2013) (Scalia, J., dissenting) (remarking that the "famous, decades-long disputes between the President and Congress [discussed in *Raines*] . . . would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation"). Indeed, no appellate court has ever adjudicated such a suit.

The House points to cases from this Circuit purportedly supporting the view that legislatures have standing to seek redress for this type of injury. Pl.'s Mot. at 33. Not so.

True, the D.C. Circuit has held that the "House as a whole has standing to assert its *investigatory* power." *United States v. AT&T*, 551 F.2d 384, 391 (D.C. Cir. 1976) (emphasis added). *See also Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) (finding that the House has standing to assert investigatory and oversight authority); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013) (same). But whatever these cases may suggest about the House's ability to hale the Executive into court in the context of investigations, or the scope of this ability, they are of little use to the House here.

Indeed, using the Judiciary to vindicate the House's investigatory power is constitutionally distinct from seeking Article III standing for a supposed harm to Congress's Appropriations power. Unlike the Appropriations power, which requires bicameralism and presentment, the investigatory power is one of the few under the Constitution that *each* House of Congress may exercise individually. *See* U.S. Const. art. I, § 5 ("Each House may determine the Rules of its Proceedings"); *see also Congress's (Limited) Power to Represent Itself in Court*, 99 Cornell L. Rev. at 596-97 (noting that "the House and the Senate have long asserted the power to

conduct investigations and handle any litigation arising out of those investigations," while they have not historically brought suits to enforce federal statutes).

It is perhaps for this reason that the House's power to investigate has been enforced with periodic help from federal courts. In 1927, for instance, the Supreme Court observed that a "legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). Thirty years later, the Court affirmed that the power to investigate is "inherent in the legislative process" and is "broad." *Watkins v. United States*, 354 U.S. 178, 187 (1957). *See also Miers*, 558 F. Supp. 2d at 56 (noting that vindicating the House's investigatory power "involves a basic judicial task—subpoena enforcement—with which federal courts are very familiar").

And the House has, since the Founding era, exercised an independent power to conduct investigations and gather information. In 1792, it established a committee to examine General St. Clair's defeat at the Battle of the Wabash, a failed raid by the U.S. Army against Native Americans residing in the Northwest Territory. *See* 3 Annals of Cong. 494 (1792). Before complying with its requests for papers and records, President George Washington and his cabinet members, including Thomas Jefferson and Alexander Hamilton, concluded that "the House could conduct an inquest, institute inquiries, and call for papers." *Congress's (Limited) Power to Represent Itself in Court*, 99 Cornell L. Rev. at 598-99. This history of judicial and executive recognition of the House's investigatory power distinguishes it from the Appropriations power. Standing based on the Appropriations power would be a very different matter.[4]

---

[4] The Administration contends that the "scattered cases involving congressional subpoena enforcement are likewise incorrect and inconsistent with the Constitution's fundamental design, as well as irreconcilable with *Raines*." Defs.' Opp. at 42. But because the Court finds that the House's investigatory power is distinct from Congress's Appropriations power, it need not address this argument.

During oral argument, the House also suggested that *U.S. House of Representatives v. U.S. Department of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998), provides an example of courts' willingness to recognize standing in similar contexts. Hr'g Tr. 6:12:23. Not so. There, the House had standing to argue that the Census Bureau's "statistical sampling will deprive Congress of information it is entitled to by statute (and the Constitution), and must have in order to perform its mandatory constitutional duty—the apportionment of Representatives among the states." *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 85. In other words, the "inability to receive information which a person is entitled to by law" is "sufficiently concrete and particular to satisfy constitutional standing requirements." *Id.* This type of informational injury, which an individual can allege, is conceptually distinct from the "institutional" harm to an "institutional plaintiff" the House asks the Court to recognize here. More, informational injuries to Congress arise "primarily in subpoena enforcement cases," which hold that the legislature "has standing to assert its investigatory power." *Id.* at 86.[5]

This leaves the House with a single, non-precedential case in its support. In *U.S. House of Representatives v. Burwell*, the House alleged that the Executive Branch "spent billions of

_____

[5] The House relied on two other cases at the hearing to suggest that the Supreme Court is "perfectly comfortable" resolving claims of the type it raises. Hr'g Tr. 11:19-12:4. Neither case lends the House's position much support.

In the first, *Chadha*, the Court noted that, before Congress sought to intervene to defend its veto power, "there was adequate Art[icle] III adverseness even though the only parties were the INS and Chadha." 462 U.S. at 939. True, the Court suggested that "Congress is the proper party to defend the validity of a statute when an agency of government . . . agrees with plaintiffs that the statute is inapplicable or unconstitutional." *Id.* at 940. But this statement arose in the context of "prudential, as opposed to Art[icle] III, concerns" about hearing the merits of the parties' claims. *Id.*

In the second, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), the Court held that the political question doctrine did not bar judicial review of a private plaintiff's claim against the Executive Branch. *Id.* at 191. Both *Chadha* and *Zivotofsky*, in other words, featured private plaintiffs seeking to vindicate their rights. And neither case held that one House of Congress has standing to allege harm to its Appropriations power.

unappropriated dollars to support the Patient Protection and Affordable Care Act." 130 F. Supp. 3d 53, 57 (D.D.C. 2015). This spending, the House alleged, "usurped its Article I legislative authority." *Id*. at 63.

The *Burwell* court held that the House had standing to sue on this "Non-Appropriation Theory," as it would "suffer a concrete, particularized injury if the Executive were able to draw funds from the Treasury without a valid appropriation." *Id*. at 74. The court distinguished "constitutional violations," which it found supported institutional standing, from "statutory violations," which it concluded did not. *Id*. Based on this dichotomy, it dismissed some claims but allowed others to proceed. *See id.*

This slender reed will not sustain the House's burden. As *Burwell* itself shows, it can be difficult to articulate a workable and consistent distinction between "constitutional" and "statutory" violations for legislative standing. There, Counts I and II of the House's complaint both alleged violations of constitutional provisions. Even so, the court dismissed Count II but permitted Count I to survive, because the former's allegations were "far more general" than the latter's. *Id*.

More, as *Burwell* notes, if "the invocation of Article I's general grant of legislative authority to Congress were enough to turn every instance of the Executive's statutory non-compliance into a constitutional violation, there would not be decades of precedent for the proposition that Congress lacks standing to affect the implementation of federal law." *Id*. (citing *Bowsher*, 478 U.S. at 722). But any claim about a violation of the Appropriation power would "inevitably involve some statutory analysis," as the Administration's "primary defense will be that an appropriation *has* been made, which will require reading the statute." *Id*. at 74 n.24 (emphasis in original).

Applying *Burwell* to the facts here would clash with binding precedent holding that Congress may not invoke the courts' jurisdiction to attack the execution of federal laws. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) ("To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an individual right vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3."). The Court thus declines to do so.[6]

In short, like in *Raines*, the Court finds the lack of historical examples telling. The Executive and Legislative Branches have resolved their spending disputes without enlisting courts' aid. Until now. The House thus "lack[s] support from precedent," and "historical practice appears to cut against [it] as well." *Raines*, 521 U.S. at 826.

**2.**

The availability of institutional remedies also militates against finding that the House has standing. The notion that nullification of a legislature's power can support institutional standing, expressed in both *Raines* and *Arizona State Legislature*, comes from *Coleman v. Miller*, 307 U.S.

---

[6] More still, even if the Court were to apply the *Burwell* approach, it is far from certain that the case would survive. Count III of the House's Complaint, for instance, alleges that the Administration's planned spending violates the APA. Compl. 42. This Count claims, in part, that the Administration's actions would be "'in excess of statutory, jurisdiction, authority, or limitations, or short of statutory right.'" *Id.* at 43 (quoting APA § 706(2)(C)). Whether the Administration has fallen afoul of this provision of the APA is a "statutory and not constitutional" question that concerns "the implementation, interpretation, or execution of federal statutory law." *Burwell*, 130 F. Supp. 3d at 74. The House would thus lack standing to allege this part of Count III, as it does not "seek redress for *constitutional* violations." *Id.* (emphasis in original). The remaining counts allege both statutory and constitutional allegations, not dissimilar to the count *Burwell* dismissed. *See* Compl. 39-42.

Additionally, *Burwell* emphasized that the Administration "conceded that there was no 2014 statute appropriating new money" for its planned expenditure. 130 F. Supp. 3d at 63. The Administration made no such concession about the lack of an applicable appropriations authority here. The lack of this concession complicates any effort to distinguish an alleged "constitutional" violation from a "statutory" one. Because the Court declines to apply *Burwell*, it need not resolve this issue.

433 (1939).[7] *Id*.  There, the Kansas Legislature had rejected Congress's proposed Child Labor

Amendment to the U.S. Constitution.  *Coleman*, 307 U.S. at 435.  Later, a state senator

introduced a resolution to ratify the amendment.  *Id*. at 435-36.  The state senators' votes split

evenly, so the lieutenant governor purported to cast a tie-breaking vote for the resolution.  *Id*. at

436.  The state's house of representatives then adopted the resolution.  *Id*.

The senators who voted against, and three members of the state's house, sued in the

Kansas Supreme Court to block the resolution from taking effect.  *Id*.  After the state's high court

found that the lieutenant governor could legally cast the deciding vote, the legislators asked the

U.S. Supreme Court to review and reverse the judgment.  *Id*. at 437.

The Court held that the legislators had standing to challenge the state court's decision.  It

found that, assuming the truth of their allegations, their votes against ratifying the amendment

had "been overridden and virtually held for naught."  *Id*. at 438.  Thus, because they had a

"plain, direct and adequate interest in maintaining the effectiveness of their votes," the legislators

fell "directly within the provisions of the statute governing [the Supreme Court's] appellate

jurisdiction."  *Id*.  The plaintiffs in *Coleman*, in other words, had no other recourse but to turn to

federal court.

So too in *Arizona State Legislature*.  There, the Court found that the voter-adopted

constitutional amendment "would completely nullify any vote by the Legislature, now or in the

future."  135 S. Ct. at 2665 (cleaned up).  Because of this, the Court concluded that judicial

resolution of the legislature's claims was appropriate.  *Id*. at 2665-66.

---

[7] The House does not rely on, or even cite, *Coleman* in its application for a preliminary injunction.  *See generally* Pl.'s Mot.  But the holding and reasoning in *Coleman* animates much of the analysis in *Arizona State Legislature* and thus merits brief discussion here.

Not so in *Raines.*  There, the Court noted that dismissal "neither deprives Members of Congress an adequate remedy (since they may repeal the Act or exempt appropriations bills from its reach), nor forecloses the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act)."  *Id*. at 829.  It clarified that, "at most," *Coleman* means that "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue . . . on the ground that their votes have been completely nullified."  *Id*. at 823.  No such nullification, the Court held, had been alleged by the six legislators.  *Id*.  The Court thus concluded that there is "a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here."  *Id*. at 826.

Again, *Raines* is the more salient precedent.  The House urges that "Congress's authority under the [Appropriations] Clause is absolute for good reason."  Pl.'s Mot. at 31.  The Court agrees.  It is no doubt true that Congress "should possess the power to decide how and when any money should be" spent by the Federal Government.  *OPM v. Richmond*, 496 U.S. 414, 427 (1990).  "If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure."  *Id*.

But like the plaintiffs in *Raines*, the House retains the institutional tools necessary to remedy any harm caused to this power by the Administration's actions.  Its Members can, with a two-thirds majority, override the President's veto of the resolution voiding the National Emergency Declaration.  They did not.  It can amend appropriations laws to expressly restrict the transfer or spending of funds for a border wall under Sections 284 and 2808.  Indeed, it appears to be doing so.  *See* ECF No. 36-9 at 3-4 (describing a proposed FY 2020 appropriation stating that "none of the funds appropriated in this or any other Act for a military construction project . .

. may be obligated, expended, or used to design, construct, or carry out a project to construct a wall, barrier, fence, or road along the Southern border of the United States").  And Congress "may always exercise its power to expand recoveries" for any private parties harmed by the Administration's actions.  *OPM*, 496 U.S. at 428.

More still, the House can hold hearings on the Administration's spending decisions.  As it has recently shown, the House is more than capable of investigating conduct by the Executive.  *See, e.g.*, Alex Moe, *House Investigations of Trump and his Administration: The Full List*, NBC News (Mar. 27, 2019) (detailing "at least 50" ongoing House investigations into the President, federal agencies, and members of the Administration).  And it has other tools it can use against Officers of the Executive Branch for perceived abuses of their authority.

The House believes it has exhausted the institutional remedies at its disposal.  *See* Hr'g Tr. 14:19-15:6 (contending that "the House did exactly what the political weaponry tells it to do").  *See also* Former General Counsels' Amicus Br. at 22 ("Congress has used all of the political tools in its box"); *id.* at 23 (noting that "any new legislation here would require two-thirds majorit[ies] in both the House and Senate to overcome the President's veto, and so would be an exercise not only in redundancy but also futility").  But that the House majority may lack the votes to pass a resolution over the President's veto does not, by itself, confer standing on the legislators who would like to see the resolution enacted.  To hold otherwise would likely place "the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership[, which] does not do the system a favor."  *Windsor*, 570 U.S. at 791 (Scalia, J., dissenting).

The availability of these institutional remedies shows that there is no "complete nullification" of the House's power.  Considering the type of lawmaking at issue emphasizes this

point.  As the D.C. Circuit has noted, the "key to understanding the [Supreme Court's] treatment of *Coleman* and its use of the word nullification is its implicit recognition that a ratification vote on a constitutional amendment is an unusual situation."  *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000).  Once the amendment passed, "[i]t is not at all clear whether" the legislature "could have done anything to reverse that position."  *Id*. at 22-23.[8]

The House does not allege that it is powerless to legislate in the future.  Nor does it suggest that appropriations bills are unusual in the way the constitutional amendment in *Coleman* or the referendum in *Arizona State Legislature* might have been.  Rather, it argues that the Administration's planned expenditures violate the Appropriations Clause because the Administration is interpreting Sections 284 and 2808 incorrectly.  But like in *Raines*, the House "may repeal" or amend these laws or "exempt [future] appropriations" from the Administration's reach.  *Raines*, 521 U.S. at 829.  Thus, it has not alleged that the Administration's actions have nullified its legislative power.  And it is therefore the political tools the Constitution provides,

---

[8] *Coleman* may in fact be best understood as a case about the Supreme Court's jurisdiction to review the decisions of state courts rather than to the ability of the Judiciary to hear suits between the co-equal political branches of the Federal Government.  Recall that the plaintiffs first sued in state court before seeking to invoke the Supreme Court's appellate jurisdiction.  *See Coleman*, 307 U.S. at 446.  The Court did not suggest that the plaintiffs would have had jurisdiction to bring their claims directly to federal court.  Indeed, as Justice Frankfurter observed, "[c]learly a Kansan legislator would have no standing had he brought suit in a federal court."  *Id*. at 465 (Frankfurter, J., dissenting).  No Justice disagreed with him.

When it issued, scholars and commentators viewed *Coleman* as part of a then-ongoing debate over the scope of the Court's ability to review the decisions on federal law made by state courts.  *See, e.g.*, James Wm. Moore *et al.*, *The Supreme Court: 1938 Term II. Rule-Making, Jurisdiction and Administrative Review*, 26 Va. L. Rev. 679, 706-07 (1940) (suggesting that *Coleman* was "consistent with earlier cases" because it held that the legislators could "invoke the appellate jurisdiction of the Supreme Court, although they would not have had standing to sue initially in the federal courts"); *see also Raines*, 521 U.S. at 832 n.3 (Souter, J., concurring).  That debate is over, and the "same standing requirements" now apply "both at trial and on appeal to any Article III court."  Tara L. Grove, *Government Standing and the Fallacy of Institutional Injury*, forthcoming 167 U. Pa. L. Rev. ___ at *40 (2019).  The basis on which the *Coleman* legislators had standing then does not supply the House a basis for asserting standing today.

20

rather than the federal courts, to which the House must turn to combat the Administration's planned spending.[9]

**3.**

Lastly, *Raines* and *Arizona State Legislature* caution federal courts to consider the underlying separation-of-powers implications of finding standing when one political branch of the Federal Government sues another. *See Ariz. State Leg.*, 135 S. Ct. 2665 n.12; *Raines*, 521 U.S. at 820 ("the law of Art. III standing is built on a single idea—the separation of powers"). Respect for the doctrine of separation of powers "requires the Judicial Branch to exercise restraint in deciding constitutional issues by resolving those implicating the powers of the three branches of Government as a 'last resort.'" *Raines*, 521 U.S. at 833 (Souter, J., concurring).

Were it to rule on the merits of this case, the Court would not be deciding constitutional issues as a "last resort." *Id.* Instead, intervening in a contest between the House and the President over the border wall would entangle the Court "in a power contest nearly at the height of its political tension" and would "risk damaging the public confidence that is vital to the functioning of the Judicial Branch." *Id.*

As discussed above, Congress has several political arrows in its quiver to counter perceived threats to its sphere of power. These tools show that this lawsuit is not a last resort for the House. And this fact is also exemplified by the many other cases across the country challenging the Administration's planned construction of the border wall. *Cf. Raines*, 521 U.S.

---

[9] One other distinction between this case and *Arizona State Legislature* merits mention. Here, the House's claims are not being brought by both chambers of the legislature. While the House is correct that its allegations are less disparate and diluted than those brought by the *Raines* plaintiffs, these allegations are also less concrete and particularized than those brought by the united legislature in *Arizona State Legislature*.

at 534 (Souter, J., concurring) ("The virtue of waiting for a private suit is only confirmed by the certainty that another suit can come to us.").

In some of these lawsuits, including two before this Court, private plaintiffs have disputed the legality of the President's declaration of a national emergency and the Administration's ability to use Sections 284 and 2808 to build the wall. *See Ctr. for Biological Diversity v. Trump*, No. 19-cv-408 (D.D.C. 2019); *Rio Grande Int'l Study Ctr. v. Trump*, No. 19-cv-720 (D.D.C. 2019). The plaintiffs in both cases specifically allege that the Administration's planned expenditures violate the Appropriations Clause. *See, e.g.*, Compl., No. 19-cv-720, ECF No. 1 at 38; Compl., No. 19-cv-408, ECF No. 1 at 35-36. The House is free to seek leave to file briefs as *amicus curiae* in these suits.

In fact, it has done so in a related matter in the Northern District of California. *See* Br. of Amicus Curiae, *Sierra Club v. Trump* ("House *Sierra Club* Br."), No. 4:19-cv-892 (N.D. Cal. 2019), ECF No. 47. There, two citizens' groups sought a preliminary injunction against the Administration to prevent it from using the Sections 284 and 2808 funds to build the wall. *See Sierra Club v. Trump*, No. 4:19-cv-892, 2019 WL 2247689 (N.D. Cal. May 24, 2019). As *amicus curiae*, the House too, urged the court to enjoin the Administration, raising many of the contentions it did before this Court. *See* House *Sierra Club* Br. at 3-17. The *Sierra Club* court granted the citizens' groups a partial injunction and enjoined the Administration "from taking any action to construct a border barrier" along the southern border using Section 284 funds. *Sierra Club*, 2019 WL 2247689 at *30.

An old maxim in politics holds that, "Where you stand depends on where you sit." *See* Rufus E. Miles, Jr., *The Origin and Meaning of Miles' Law*, 38 Pub. Admin. Rev. 399 (1978). At law too, whether a plaintiff has standing often depends on where he sits. A seat in Congress

comes with many prerogatives, but legal standing to superintend the execution of laws is not among them.

As Chief Justice Marshall explained, the "province of the [C]ourt is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). The "irreplaceable value" of the Judiciary's power "lies in the protection it has afforded the constitutional rights and liberties of *individual citizens and minority groups* against oppressive or discriminatory government action." *Raines*, 521 U.S. at 829 (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring)) (emphasis added). It is "this role, not some amorphous, general supervision of the operations of government," that permits the "countermajoritarian implications" of judicial review to coexist with the "democratic principles upon which" the Founders built the Federal Government. *Id*. Mindful of these admonitions, the Court declines to take sides in this fight between the House and the President.[10]

---

[10]  Based on the D.C. Circuit's reading of *Raines*, the Court includes this separation-of-powers discussion as a part of its standing analysis. *See Chenoweth v. Clinton,* 181 F.3d 112, 116 (D.C. Cir. 1999) (suggesting that *Raines* may "require us to merge our separation of powers and standing analyses"). Before *Raines*, the D.C. Circuit had upheld a district court's dismissal on equitable grounds of an inter-branch controversy that raised significant separation-of-powers concerns. *See Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984).

The House urges the Court not to apply this "doctrine of equitable discretion," as it has rarely been used in recent years. Pl.'s Reply at 22. But the Circuit has not found that *Raines* formally overruled the *Moore* approach. *See Chenoweth*, 181 F.3d at 116 ("*Raines* notwithstanding, *Moore* . . . may remain good law, in part, but not in any way that is helpful to the plaintiff Representatives. Whatever *Moore* gives the Representatives under the rubric of standing, it takes away as a matter of equitable discretion."). Here, as in *Chenoweth*, the parties' dispute is "fully susceptible to political resolution" on either jurisdictional or prudential grounds. *Id*.

## IV.

This case presents a close question about the appropriate role of the Judiciary in resolving disputes between the other two branches of the Federal Government.  To be clear, the Court does not imply that Congress may never sue the Executive to protect its powers.  But considering the House's burden to establish it has standing, the lack of any binding precedent showing that it does, and the teachings of *Raines* and *Arizona State Legislature*, the Court cannot assume jurisdiction to proceed to the merits.  For these reasons, it will deny the House's motion.  A separate Order accompanies this Opinion.

Dated: June 3, 2019

_____
TREVOR N. McFADDEN, U.S.D.J.